# EXHIBIT B

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF LOUISIANA
 3
 4
 5 JOHNNIE HARDY, JR.
                          CIVIL ACTION
 6
 7 VERSUS              NO. 3:20-CV-00565
 8
                      SECTION "JWD-RLB"
 9 SAVAGE SERVICES
   CORPORATION, ET AL.
10
11
12
13
14
15      Deposition of JOHNNIE ROY HARDY, JR.,
16 5355 South Park Drive, Apartment 5208,
17 Lake Charles, Louisiana 70607, taken in the
18 offices of Arnold & Itkin, 835 Louisiana
19 Avenue, Baton Rouge, Louisiana 70802,
20 reported on Wednesday, March 31st, 2021,
21 beginning at 10:08 a.m.
22
23
24
25
```

**Page 2**

```
 1 APPEARANCES:
 2
 3
       ARNOLD & ITKIN
 4     (BY:  TRENT SHELTON, ESQUIRE)
       835 LOUISIANA AVENUE
 5     BATON ROUGE, LOUISIANA 70802
       (713) 222-3800
 6     tshelton@arnolditkin.com
       jaiteam@arnolditkin.com
 7
            ATTORNEYS FOR JOHNNIE HARDY, JR.
 8
 9
   LUGENBUHL, WHEATON, PECK, RANKIN &
10 HUBBARD
       (BY:  TODD G. CRAWFORD, ESQUIRE)
11     PAN-AMERICAN LIFE CENTER
       601 POYDRAS STREET, SUITE 2775
12     NEW ORLEANS, LOUISIANA 70130
       (504) 568-1990
13     tcrawford@lawla.com
14         ATTORNEYS FOR SAVAGE SERVICES
       CORPORATION, ET AL.
15
16
   McLEOD, ALEXANDER, POWEL & APPFEL, P.C.
17     (BY:  DOUGLAS W. POOLE, ESQUIRE)
       802 ROSENBERG
18     GALVESTON, TEXAS 77550
       (409) 705-2016
19     dwpoole@mapalaw.com
20         ATTORNEYS FOR SASOL CHEMICALS
       (USA), LLC
21
22
   REPORTED BY:
23
       DIANE TEWIS CLARK, RPR, RMR, CRR
24     CERTIFIED COURT REPORTER
       LOUISIANA CERTIFICATE #73005
25     ARKANSAS CERTIFICATE #672
```

**Page 3**

```
 1               *   *   *
 2          EXAMINATION INDEX
 3                           Page
 4 EXAMINATION BY MR. CRAWFORD ...........6
 5 EXAMINATION BY MR. POOLE ............221
 6 EXAMINATION BY MR. CRAWFORD .........248
 7 EXAMINATION BY MR. POOLE ............255
 8
 9               *   *   *
10          INDEX OF EXHIBITS
11                           Page
12
13 Exhibit No. 1 .......................90
14    Copy of Deponent's Driver's License
15 Exhibit No. 2 .......................91
16    Photograph
17 Exhibit No. 3 .......................92
18    Photograph
19 Exhibit No. 4 ......................100
20    Ceridian paystubs, Johnnie Hardy
      000020 through Johnnie Hardy 000022
21
22 Exhibit No. 5 ......................129
23    Statement
24 Exhibit No. 6 ......................130
25    Photographs
```

**Page 4**

```
 1 Exhibit No. 7 ......................155
 2    Photographs
 3 Exhibit No. 8 ......................156
 4    Photographs
 5 Exhibit No. 9 ......................169
 6    Photographs
 7 Exhibit No. 10 .....................184
 8    Letter to Johnnie Hardy from Ed
      Lee, dated May 14, 2020, Johnnie
 9    Hardy 000019
10 Exhibit No. 11 .....................209
11    Raymond Gaudet Statement,Trigg
      White statement, Sulphur Police
12    Department Statement, 000305
      through 000307
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

```
 1           S T I P U L A T I O N
 2           It is stipulated and agreed by and
 3   between counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   is hereby being taken pursuant to the
 6   Federal Rules of Civil Procedure;
 7
 8           All formalities, including the
 9   reading and signing of the transcript by the
10   witness, are hereby waived;
11
12           All objections, except those as to
13   the form of the question and the
14   responsiveness of the answer, are hereby
15   reserved until such time as this deposition,
16   or any part thereof, may be used or sought
17   to be used in evidence.
18
19                   * * *
20
21           DIANE TEWIS CLARK, RPR, RMR, CRR,
22   Certified Court Reporter, State of
23   Louisiana, officiated in administering the
24   oath to the witness.
25
```

Page 6

```
 1                   * * *
 2           JOHNNIE ROY HARDY, JR.,
 3   after having been first duly sworn by the
 4   above-mentioned court reporter, did testify
 5   as follows:
 6   EXAMINATION BY MR. CRAWFORD:
 7       Q.   Mr. Hardy, my name's Todd
 8   Crawford, I represent Savage -- all the
 9   Savage defendants in connection with this
10   matter.  We're here to give -- to take your
11   deposition today.  Have you ever given a
12   deposition before?
13       A.   Yes, I have.
14       Q.   In what case was that?
15       A.   I had an accident, a vehicle
16   accident.
17       Q.   A motor vehicle accident?
18       A.   Uh-huh (indicating affirmatively).
19       Q.   Is that the one where you hurt
20   your foot?
21       A.   Yes.
22       Q.   And filed suit in -- I think it's
23   in Lake Charles?
24       A.   Yes, sir.
25       Q.   And around 2013?
```

Page 7

```
 1       A.   Yes, sir.
 2       Q.   All right.  Any other occasion
 3   where you've given a deposition?
 4       A.   That's it that I know of.
 5       Q.   Okay.  All right.  So we talked a
 6   little bit off the record beforehand.  If we
 7   just have a couple of ground rules, if you
 8   will let me finish asking the question
 9   before you try to answer, I will do my best
10   to let you finish your answer before I try
11   to ask you another question.
12       A.   Okay.
13       Q.   That will keep us in good stead
14   with our friend the court reporter, because
15   she can only take one of us down at a time.
16   Okay?
17       A.   Okay.
18       Q.   Plus if you, you know, later on,
19   you're trying to read the deposition, you
20   got half my question and then part of your
21   answer and the rest of my question and the
22   rest of your answer, it gets difficult to
23   read.  Okay?
24       A.   Okay.
25       Q.   You -- if I could get you to avoid
```

Page 8

```
 1   the use of uh-huhs (indicating
 2   affirmatively) and uh-uhs (indicating
 3   negatively) an uh-huhs (indicating
 4   affirmatively), and uh-uhs (indicating
 5   negatively), and other grunts and noises
 6   that we tend to make even though we may
 7   understand one another today, it's very
 8   difficult for the court reporter to write
 9   those things down accurately.  She has to
10   put down something like indicating
11   affirmatively, you know.  And it's a lot
12   easier for her to write yes or no, or words
13   to that effect.  So try and do that for me
14   if you can.
15       A.   Okay.
16       Q.   Occasionally, we slip into our
17   habits of saying uh-huhs (indicating
18   affirmatively) and uh-uhs (indicating
19   negatively), you know, or, for example, you
20   might be nodding or shaking the head and I
21   understand it, but I got to have it on the
22   record.
23       A.   Right.
24       Q.   So I do this, I just -- this is a
25   little gesture that I make that says I need
```



Page 9

1 it to come out of your mouth, okay?  So if
2 you see me doing this, I'm just saying I
3 understand you, but say something, yeah,
4 okay (indicating)?
5     A.   Okay.
6     Q.   If I ask a bad question, and I
7 will tell you that I do not always ask
8 perfect questions, but if I ask a question
9 that you don't understand or I use a word
10 that you're not familiar with, anything like
11 that, let me know, I will be happy to
12 rephrase the question.  If you don't tell me
13 you don't understand the question, then
14 we're going for assume you understood the
15 question, you're doing your best to answer,
16 is that fair?
17     A.   Fair.
18     Q.   That way I don't have to ask you
19 every time, you understood that last
20 question, right?  Yes, it's kind of a --
21 everybody knows, all right?  Occasionally,
22 we'll have a double negative.  I will ask
23 you if you didn't do something and you will
24 say no, and I don't know if you're agreeing
25 with me or not.

Page 10

1       So if I follow up on something
2 like that, I'm not trying to beat you up,
3 I'm just trying to make sure your testimony
4 is clear as to what you're trying to say,
5 okay?
6     A.   All right.
7     Q.   And then, finally, if you'll help
8 me, try to avoid the use of pronouns as much
9 as possible -- he, they, she, it, we --
10 because almost immediately I follow up with
11 who is he, who is she, you know?
12     A.   Interesting.
13     Q.   Yeah, try to use somebody's name
14 if possible.  And, again, if it's -- you
15 know, it's not a test.  You know, how many
16 times do you mess up and use a pronoun.  I'm
17 just trying to tell you we're going to cut
18 down on those questions, all right?
19       If you need to take a break at any
20 time, I'm sure we'll probably be together
21 for several hours and Mr. Poole is going to
22 have some questions for you separately.  He
23 represents Sasol, okay?
24     A.   Okay.
25     Q.   And so, you know, if you need to

Page 11

1 take a break at some time, the only thing we
2 ask, if there's a pending question, we want
3 to answer that question before we take a
4 break.  Sometimes we're in the middle of a
5 series of questions and we want to finish
6 that series before we take a break, okay?
7     A.   Okay.
8     Q.   All right.  Again, you know, we
9 don't want you to sit here and be
10 uncomfortable if you need to go to the
11 restroom or get some more coffee or whatever
12 the case may be.  Are you a smoker or a dip
13 or anything like that?
14     A.   Uh-uh (indicating negatively).
15 No.
16     Q.   Good.  Sometimes we -- listen, if
17 a man wants to smoke, I let him go smoke,
18 right?  Because I don't want him to be upset
19 with me, because his body is craving some
20 nicotine.  So I'm glad we don't have that as
21 an issue today.
22       All right, what I like to do --
23 first of all, could you state your name for
24 the record?
25     A.   Johnnie Roy Hardy, Jr.

Page 12

1     Q.   And, Mr. Hardy, you understand
2 you're under oath, correct?
3     A.   Yes.
4     Q.   And that's the same as though you
5 were sworn to tell the truth in a court of
6 law, you understand that?
7     A.   Yes.
8     Q.   And your testimony today is
9 subject to perjury, you understand that?
10     A.   Yes.
11     Q.   Okay.  What I want to start with,
12 if I can, is just a list of elements or
13 injuries that you have or have had since
14 this accident that you attribute to the
15 accident.
16     A.   Right now, it's pain.  Started off
17 with pain.  It's my -- the back of my head,
18 my neck, my upper shoulder and my shoulder.
19 Should I say my middle -- I'm sorry, my
20 upper back.  I'm sorry.
21     Q.   Okay.
22     A.   And my shoulder.
23     Q.   Now, you indicated your right
24 shoulder?
25     A.   Right.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
13–16

Page 13

1    Q.   Back of head, neck, right upper
2 shoulder and upper back?
3    A.   Right.
4    Q.   Okay.  Anything other than those
5 areas?
6    A.   And I have anxiety.
7    Q.   Okay.
8    A.   So I've got pain in the back of
9 your head, neck, right upper shoulder, upper
10 back and anxiety.
11    Q.   Anything else?
12    A.   That's it.
13    Q.   Okay.  Now, have you ever suffered
14 from anxiety before May of 2020?
15    A.   Yes.
16    Q.   And where was that?
17    A.   It was at my job.  2017, when they
18 were trying to fire me.
19    Q.   And was that with the Sulphur Fire
20 Department?
21    A.   Correct.
22    Q.   And I do have some of those
23 records, and we'll talk about that in a
24 minute.  I had seen indication that you were
25 placed on administrative leave for a period

Page 14

1 of time?
2    A.   Yes, sir.
3    Q.   Okay.  And was that -- is that
4 when -- is that the general timeframe when
5 they were trying to fire you?
6    A.   Correct.
7    Q.   And I also had seen -- I think
8 it's in some of your discovery responses
9 where you went to Memorial Hospital in
10 Lake Charles for that, is that right?
11    A.   Correct.
12    Q.   How many days were you there?
13    A.   I would say approximately a week.
14    Q.   Okay.
15    A.   If I'm not mistaken, I think it's
16 a week.
17    Q.   And was that -- you think that was
18 related to the issues that were happening
19 with your job at the Sulphur Fire
20 Department?
21    A.   Exactly.
22    Q.   Okay.  So if that happened around
23 about December of '17, when do you think
24 that hospitalization happened?
25    A.   I'm not sure.

Page 15

1    Q.   Okay.  All right.  I have some
2 records, we'll -- we'll refer to that.
3 Also, I meant to tell you when we were going
4 through the kind of how to give a
5 deposition, your answer is a perfect
6 example.  If you don't know the answer, just
7 tell me, okay?
8    A.   Okay.
9    Q.   And I will tell you if everything
10 that you know is the top of this table I
11 have to get to the edges to figure out where
12 your knowledge stops, right?
13    A.   Got you.
14    Q.   So sometimes it may seem like I
15 just answered that question.  I'm trying to
16 make sure I know the full content of what
17 you know, understand?
18    A.   Understood.
19    Q.   So sometimes knowing what you
20 don't know is important as well.  Okay, and
21 by the same token, if you don't remember
22 something, you can tell me that as well.
23    A.   Okay.
24    Q.   All right?  All right.  So we were
25 talking about the issues that you're having.

Page 16

1 Other than the occasion in approximately
2 2017, when you were having the episode of
3 anxiety while you were going through the
4 issues with the Sulphur Fire Department,
5 have you had anxiety on any other occasion?
6    A.   Just this one here, for this
7 accident.
8    Q.   All right.  So the accident that
9 we're here for is May 8th of 2020, is that
10 right?
11    A.   Correct.
12    Q.   Okay.  I just want to make sure I
13 use that date in my -- in my questions.
14    A.   You want me to tell you the time,
15 too?
16    Q.   No.  We'll talk about that in a
17 minute.
18    A.   Okay.
19    Q.   We're going to get to that.  My
20 questions get too long if I start giving the
21 time.  Before May 8th, 2020, had you ever
22 had any pain in the back of your head?
23    A.   No.
24    Q.   Before May 8th, 2020, had you ever
25 had any pain in your neck?



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          17–20

Page 17

1    A.   No.
2    Q.   Before May 8th, 2020, had you had
3 any pain in your right upper shoulder?
4    A.   I had -- it was -- I went through
5 therapy.  The doctor released me and I was
6 okay.  So, no, I did not.
7    Q.   Okay.  So I -- is it your right
8 shoulder that you had rotator cuff repair
9 for?
10   A.   Correct.
11   Q.   And where did you have the
12 therapy?
13   A.   In Lake Charles, Dr. Cascio.
14   Q.   Did Dr. Cascio perform the
15 surgery?
16   A.   Yes, he did.
17   Q.   And then, do you know the name of
18 the physical therapy group where you went?
19   A.   It's on McNeese Street, it's like
20 a sport deal.  I can't recall the name of
21 it, but I know it was on McNeese -- McNeese
22 Street in Lake Charles.
23   Q.   Okay.  And so other than this
24 incident with the rotator cuff repair, is
25 that -- when is that approximately?

Page 18

1    A.   With the repair, for the surgery I
2 had?
3    A.   Yes.
4    A.   Are you saying?
5    Q.   Yes.  When was the surgery?
6    A.   It was on the 7th -- I'm  wanting
7 to say the 16th, 2016, if I'm not mistaken.
8    Q.   Okay.  And I think I may have seen
9 reference to surgery for rotator cuff repair
10 in 2015?  I'm not --
11   A.   Somewhere up in --
12   Q.   Let's put 2016 question mark, is
13 that fair?
14   A.   Okay, that's fine.
15   Q.   All right?  All right?  Because
16 you're not 100 percent, are you?  And I'm
17 not either.
18   A.   Right.
19   Q.   It's your life, not mine.
20   A.   Right, right, you can put a
21 question mark.
22   Q.   All right.  Okay.  And then how
23 long were you out of work for that rotator
24 cuff?
25   A.   Eleven-months.

Page 19

1    Q.   Okay.  Before May 8th, 2020, did
2 you ever have any pain in your upper back?
3    A.   No, I did not.
4    Q.   So in this motor vehicle accident
5 that you had in 2013, you didn't hurt your
6 head, neck, shoulder or upper back?
7    A.   No.
8    Q.   And you didn't have any anxiety
9 from that?
10   A.   No, not from that.
11   Q.   Okay.  So I'll try not to make
12 this too much of a test, right?  I've got
13 some of your discovery responses, a couple
14 of them, actually.  So I know you gave your
15 current address as an apartment at
16 5355 South Park Drive, number 5208, correct?
17   A.   Uh-huh (indicating affirmatively).
18 Yes.
19   Q.   And that's in Lake Charles?
20   A.   Correct.
21   Q.   Okay.  And I -- when we had sent
22 some discovery, we had an address given to
23 us, 4101 5th Avenue, Lake Charles.
24   A.   That's my daughter's apartment.
25   Q.   That's your daughter's apartment?

Page 20

1    A.   Yes.
2    Q.   Okay.  So let me back up.  And I
3 think you told us you just moved to this
4 apartment at the South Park Drive address,
5 correct?
6    A.   Yes.
7    Q.   And that was -- did you say the
8 19th?
9    A.   The 19th of May -- February, of
10 February.
11   Q.   And so who lives with you at the
12 South Park Drive address?
13   A.   No one.
14   Q.   You're by yourself?
15   A.   Yes.
16   Q.   And I had seen previously, you
17 were married to Sandra Marie Guidry?
18   A.   Sondra.
19   Q.   S-O-N?
20   A.   S-O-N.
21   Q.   They spelled it wrong, but it's
22 Sondra, okay.
23   A.   Yes.
24   Q.   I can't tell you -- that's fine.
25 Are you and Sondra separated?



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          21–24

Page 21

1    A.  Separated.
2    Q.  Okay.  And is this a -- did you
3 all first separate when you moved to that
4 location at South Park or had you separated
5 previously?
6    A.  Separated previously.
7    Q.  Okay.  So let me just ask you,
8 cause I was just trying to get to some basic
9 addresses.
10       Did you live anywhere other than
11 4101 5th Avenue before you moved to the
12 South Park address?
13   A.  Yes.  I lived with my mom at 945
14 Beulah, B-E-U-L-A-H.  Yes, Beulah Street in
15 Sulphur.
16   Q.  And I think I had seen that
17 address on your driver's license?
18   A.  Correct.
19   Q.  Okay.  And that's your mother's
20 house?
21   A.  Correct.
22   Q.  Okay.  So what's your mother's
23 name?
24   A.  Barbara Hardy.
25   Q.  And who else lives at the Beulah

Page 22

1 address other than your mother?
2    A.  No one lives there now.
3    Q.  Okay.  And you were living
4 there -- does she live there now?
5    A.  No.  She's in a nursing home.
6    Q.  I see.
7    A.  Because the house was damaged
8 during the hurricane.  And then she can't --
9 no one could take care of her, so they did
10 put her in a nursing home.
11   Q.  How old is Miss Barbara?
12   A.  She should be 82.
13   Q.  So that house is currently not
14 habitable?
15   A.  Right.
16   Q.  Were you living in that house
17 during Hurricane Laura?
18   A.  No, I was not.
19   Q.  Okay.  Well, just try to help me
20 as best you can.
21   A.  I was with my daughter.
22   Q.  Let me get my question out.
23   A.  Oh.
24   Q.  I understand that, but let me
25 just -- I'm trying to figure out the time

Page 23

1 line of where you lived when.  Okay?  Go
2 ahead.
3    A.  That's the issue right there of
4 why they tried to fire me as well.  They
5 tried to get me, saying, well, I don't live
6 at 945 Beulah, so that I've been staying
7 with my mom for the longest at 945 Beulah.
8    Q.  I see.  Okay.  I'm just trying to
9 compact it here in this last year or so.
10   A.  Okay.
11   Q.  For the moment.
12   A.  Okay.  When I was with --
13   Q.  I'm not going to fire you for
14 living at 945 Beulah or not, but, so okay --
15 I know how long you've been with the -- at
16 the South Park address.  Immediately before
17 South Park you were at the Beulah address?
18   A.  No, no, no.  I was with my
19 daughter.
20   Q.  With the dau -- at 4101 5th
21 Avenue?
22   A.  Right, correct.
23   Q.  Okay.  And what's your daughter's
24 name?
25   A.  Megan Hardy.

Page 24

1    Q.  And who else lived at 4105 5th
2 Avenue other than Megan?
3    A.  Her son.
4    Q.  What's her -- what's his name?
5    A.  Bryson, he's three.
6    Q.  Anyone other than Bryson and Megan
7 at that address?
8    A.  No.
9    Q.  Okay.  I started off trying to
10 figure out when you separated from Sondra.
11 I'm still not clear.  When did you and
12 Sondra first separate?
13   A.  It was around that time of the
14 incident which was going on with my job,
15 2017.
16   Q.  Okay.  Are you telling me that you
17 and Sondra have not lived together as man
18 and wife since 2017?
19   A.  Exactly.
20   Q.  Okay.  All right.  And do you know
21 where Sondra lives?
22   A.  She lives in Texas right now.
23   Q.  All right.  I'm still trying to
24 get the addresses and where you lived when.
25 At the time of the accident, when you were



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
25–28

Page 25

1 working for Savage --
2    A.   Before Sasol, before I worked for
3 Savage, I was staying at 945 Beulah Street.
4    Q.   Okay.
5    A.   That's the address.
6    Q.   Right.
7    A.   And then when the -- I stayed
8 there for a while.  I got evicted.  My
9 sister evicted me out of my own parent's
10 house under illegal documents and I had to
11 leave out of -- leave from 945 Beulah Street
12 and I went and lived with my daughter.
13    Q.   Okay.  So I'm assuming there was
14 some kind of eviction proceeding in court?
15    A.   Uh-huh (indicating affirmatively).
16    Q.   (Gesturing).  Yes, sir.
17    A.   Yes, sir.
18    Q.   No problem.  Would that have been
19 in the Sulphur area?
20    A.   Sulphur.  Judge Charles Schrumpf.
21    MR. POOLE:
22        Schrumpf?
23    THE WITNESS:
24        Schrumpf, uh-huh (indicating
25 affirmatively).

Page 26

1    MR. POOLE:
2        S-H-R-U-M-P-H?
3    THE WITNESS:
4        Yeah, something like that,
5 S-T-U-M-P-H, something like that.
6 EXAMINATION BY MR. CRAWFORD:
7    Q.   We'll figure that out.  Is that --
8 is that in Sulphur City Court, do you know?
9    A.   Correct, yes.
10    Q.   Okay.  And at the time you were
11 living -- when you got evicted, was your
12 mother still living there or had --
13    A.   Yes.
14    Q.   Okay.
15    A.   She was still there.
16    Q.   All right.  And so give me -- just
17 give me the month, if you can?
18    A.   November.
19    Q.   Of '20?
20    A.   Of 2019.
21    Q.   2019, okay.  All right.  So let me
22 say what I think you said back to you and
23 you tell me if I got it right.
24    A.   Okay.
25    Q.   You were more or less living with

Page 27

1 your mother at 945 Beulah Street up until
2 November of 2019 when you got evicted?
3    A.   Correct.
4    Q.   And then after you got evicted,
5 you moved in with your daughter Megan, at
6 the 4101 5th Avenue address?
7    A.   Correct.
8    Q.   And then in February of 2021 --
9    A.   19, February 19.
10    Q.   About a month or so ago, you moved
11 into the apartment -- on -- is it
12 South Park?
13    A.   South Park Drive.
14    Q.   All right.  And that's where you
15 live right now?
16    A.   Correct.
17    Q.   Okay.  Do you have any contact
18 information for Sondra?
19    A.   No, I do not.
20    Q.   Do you know what town she's living
21 in, in Texas?
22    A.   I'm not sure.  I'm not sure what
23 the town is.  I'm not sure what the town --
24 I'm not sure.
25    Q.   Do you have any -- let me ask you

Page 28

1 this way:  Can you give me just a basic
2 geography north, south, east, west?
3    A.   North.
4    Q.   North.  Is it up by --
5    A.   North of Houston.
6    Q.   North of Houston?
7    A.   Yes.
8    Q.   Okay.  But the name of the town,
9 if I -- and again remember, I'm trying to
10 find out what you know, right?
11    A.   Okay.
12    Q.   Is it, to your understanding, is
13 it within approximately an hour's drive of
14 Houston?
15    A.   It's 30 minutes north of Houston.
16    Q.   Okay.  Do you have any children
17 other than Megan?
18    A.   Yes, Johnnie, III.
19    Q.   All right.  What do you call
20 Johnnie, III?
21    A.   I call him JT.
22    Q.   JT, all right.  Johnnie, III, that
23 makes sense.  I got it.  And where is JT?
24    A.   He's with his mother.
25    Q.   Okay.  Do you know -- have contact



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
29–32

Page 29

1 information for JT?
2    A.   No.
3    Q.   You don't -- you don't have a cell
4 phone number?
5    A.   Oh, I got his cell phone number.
6    Q.   Can we have that?
7    A.   It's in my cell phone in my truck.
8    Q.   Okay.  We'll take a break in a
9 little while and we may ask you to help us
10 with that, if only to help us find Sondra,
11 if nothing else.  The same question for
12 Megan, does she, number 1, still live at
13 4101 5th Avenue, so far as you know?
14    A.   Yes.
15    Q.   And you have her cell phones on
16 your cell phone?
17    A.   Yes, yes.
18    Q.   Okay.  We'll do that for Megan and
19 JT.  Other than Bryson, do you have any
20 other grandchildren?
21    A.   No, that's it.  I hope not.
22    MR. CRAWFORD:
23       Off the record.
24       (Whereupon, an off-the-record
25 discussion was held.)

Page 30

1 EXAMINATION BY MR. CRAWFORD:
2    Q.   Let's keep going if we can.  Have
3 you and Sondra ever filed for divorce?
4    A.   Yes.
5    Q.   And where did you file?
6    A.   Lake Charles City Court.
7    Q.   Okay.  Are you and she officially
8 divorced or no?
9    A.   We're not, not officially
10 divorced.
11    Q.   Which one of you filed, if you
12 know?  You filed?
13    A.   I did.
14    Q.   And it just -- it just got filed
15 and didn't finish up?
16    A.   No.
17    Q.   Okay.  Do you and Sondra have any
18 plans to reconcile?
19    A.   No.  I kind of say that with an
20 attitude.
21    Q.   Understood.  Let the record so
22 reflect.  The witness' voice got increased,
23 an emphatic no.
24       So when the accident happened on
25 May 8th, you went home that night to your

Page 31

1 daughter's house?
2    A.   Correct.
3    Q.   Okay.  And as I appreciate your
4 testimony, essentially the entire time you
5 worked for Savage, you were living with your
6 daughter?
7    A.   Yes, sir.
8    Q.   Okay.  All right.  Okay.  So have
9 you been married to anyone other than
10 Sondra?
11    A.   No.
12    Q.   Have you lived in a romantic way
13 with anyone other than Sondra?
14    A.   No.
15    Q.   Okay.  Is there -- have either of
16 you ever called the police for any type of
17 domestic incident?
18    A.   Yes.
19    Q.   Who was that?
20    A.   Sheriff's Department.
21    Q.   The Calcasieu Sheriff's
22 Department?
23    A.   Correct.
24    Q.   And when was that?
25    A.   Say 2013.  Approximately 2013.

Page 32

1    Q.   Okay.  And who called, was it you
2 calling or her calling?
3    A.   I did.
4    Q.   And just very generally what was
5 the nature of the call?
6    A.   Well, we were disagreeing.  I
7 sprayed mace on her.
8    Q.   Oh, I see.  Okay.  Any time other
9 than that occasion in approximately 2013,
10 when you called the Sheriff's Department,
11 have you had any other marital --
12    A.   No.
13    Q.   -- you know, calls for any kind of
14 domestic calls for somebody?
15    A.   No.  We learned from that.
16    Q.   Not a good experience?
17    A.   No.
18    Q.   What happened when the Sheriff's
19 Department showed up?
20    A.   I was arrested.
21    Q.   And did you spend a night in jail?
22    A.   Six hours.
23    Q.   Is that at the Calcasieu Parish
24 jail?
25    A.   Correct.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
33–36

Page 33

1    Q.   And how did you get out?
2    A.   Bond out.
3    Q.   By who?
4    A.   I think it's -- I forgot the
5  bond's name.  It was across the street.
6    Q.   Oh, I'm sorry, who was the -- who
7  was the family member or friend who came and
8  helped you get bonded out?
9    A.   My daughter.
10   Q.   Megan?
11   A.   Yes.
12   Q.   It's just Megan and JT?
13   A.   Right.  Say the names --
14   Q.   What's that?
15   A.   I got to say the names, not he,
16  she or pronouns.
17   Q.   Yeah, see, I try to say it, you
18  know, makes it easy for us.  Like.
19        Now, I had seen, probably just be
20  easier to ask you, you graduated from high
21  school?
22   A.   Yes.
23   Q.   Which high school?
24   A.   Sulphur High.
25   Q.   And what year did you graduate?

Page 34

1    A.   1982.
2    Q.   Do you know Brian Scofield?
3    A.   Yes, I did -- yes, I do.
4        How do you know Brian?
5    Q.   Man, this ain't your deposition.
6    A.   Huh?
7    Q.   This ain't your deposition.
8    A.   (Laughing).
9    Q.   No, he was my law partner before
10  when I was in Lafayette.
11   A.   Okay.
12   Q.   I know Brian pretty well.  You
13  probably know more stories than I do.
14        All right.  So did -- after high
15  school, did you have any further formal
16  education?
17   A.   No.
18   Q.   Okay.  Now, I had seen reference
19  in some of your discovery responses, and
20  don't ask me to tell you which one because I
21  don't have it committed to memory, but
22  something about some training that you had
23  while you were working at the fire
24  department?
25   A.   Yeah.  I went to Texas A&M for a

Page 35

1  week.  We took EMT classes, but that was so
2  long, I just dropped out of the EMT.  We
3  didn't want to be an EMT.  We took hazmat
4  techs.
5    Q.   Hazmat?
6    A.   Tech.
7    Q.   Tech, like --
8    A.   T-E-C-T -- T-E-C-H.
9    Q.   So hazmat tech, okay.
10   A.   Took that training, first
11  responder, I mean, CPR.
12   Q.   All right.  Tell me this, I know
13  you were at the -- you were at the fire
14  department for about 20 years, is that
15  right?
16   A.   Exactly.
17   Q.   When did the administrative leave
18  issues happen in relation to when you
19  retired?  So let me -- I know when the thing
20  happened, I'm not trying to make that a
21  secret.  I'm trying to say how soon after
22  that happened did you retire?
23   A.   I retired in 2019, May 23rd.
24   Q.   Okay.
25   A.   And that administrative leave,

Page 36

1  that happened -- that was with pay, that was
2  in 2017, if I'm not mistaken.  Let me --
3    Q.   I've got some documents.
4    A.   2017.
5    Q.   I've got some documents here from
6  the -- part of your personnel file.
7    A.   From what?
8    Q.   From the Sulphur Fire Department.
9  I'm just -- I'm not trying to make you not
10  have to guess is what I'm trying to do.
11   A.   Okay.
12   Q.   Okay.  I'm going to come back to
13  this other in a minute, and then it then
14  I'll -- it will make sense to you in a
15  second.  It looks like the administrative
16  leave with pay first started October 17,
17  2017.  And I'm referring to something that's
18  Bates numbered 254.  I don't have any other
19  marking, just 254.
20        Does that sound about right as the
21  time it began?
22   A.   Yes.  Yes, that sounds about
23  right.
24   Q.   And then there's another date that
25  says effective date of action,



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
37—40

Page 37

1 December 11th, 2017.  During the -- during
2 the course of the investigation, the
3 employee requested to return to work and the
4 appointing authority approved the request.
5     Does that sound right?
6     A.   That sounds about right, yes.
7     Q.   Okay.  Now, I had in my mind, what
8 was the investigation, are you telling us
9 that it was whether you lived in Beulah --
10 at Beulah Street or not?
11    A.   No.  The investigation was
12 whenever we're on extended leave, they
13 expect us to stay at home 24/7.  If we
14 come -- if they come knock on our door --
15 you're supposed to knock on their door and
16 if you don't -- if you don't answer, you
17 knock and you leave.  That's how it's
18 supposed to be with the fire department and
19 what he did was --
20    Q.   Who is he?
21    A.   I'm sorry.  Randy Buller.
22    Q.   Randy --
23    A.   He was the assistant fire chief.
24    Q.   Randy --
25    A.   Randy Buller.

Page 38

1     Q.   B-U-L-L-E-R?
2     A.   Yes.
3     Q.   Okay.
4     A.   Randy Buller was the assistance
5 fire chief and he come knock on my door.
6 It's wellness -- it's supposed to be
7 wellness, but I'm staying out.  I -- I don't
8 live there, I live with my mom.  He has a
9 whole -- he's totally -- he had a
10 different -- he had my house where it was
11 built, but I was staying with my mom.  My
12 address showed 945 Beulah Street on the
13 checks and everything.  He went to where my
14 wife was living at, so, he went over there
15 and knocked on the door.  She got cameras
16 all the way around.  He's peeping through
17 the door.  They got -- they got like a glass
18 window, a big glass window on the door, he's
19 peeking like this here (indicating), he's in
20 between the bushes looking inside the house,
21 got it all on camera.  So Sondra got mad and
22 sent that to City Hall.
23    Q.   Oh, the video?
24    A.   The video.  So they seen I was --
25    Q.   You've obviously seen the video?

Page 39

1     A.   Yes, I've seen them.  So she sent
2 them -- I take that back.  She sent them to
3 our -- my attorney that they had for me,
4 Aaron Green out of Alexandria, and I was --
5 and our union rep seen them as well.  So
6 that's when they decide they were going to
7 put me on administrative leave and my union
8 rep got me a lawyer -- a union lawyer.
9     Q.   Is that Mr. Green?
10    A.   Mr. Green.
11    Q.   All right.  So let me -- let me
12 back up.
13    A.   Okay.
14    Q.   Why were you on administrative
15 leave?
16    A.   Because they went with thinking I
17 had -- I was living at the wrong address.
18 They tried to pen stand where you lived at
19 this address and I lived at another address
20 and they were pretty much mad at me because
21 I had -- well, we had pictures of the
22 assistant chief peeking around my house,
23 looking in the cars, looking in the
24 dumpster.
25    Q.   I'm sorry?  Let me back up.

Page 40

1     A.   It was -- it was -- I think it
2 was -- it was because I had evidence on him
3 doing that stuff and they tried to retaliate
4 just because I gave -- I had -- I had this
5 here evidence on him.  Instead of doing his
6 job, he's peeping through my windows and
7 stuff at the house where I don't even live
8 at.
9     Q.   Let me -- let me back up.  Because
10 I'm going to tell you why.  I'm confused and
11 hopefully you can help me.
12    A.   Okay.
13    Q.   Okay.  I understood you to say
14 that while you were on extended leave, they
15 expect -- they, I do it myself, the fire
16 department --
17    A.   The fire department --
18    Q.   The fire department expected you,
19 employees like you, essentially to stay
20 home?
21    A.   Uh-huh (indicating affirmatively).
22    Q.   Okay.  And then the assistant
23 chief, Mr. Buller, went out to the wrong
24 house it turns out to check on you?
25    A.   Right.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
41–44

Page 41

1    Q.   And then that's when you got all
2 the films and so forth because your wife had
3 that?
4    A.   Uh-huh (indicating affirmatively).
5    Q.   My question is, what were you on
6 extended leave for to begin with so that --
7 that caused him to go out and see if you
8 were at home?
9    A.   My surgery on my shoulder.
10   Q.   Your rotator cuff?
11   A.   Exactly.
12   Q.   Okay.  All right.
13   A.   I'm sorry.  I didn't --
14   Q.   So he's essentially going to
15 follow up on the rotator cuff leave, goes to
16 the wrong house?
17   A.   (Nodding head affirmatively).
18   Q.   Okay.  Okay.  Now, I'm -- I'm
19 looking at other records, okay?  And this
20 begins -- there's a letter in here, Bates
21 No. 369, essentially says, and it's dated
22 October 29, 2015.  And it says you get
23 52 weeks sick leave for shoulder surgery.
24 And this -- and then it says this letter is
25 to inform you this 52 week period will end

Page 42

1 on March 1, 2016.  And then there's a -- an
2 effective date, this is number 257, Bates
3 No. 257, it's saying you're resuming work
4 from sick leave on January 8, 2016.  It says
5 you're -- and you've been off work for
6 eight months at that time.  So I'm trying
7 to -- if you're saying --
8    A.   I'm not familiar with those
9 numbers that you're giving me.
10   Q.   Well, let me -- let me say this,
11 because I -- and I'm just asking questions,
12 right?  I'm not trying to suggest -- I'm not
13 suggesting any of this is right, wrong, or
14 what have you.
15        If you had the surgery for your
16 shoulder in 2015, would you have still been
17 on leave for your shoulder in October of
18 2017?
19   A.   I'm not sure what --
20   Q.   Okay.
21   A.   I'm not sure of that.  Those
22 numbers that you're giving me, I'm not sure
23 about all of that.
24   Q.   You're not sure of the dates?
25   A.   Yeah.

Page 43

1    Q.   Well, let me ask it this way:  If
2 you weren't on leave in October of 2017 for
3 your shoulder, can you think of any other
4 reason why you were on leave?
5    A.   No.
6    Q.   All right.  Have you ever been in
7 the military?
8    A.   No.
9    Q.   Do you have any criminal
10 convictions of any kind?
11   A.   No.
12   Q.   So I know we asked this in
13 discovery, but I like to ask it
14 straightforward, and I want to tell you
15 ahead of time, I know you've had rotator
16 cuff surgery, I know you've had a foot issue
17 in a motor vehicle accident.  Other than
18 those two events, have you ever sought
19 medical attention for any injury to your
20 body?
21   A.   No, not that I know of.
22   Q.   Okay.  Now, the treatment for your
23 foot, that was by whom?
24   A.   Dr. Tyson Green.
25   Q.   And that happened from the motor

Page 44

1 vehicle accident in 2013?
2    A.   Correct.
3    Q.   Where did that accident happened?
4    A.   That happened on, I think that's
5 Broad Street, on the corner of Broad and --
6 right by the Civic Center, I guess.  I think
7 that's Broad that curves around, the Civic
8 Center area.
9    Q.   Lakeshore Drive?  Is that
10 Lakeshore -- right in front of --
11   A.   Broad comes down and it curves
12 going back towards the interstate and it
13 happened like right on that -- I guess
14 that's Broad and the Civic Center ground.
15   Q.   It's right in front of the Civic
16 Center?
17   A.   No.  It's on the side, it's on the
18 north side of the Civic Center.  There is an
19 exit point on the north side of the Civic
20 Center.
21   Q.   And we're talking about the Civic
22 Center in Lake Charles?
23   A.   Right.
24   Q.   Okay.  And where did he hit you
25 from?



Page 45

1     A.   I hit him.  He passed up the stop
2 sign and I hit him.
3     Q.   Oh, so he ran a stop sign and you
4 broadsided him?
5     A.   Correct.
6     Q.   So the front of your vehicle made
7 impact with the side of his vehicle?
8     A.   Correct.
9     Q.   And then you injured -- which foot
10 was it?
11     A.   The right.
12     Q.   And what ha -- what was it that
13 was wrong with your foot?
14     A.    It had like a ball or something, I
15 guess, from going down hard, from what I
16 understood, and they had surgery to take
17 like a little ball or something out of my
18 foot.
19     Q.   And how long -- do you know when
20 the accident happened?
21     A.   I'm saying -- I'm saying --
22 because I had the boot on, it had to be
23 somewhere up in 2013.  It had to be
24 somewhere in 2013.
25     Q.   Does January 2013 sound correct?

Page 46

1     A.   I'm not sure.
2     Q.   Okay.
3     A.   I'm not sure.
4     Q.   All right.  Did you immediately
5 start missing work after that accident?
6     A.   Not that I know of.  I don't think
7 I -- no, I don't believe I did.  I'm not
8 sure.
9     Q.   I apologize.  I was talking to you
10 about your work and I got off here.  So you
11 retired from the Sulphur Fire Department on
12 May 23rd, 2019, is that right?
13     A.   Uh-huh (indicating affirmatively).
14     Q.   (Gesturing)?
15     A.   Yes.
16     Q.   Okay.  And so what became of the
17 administrative leave issue?  They just
18 reinstated you to your normal job?
19     A.   Yes.
20     Q.   At the time that -- when you were
21 on leave, October to December 2017, what was
22 your position at that time?
23     A.   I was captain.
24     Q.   And as captain, what were your job
25 duties?

Page 47

1     A.   I had to make sure the apparatus
2 was fit, was equipped at all times.  I had
3 to oversee the engineer and a firefighter,
4 and answer all calls that was in my
5 district.
6     Q.   Did you ever -- were you ever any
7 higher than a captain?
8     A.   No.
9     Q.   That's what you were when you
10 retired?
11     A.   Yes.
12     Q.   Your immediate supervisors would
13 have been who?  Mr. Buller would have been
14 one.
15     A.   He was -- yeah, he would have been
16 the assistant chief at that time.
17     Q.   Is that the next level up to
18 captain?
19     A.   No.  District -- next level up
20 from captain is district chief, then
21 assistant chief and then chief.
22     Q.   Okay.  When you retired, who was
23 the district chief?
24     A.   Shannon Clark.
25     Q.   And that's a man?

Page 48

1     A.   Yeah.
2     Q.   Shannon could be -- go either way,
3 right?
4     A.   Exactly.
5     Q.   And was Mr. Buller, the assistant
6 chief?
7     A.   No, not at that time.  He just
8 went on and resigned.
9     Q.   Okay.  Who was the assistant chief
10 when you retired?
11     A.   Mark McClelland.
12     Q.   Okay, and who was the chief?
13     A.   Daniel Selph.
14     Q.   To you -- to your knowledge, are
15 Shannon Clark, Mark McClelland and Daniel
16 Selph still employed by the Sulphur Fire
17 Department?
18     A.   Yes.
19     Q.   What other positions did you hold
20 while you were at the fire department?
21     A.   We work our way on up from fire
22 fighter, firefighter first class, then we go
23 to engineer, and then captain.
24     Q.   And you held all those positions
25 at some time?



Page 49

1    A.   Yes.
2    Q.   And how long had you been captain
3 before you retired?
4    A.   Four years.
5    Q.   Now, I don't -- I was about to say
6 I'm assuming, but you know what you say
7 about people who assume.
8         At some point while you were
9 working there, you had to get some kind of
10 training on how to fight fires, is that
11 fair?
12   A.   Yes.
13   Q.   All right.  And also receive
14 training on how to maintain and operate the
15 equipment?
16   A.   Yes.
17   Q.   When you're talking about
18 maintaining the equipment, what are we
19 talking about, fire truck, fire hoses?
20   A.   Make sure -- make sure everything
21 is in working condition.
22   Q.   Okay.  And what is everything is
23 what I'm saying?
24   A.   You got a lot of stuff, you got
25 jaws of life, you got cutters, you got

Page 50

1 sprayers, you have saws, you have a bunch of
2 stuff, fire hose, make sure there is no
3 holes in the fire hose.  Make sure you got
4 to check from one end -- from bumper to
5 bumper, air is in the tires, everything,
6 siren works.
7    Q.   And what about the pumps and so
8 forth on the fire trucks?
9    A.   You got to make sure that's
10 accurate as well.
11   Q.   And what kind of pressure do they
12 generate on those pumps?
13   A.   150 psi.
14   Q.   I have -- I have seen pictures
15 of -- in videos at some point of the people
16 learning to hold the fire hoses and so
17 forth.  Is that something that you had to
18 do?
19   A.   Oh, yes.  You usually have 150,
20 but we don't -- our engineers don't put it
21 up to 150 because the hose is so tight and
22 stuff.  It makes it hard to turn a corner,
23 so it kind of slack off a little bit.
24   Q.   So is 150, the maximum capacity?
25   A.   That's the maximum.

Page 51

1    Q.   And what is a working pressure you
2 guys just normally use?
3    A.   That should be between -- an
4 engineer would give you 140, 150.
5    Q.   Okay.
6    A.   Yeah.
7    Q.   But close to 150?
8    A.   Close to 150.
9    Q.   But just not --
10   A.   Our standard is 150.
11   Q.   I see.  Okay.  And at that 150,
12 when that is coming out at 150, is that akin
13 to, you know --
14   A.   You have more than -- when you
15 have a hose, it always more than one man on
16 a hose, either the captain or firefighter.
17 The engineer is operating the apparatus.
18 He's the one who's supplying your water
19 pressure.
20   Q.   I see.  And are there -- did you
21 all receive training about how not to get in
22 the line of fire of that water -- of that
23 water?
24   A.   Yes.
25   Q.   Okay.  And what would happen to

Page 52

1 you if you were struck by that water?
2    A.   You would -- you would feel it.
3 You would feel it.
4    Q.   Did that ever happen to you during
5 your employment with the fire department?
6    A.   No, it never happened to me.  To
7 be honest with you, no.
8    Q.   Did you ever see it happen?
9    A.   Oh, yes.  Yes.
10   Q.   You have?  Who was involved in
11 that?
12   A.   I can't tell you -- remember, but
13 they were coming in, we were coming in one
14 side and they were going in the other side.
15   Q.   Of the house?
16   A.   Of the house.
17   Q.   The house that's on fire?
18   A.   Yes.  And one hose struck the
19 other firemen.  They -- and then I seen
20 it -- I seen it happening and it's not --
21   Q.   Did he fall?  What happened?
22   A.   Yes, he fell.  He fell.
23   Q.   What part of his body got hit by
24 the -- by the water?
25   A.   Pretty much his upper body.



JOHNNIE ROY HARDY, JR.                                                                March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                                                      53–56

Page 53

1    Q.   His upper body, and you don't
2 remember his name?
3    A.   No, no, I don't.
4    Q.   Do you remember where you were?
5    A.   We was on Cane Street in Sulphur.
6    Q.   And about when was that?
7    A.   I couldn't tell you -- honestly
8 tell you that.
9    Q.   Got you.  Okay, but this was not
10 part of the training exercise, this was an
11 accidental happening while you were actually
12 fighting the fire?
13   A.   Right, working, right.
14   Q.   I see.  And the gentleman whose
15 name you can't remember, do you remember
16 what his position was?
17   A.   He was a captain, if I'm not
18 mistaken.  Because the captains are always
19 on the front of the hose and the
20 firefighters' in behind.
21   Q.   I see.  So do you know if he was
22 out of work at all because of that?
23   A.   I can't recall.  I can't.
24   Q.   What size is the -- what size is
25 the fire hose that you all use at the fire

Page 54

1 department?
2    A.   Inch 25, 1.25.
3    Q.   1.25?
4    A.   Right.  If I'm not mistaken, 1.25,
5 1.50, 2-inch, we have a 5 inch on there as
6 well.
7    Q.   Okay.  So let me make sure I'm
8 tracking okay for this?  Are you telling me
9 that normally what you would use is a 1.25?
10   A.   1 point -- I'm saying it.  I'm
11 trying to think of the size of the hand
12 nozzle, is it 1.50 or -- cause I know the
13 bigger ones are 2 inch and it got to be
14 probably 1.50, something like that, 1.50.
15   Q.   Okay.  So let me -- you had
16 mentioned a 5 inch, which I'm having a hard
17 time envisioning something like that.
18   A.   It's a fire line from the hydrant.
19   Q.   You're going from the hydrant to
20 the --
21   A.   To the truck.
22   Q.   Okay.  That's not the one that
23 you're actually making use of to fight the
24 fire by hand?
25   A.   No.  That's the supply line.

Page 55

1    Q.   That's the supply line getting
2 water to the truck?
3    A.   Right.
4    Q.   I got you.  All right.  Did you
5 have any injuries while working at the fire
6 department?
7    A.   Besides -- no.  Not that I recall.
8    Q.   And to be clear, I understand that
9 while you were at the fire department, you
10 had the motor vehicle accident where you
11 hurt your foot and you had a rotator cuff
12 issue.  I'm not asking you about -- well,
13 let me -- I may ask you about it in a
14 minute, but for the moment, did you have any
15 other injuries while you were at the fire
16 department?
17   A.   I can't recall.
18   Q.   Okay.  The rotator cuff surgery
19 that you had, was that related to any type
20 of accident or was that just a wear and tear
21 kind of thing or what happened?
22   A.   It was a weight, lifting weights.
23   Q.   Okay.  Where were your doing that?
24   A.   At Planet Fitness.
25   Q.   Okay.  Was it like an aha moment,

Page 56

1 like you felt it, something happened?
2    A.   Well, kind of, sort of, but after
3 a while you could see where I had blood
4 right up in this area.
5    Q.   Like bruising, kind of?
6    A.   Yeah.
7    Q.   I see.  And just for the record,
8 referring to the underside of your bicep?
9    A.   Uh-huh (indicating affirmatively).
10   Q.   From -- coming down?
11   A.   From here -- just bleeds, like
12 blood just coming down.
13   Q.   But not on the outside?
14   A.   No, on the inside.
15   Q.   On the inside?
16   A.   Right.
17   Q.   And so you -- obviously, that
18 would cause you concern?
19   A.   Oh, yes.
20   Q.   And I'm assuming there was a lot
21 of pain if you had that kind of blood coming
22 down?
23   A.   Yes, it did hurt.
24   Q.   Okay.  I want to talk briefly
25 about other jobs you had between the time



Page 57

1 that you retired in May of 2019 --
2    A.   Okay.
3    Q.   -- and when you went to work at
4 Savage?
5    A.   Uh-huh (indicating affirmatively).
6    Q.   So tell me, I know they're written
7 down somewhere, but by the time I find them,
8 you can tell me.  If you retired in May,
9 when was the first job after that, that you
10 had worked somewhere?
11    A.   It was Gulfstream.
12    Q.   And what did you do for
13 Gulfstream?
14    A.   They had advertised that they
15 needed forklift drivers.  So when we got on
16 the job, it was false advertising.
17    Q.   What was it -- what was the
18 matter?
19    A.   He had us doing labor, doing
20 chain, hooking up chain.  It was more like
21 riggers of these -- those long windmill
22 blades that's at the Port of Lake Charles,
23 they had us loading up trucks.  I didn't --
24 they already had the guys with the forklift.
25 So they were false -- they were telling

Page 58

1 people we need forklift drivers, we need
2 forklift drivers.  No, they didn't.  They
3 made us more riggers.
4    Q.   I see.  So you got there thinking
5 you were going to be a forklift driver and
6 actually were doing more hands-on labor
7 work?
8    A.   Oh, yes.
9    Q.   How old were you at that point?
10 What year were you born?
11    A.   I was born in '64.
12    Q.   So in 2019, when you retired you
13 were 55ish, 54.  How old are you now?
14    A.   I'm 56 right now.
15    Q.   So two years ago, you were 54?
16    A.   Fifty-four, give or take.
17    Q.   At 54, you didn't want to be doing
18 heavy manual labor as a rigger, is that
19 fair?
20    A.   No, it's -- no, I didn't want
21 to -- I was applying for the job that I --
22 that they advertised.  It wasn't so much
23 that I didn't want to be a rigger or
24 anything.  No, I applied for the forklift
25 job.  I wasn't applying for a rigger.

Page 59

1    Q.   How long did you work at
2 Gulfstream?
3    A.   About maybe a month or so.
4    Q.   Okay.  And then you left there
5 because you weren't doing forklift driving,
6 you were doing rigging?
7    A.   Right.
8    Q.   And is it fair to say you didn't
9 want a job as a rigger?
10    A.   I did not.
11    Q.   Okay.  So if you retired in May,
12 when did you actually start work for that
13 month at Gulfstream?
14    A.   I can't honestly tell you that.
15    Q.   Okay.
16    A.   I don't remember.
17    Q.   But that was the first one after
18 you retired?
19    A.   That was the first one.
20    Q.   Okay.  And was there a period when
21 you were just retired and not working, like
22 a month or so?
23    A.   I don't know.  I was looking
24 for --
25    Q.   You were looking for another job?

Page 60

1    A.   Yes.
2    Q.   Okay.  I'm going to back up and
3 talk about the fire department just a few
4 more minutes.  We might take a break here in
5 just a second and stretch our legs.
6         But after that incident with the
7 administrative leave and all of that stuff,
8 was it stressful for you to work at the fire
9 department after that?
10    A.   I was just more like dotting my
11 I's and crossing my T's after that, making
12 sure I did everything correct.
13    Q.   Did you feel like some of your
14 superiors at the fire department had it out
15 for you at that point?
16    A.   No.  Because they were all -- they
17 all -- they were behind me.  We're union,
18 we're tight knitted, we all live together.
19    Q.   Just not Mr. Buller?
20    A.   Just not the mayor.
21    Q.   Oh, the mayor?
22    A.   It was the mayor that was behind
23 all of that.
24    Q.   I see.  And who was the mayor at
25 the time?



Page 61

1    A.   Chris Duncan.
2    Q.   Okay.  And look, you know a lot
3 more how the fire department politics works
4 than I do.
5    A.   He -- well, when he first got
6 hired on as mayor, he got the Chief of
7 Police and Chief of Fire Department, "Come
8 in my office, you, you, you're fired."
9        So my chief said, "You can't do us
10 that."  He said, "You can't do me that for
11 sure.  I'm civil service.  You can't fire
12 me."
13       And that's what he told the mayor.
14 I don't know why the mayor had it out for
15 the firemen, maybe because of that.  He
16 didn't like us at all.  He didn't like
17 nothing about the fire department.
18   Q.   I see.  What about the Chief of
19 Police, did he get fired or do you know?
20   A.   I don't know what happened with
21 him.
22   Q.   I also hear about the mayor
23 appointing some new Chief of Police in all
24 the towns.
25   A.   He might have.  He might have, but

Page 62

1 he couldn't fire -- they wasn't in the
2 union.
3    Q.   I see.
4    A.   The police department wasn't
5 union, but they have a union now with this
6 mayor.
7    Q.   I see.  Okay.  So for whatever
8 reason, Mayor Chris Duncan thought he had
9 the ability to fire the Chief of Police,
10 excuse me, the chief of -- the Fire Chief.
11 Whether he did or not is immaterial, but
12 that kind of led to some conflict with fire
13 department?
14   A.   Uh-huh (indicating affirmatively).
15 Definitely, yes.
16   Q.   So when you were minding your P's
17 and Q's, so to speak, after that
18 administrative leave, it was out of concern
19 that Mayor Chris Duncan might have some way
20 to try to get rid of you?
21   A.   Yes.
22   Q.   Not so much the immediate chief or
23 assistant chief --
24   A.   He just had the assistant chief
25 push it.  I mean, he had the chief pushing

Page 63

1 things like interviewing me like we one on
2 one right now.  He had the chief doing that
3 to me.
4    Q.   I see.  Okay.  All right.  And
5 then the decision to retire in May of 2019,
6 was that partially driven by issues that had
7 happened or just, I got my 20 years and I'm
8 done.
9    A.   That's it.  I got my 20 years, I'm
10 done.
11   Q.   That's it, okay.  And then, are
12 you drawing retirement right now or does
13 that not start until sometime in the future?
14   A.   I'm drawing retirement right now.
15   Q.   And what do you receive now?
16   A.   I only get a thousand sixty.
17 Sondra gets the other half.
18   Q.   But for the -- your separation,
19 you'd be getting about $2,100 a month total
20 from your retirement?
21   A.   Correct.
22   Q.   And is that part of a formal
23 document in the divorce proceeding or that's
24 just the agreement that you all reached?
25   A.   No, that's in the -- that's in

Page 64

1 the --
2    Q.   That's in some paperwork in
3 that -- at that -- in that lawsuit.
4    A.   Oh, yes.
5    Q.   In the divorce.  Okay.  All right.
6 Do you have any other source of income other
7 than the retirement that you receive?
8    A.   No.
9    Q.   Okay.  So after you left
10 Gulfstream, where did you go to work?
11   A.   I went to -- I applied for G4S.
12 That's a security for Sasol.  That was a new
13 company that was coming in, Sasol.
14   Q.   And so G4S is a contractor who
15 worked at Sasol providing security?
16   A.   Exactly, yes.
17   Q.   So same plant that you were
18 involved in, but doing security instead of
19 working for Savage?
20   A.   Yes.
21   Q.   And what were you supposed to do
22 for them?
23   A.   I was -- I was under the
24 assumption that they were going to hire me
25 for a supervisor.  I went through classes.



Page 65

1 They said, well, we're going to need you as
2 supervisor, we need you as supervisor, and I
3 did a lot of the supervisor-like jobs,
4 should I say.  We had a class at Comfort
5 Suite in Sulphur off the Civic Center.
6      THE REPORTER:
7        Conference?
8      THE WITNESS:
9        Comfort, C-O-M-F-O-R-T, Comfort
10 Suite.  It's in Sulfer.  Okay, I'm sorry.
11 EXAMINATION BY MR. CRAWFORD:
12     Q.   No problem.  I had somebody
13 yesterday was talking.  My client's name was
14 Concept, something, something and they kept
15 calling it Compact.
16        And I'm like, "It's not Compact,
17 it's Concept."
18        And they -- and I corrected them
19 and they would still say Compact.  Okay, we
20 all do that.
21        So basically some kind of training
22 at the Comfort Suites, the hotel?
23     A.   Yes, for the security officers.
24     Q.   Okay.
25     A.   I was under the assumption I was

Page 66

1 going to be a supervisor there.  We did
2 training for about -- approximately a month
3 at the hotel.  I was taking them to go get
4 their badges.  They would rent like Yukons
5 and such things -- Tahoes.  We would load
6 the employees up.  I would be one of their
7 drivers, me and another supervisor, and we
8 were taking the Sasol, get their badges,
9 have pictures taken and what have you.
10 Bring them back, go get another load, and so
11 they had it -- they had six new cars that
12 was in Nederland Texas.  We went to pick
13 those up.  It was me and I think about four
14 other supervisors, we went and picked the
15 cars up in Nederland, Texas.  We only could
16 get four at that time, brought them to
17 Sulphur.
18        So I asked the supervisor if you
19 want to go get the other two.
20        He say, "You don't mind?"
21        I say, "Let's go."
22        So we went back to Nederland and
23 got the other two vehicles that they driving
24 right now at Sasol, the security vehicles.
25     Q.   Okay.

Page 67

1     A.   And I worked there for that month
2 thinking I was going to be a supervisor.
3 When they did get their contract, when they
4 did move in as a new contract security for
5 Sasol, he put me at the gate.
6     Q.   He?
7     A.   I'm sorry, Scott.  I don't know
8 Scott's last name.
9     Q.   Okay.
10     A.   Scott put me at the gate and I
11 thought that I was going to be a supervisor.
12 He left me there for a whole week, didn't
13 tell me anything, wasn't communicating with
14 me.  So I put my two-week notice in.  I
15 worked there one week, I put my two-week
16 notice in.
17        And I told them, I said, "I
18 thought I was going to be a supervisor and
19 you stuck me at the gate."
20        "Well, it's no position open." is
21 what he told me.
22        So what they did was they already
23 had their supervisor from prior security
24 that was already there.  He didn't tell us
25 that.

Page 68

1     Q.   From the -- from the previous
2 company who had the contract before?
3     A.   Right.
4     Q.   G4S.
5     A.   Accept most of those employees.
6 He didn't -- he didn't tell us that.
7     Q.   Okay.  Let me -- let me say it
8 back to you.  So Sasol had another company,
9 not G4S, with the security contract?
10     A.   Uh-huh (indicating affirmatively).
11     Q.   G2 -- 4S is getting in line to get
12 the contract?
13     A.   (Nodding head affirmatively).
14     Q.   And you start doing the training
15 and getting the equipment, such as the
16 vehicles that you described in line so
17 they'd be ready to do their work?
18     A.   Yes.
19     Q.   But weren't actually doing any --
20 any security work yet because the contract
21 hadn't flipped over from the previous
22 company?
23     A.   Exactly.
24     Q.   When the -- when the time finally
25 comes for G4S to have the actual contract,

Page 69

1 then you get assigned the position to work
2 the gate?
3    A.   Yes.
4    Q.   And within a week of that time,
5 you're like, this is not for me and
6 resigned?
7    A.   Exactly.
8    Q.   Okay.  Did you have any injuries
9 while you worked at G4S?
10    A.   No.
11    Q.   Did you have any injuries while
12 you worked at Gulfstream?
13    A.   No.
14    Q.   And do you know when you were
15 working at G4S?
16    A.   Right before I worked at --
17 started at Savage.  No, I don't have -- I
18 don't have those dates.
19    Q.   I am showing that you were hired
20 and started working at Savage on March 1,
21 2020.  Does that sound right?
22    A.   Yes.  Yes, that sound right.
23    Q.   And you had to undergo some
24 training initially, is that right?
25    A.   Yes.

Page 70

1    Q.   Now to my understanding, you had
2 no previous railroad experience at all,
3 correct?
4    A.   False.
5    Q.   Okay.  Well, tell me.
6    A.   Yes.  I worked at Baroid Mud
7 Drilling Plant.  That's one of the reasons
8 why I got the job at Savage.
9    Q.   Okay.
10    A.   I worked at Baroid right out of
11 high school for 16 years.  We had a -- we
12 had a -- we had a Trackmobile, we deal with
13 oil cars, we deal with boxcars, and
14 switches.
15    Q.   And this was for Baroid?
16    A.   NL Baroid plant out of Westlake,
17 off of Bayou Bend Road.  Matter of fact,
18 it's still there.  I have a buddy of mine
19 that works there.
20    Q.   Okay.  And all of the switching
21 and everything that you did there was all at
22 that location, is that right?
23    A.   Right.
24    Q.   Never -- you never road a railroad
25 away from the NL Baroid plant?

Page 71

1    A.   No.
2    Q.   Do you know anything about who
3 owned the tracks or anything at Baroid?
4    A.   No.
5    Q.   Or who owned the equipment, the
6 cars and all that stuff?
7    A.   No.
8    Q.   You don't know if they're owned or
9 leased or --
10    A.   No, I don't.
11    Q.   Okay.  Same questions related to
12 Savage and Sasol with the Sasol plant, do
13 you know who owned the tracks?
14    A.   No, I don't know who owned the
15 tracks.
16    Q.   Do you know who owned the cars?
17    A.   No, I don't know that either.
18    Q.   Do you know who owned the
19 equipment that was used to move the cars?
20    A.   The trackmobile?
21    Q.   The trackmobile or other
22 equipment?  I don't know all the equipment.
23    A.   I don't -- I honestly don't know
24 who owned the trackmobile.
25    Q.   Okay.

Page 72

1    A.   But the trains --
2    Q.   Okay.
3    A.   -- they had Savage name on the
4 side of the trains, but on the trackmobile,
5 they didn't have Savage name on the side of
6 it.
7    Q.   So on the -- when you say the
8 trains, what do you mean?
9    A.   They have --
10    Q.   Like the locomotives?
11    A.   The engines, the locomotives.
12    Q.   And those -- I'm going to call
13 them the Savage locomotives.
14    A.   Okay.
15    Q.   So we -- we know what we're
16 talking about.  The Savage locomotives, did
17 they just work within the plant?
18    A.   That I know of.
19    Q.   Okay.  Did you ever see them work
20 anywhere other than the plant?
21    A.   No.
22    Q.   And so since this -- these
23 locomotives had Savage on the side of those,
24 you drew the conclusion they were owned by
25 Savage?



Page 73

1    A.   Correct.
2    Q.   Okay.  Did you ever operate one of
3 the locomotives?
4    A.   Yes.  In training.
5    Q.   In training?
6    A.   Uh-huh (indicating affirmatively).
7    Q.   Okay.
8    A.   For a short period of time, they
9 were just showing me how to work the box.
10   Q.   Okay.  And then, that was never
11 part of your regular job duties?
12   A.   No.
13   Q.   That's just part of the training
14 that you received initially?
15   A.   Yes.
16   Q.   When you -- when you first started
17 at Savage, did you -- did they have a
18 specific place in mind for you to work?
19   A.   Yes.  They had a specific place.
20 They had the -- they call it the plant, in
21 the plant.
22   Q.   Okay.  And were you receiving
23 training to work in the plant?
24   A.   Yes.
25   Q.   Now, when we talk about the plant,

Page 74

1 that's different from the wash bay where
2 your accident happened?
3    A.   Exactly.
4    Q.   Okay.  So what -- what happened so
5 that you did not end up working at the
6 plant?
7    A.   I wanted another job besides that.
8 They had another opening somewhere else and
9 I wanted to apply for another job on that.
10   Q.   Okay.  So what was the other job?
11   A.   The other job was -- they called
12 it, they called it working at the pilot.
13   Q.   At the poly?
14   A.   Poly, yes.
15   Q.   At the poly unit?
16   A.   Yes.
17   Q.   And did you make any complaints
18 that you were on your feet too much at the
19 plant?
20   A.   I did.  I told them, I said,
21 "Well, there is a lot of walking, could I --
22 do you have a position for me at the -- can
23 I go to poly?  You do have an opening there,
24 because I think somebody quit or retired or
25 got fired."

Page 75

1         And so I applied for that.
2         They said, "No."  So they said,
3 "Well, we're going to put you at the wash
4 rack, where I didn't apply for."
5    Q.   All right.
6    A.   I didn't apply for that one.
7    Q.   And was the wash rack more or less
8 walking than the plant?
9    A.   It was less walking.
10   Q.   Okay.  And you had complained that
11 the plant was too much time on your feet,
12 you would agree with me on that?
13   A.   I agree with you, yes.
14   Q.   Okay.  But you were hoping to go
15 to poly and instead they sent you to the
16 wash rack?
17   A.   Yes.
18   Q.   Now, when you got to the wash
19 rack, did you begin with training?
20   A.   Yes.
21   Q.   Okay.  And how long was it before
22 you completed your training, if you know?
23   A.   It was two different times.  It
24 was -- I can't really recall.  It's the one
25 that on the ground, you have one that's on

Page 76

1 the ground and you have another one that's
2 working the trackmobile.
3    Q.   When you say another one, you're
4 talking about another work --
5    A.   Another -- another job.
6    Q.   Okay.
7    A.   You got two different jobs over
8 there.
9    Q.   Okay.
10   A.   You got one that's operating --
11 he's operating the trackmobile, and the
12 other guy, he determine how far you need to
13 move the cars to spot them.
14   Q.   To line them up?
15   A.   He was a spotter.  I'm going to
16 say a spotter, but I forget the name they
17 called each other over there.
18   Q.   Okay.  All right.  So you got one
19 guy who's operating, what -- what did you
20 call it, the trackmobile?
21   A.   Trackmobile.
22   Q.   And I take it the trackmobile is
23 used to move a car?
24   A.   Yes.
25   Q.   So you have a line of cars to be



Page 77

1 washed?
2    A.   Yes.
3    Q.   And the guy operating the
4 trackmobile is using it to move the cars, so
5 you line them up with the equipment so that
6 you can do the washing?
7    A.   Correct.
8    Q.   And the spotter, we will call it a
9 spotter?
10    A.   He's the one -- he's the one who's
11 telling them to stop.
12    Q.   Telling where -- we're good?
13    A.   Yes.
14    Q.   Okay.  All right.  Now, once
15 you -- once you have the cars in position,
16 what do you do next?
17    A.   We chock them.  Put the chock
18 under them.
19    Q.   Like so they don't roll?
20    A.   Exactly.
21    Q.   Okay.
22    A.   And then the trackmobile, he
23 breaks away from the -- from the cars.
24    Q.   Okay.  So they're not going to
25 move anymore?

Page 78

1    A.   Exactly.  So that way you have no
2 steering wheel, trackmobile move and what
3 have you.
4    Q.   And we don't accidentally move the
5 car --
6    A.   Right.
7    Q.   -- where we're not expecting it
8 to?
9    A.   And they -- and they put the
10 brakes on them -- put the brakes on the car.
11 And then they start lowering the equipment,
12 the washers down in each of the cars and
13 they start washing.  They open the bottoms
14 up and they -- the water and all the debris
15 comes out of the cars.
16    Q.   Okay.  Just onto the ground there?
17    A.   No.  They got a opening to
18 where -- it's like a -- they have these --
19 these rails that it goes through.
20    Q.   Okay.
21    A.   What they got -- I mean I know
22 what you call them, but I'm just -- my mind
23 is foggy right now.
24    Q.   I have pictures we're going to use
25 here in a minute, but I'm just trying to get

Page 79

1 the -- the idea.  So you worked at the --
2 all right, so I'm -- I'm showing that this
3 discussion about moving from the plant to
4 the wash rack happens around April 9 or 10,
5 you don't know?
6    A.   No, I don't.
7    Q.   Okay.  If somebody else swears up
8 and down that's when that discussion
9 happened, you're not going to argue, is that
10 fair?
11    A.   I have no familiar -- I don't --
12 I'm vague.
13    Q.   I'm showing your first day
14 officially at the wash rack is on
15 April 13th.  Does that -- do you know --
16 yes, no, maybe, don't know?
17    A.   I know I'd been there at least
18 about four to five weeks before the
19 accident, so...
20    Q.   So I'm going to -- well, so you --
21 they're saying April 13, and then your
22 accident is May 8th, so that's pretty close.
23 Like around, right at three and a half,
24 almost four-weeks, okay.  It also shows you
25 qualified as a ground personnel at the wash

Page 80

1 rack on April 27th?
2    A.   That's what it is.
3    Q.   Ground personnel?
4    A.   Yes.
5    Q.   Is that what a spotter is?
6    A.   Yeah, that's what the spotter is.
7    Q.   Okay.  So let me -- let me back
8 up.  So -- and I don't -- I know you don't
9 know these dates, but, I mean, I don't --
10 I'm not verifying they're right.  But if you
11 started at the wash rack on April 13th and
12 if you were certified as a ground
13 personnel/spotter --
14    A.   Uh-huh (indicating affirmatively).
15    Q.   -- on the 27th --
16    A.   Uh-huh (indicating affirmatively).
17    Q.   -- do you know what that meant?
18 Okay, now, he's good to work by himself, he
19 doesn't need any further training to do this
20 job?
21    A.   No.  We don't never, no.
22    Q.   I -- let me -- I mean, I laid down
23 saying that --
24    A.   I don't work by myself.
25    Q.   You always had -- you'd always



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
81–84

Page 81

1 have two people at least, right?
2     A.   At least.
3     Q.   When you were doing training, was
4 there somebody there helping you to be the
5 ground personnel?
6     A.   Yes.
7     Q.   Okay.  And then after they said
8 you're officially trained, we're giving you
9 a certificate, were you able to work by
10 yourself as ground personnel?
11     A.   Yes.  They didn't give me -- they
12 didn't give me a certificate or anything
13 like that, but they gave me a, you know --
14     Q.   Something that said --
15     A.   Saying that it's okay.
16     Q.   Yeah.
17     A.   Because I had Matt, Matt was the
18 one, he was watching me work the -- spotting
19 the cars --
20     Q.   Uh-huh (indicating affirmatively).
21     A.   -- you know, telling the -- the
22 guy that's running the trackmobile how far
23 to go, how many cars you got, how many, you
24 know, where to the spot the cars.  He's a
25 groundman.

Page 82

1     Q.   Is that Matt Moyer, M-O-Y-E-R?
2     A.   Matt, I don't know.  I don't even
3 know Matt's last name.
4     Q.   Black guy, white guy?
5     A.   White guy.
6     Q.   White guy?
7     A.   White guy, older guy.  He was
8 closer to my age, cause he always come
9 through and say, "Johnnie, you're the oldest
10 one here."
11     Q.   Were you the oldest one?
12     A.   Yes, I was.  I was the oldest one
13 over -- I was older than him and -- and Ed
14 Lee, supervisor.
15     Q.   And so was Matt the one that was
16 in charge of your training at the wash rack?
17     A.   Yes.
18     Q.   Okay.  And then when -- and Matt
19 was the one that decided you'd been
20 adequately trained?
21     A.   Yes.
22     Q.   Did you feel like you had been
23 adequately trained when Matt wouldn't hold
24 your hand, you know, at the time?
25     A.   Yeah, but the other guys pretty

Page 83

1 much trained me, I mean, I was there for a
2 month.  It didn't take much for me to catch
3 on cause I was already familiar with the
4 track and the trackmobile because I worked
5 at Baroid for 16 years.
6     Q.   And it's just not -- I mean, I
7 don't mean to put it down, but the wash rack
8 job just ain't all that complicated, right?
9     A.   I ain't going to say what other
10 people said, but --
11     Q.   What did they say?
12     A.   They said, you could train a
13 monkey back here.
14     Q.   Oh, my goodness.  All right.
15     A.   I'm going to be honest with you, I
16 wanted to -- the wash rack is like a
17 straight day, eight-hour job.  I wanted to
18 work like at poly, you know, poly they just
19 spot maybe two or three cars and what have
20 you and they go -- they go chill out for
21 another 45 minutes.
22          I said, that's a -- I call it a --
23 I said, "That's a nursing home job."
24     Q.   That's a lot easier job than the
25 wash rack job?

Page 84

1     A.   Yes, I said, man.  I said, that's
2 what I applied for, because they had some
3 people that I -- I'm not -- I don't know if
4 they got fired or what happened.  One guy,
5 he left the truck in neutral and it rolled
6 into a ditch, you know, while I was there
7 and they was doing all sorts of stuff and
8 I -- and they had an opening.
9          So I applied for that when they
10 had that opening.  I said, well I'm going to
11 apply for that.
12          And he said, "Well, no."
13          I don't know why they stuck me on
14 the wash rack.  I don't know.
15     Q.   I'm -- I'm looking at -- so
16 April 27 is the time that, you know, they
17 qualified you to work on the wash rack
18 without Matt holding your hand?
19     A.   Uh-huh (indicating affirmatively).
20     Q.   Otherwise, you don't know that
21 precise date, but you know that happened.
22 Some -- whether it happened on April 27th,
23 you know there was a time when they said,
24 "Okay, you're good to go on the wash rack."
25     A.   Uh-huh (indicating affirmatively).



Page 85

1 Yes.
2    Q.   Good, okay.  And then I'm showing
3 that in the early month of May, like as
4 early as May 4, the next week, you were
5 talking to Ed Lee and Matt Moyer that you
6 really didn't want to be at the wash rack,
7 you wanted to be at poly?
8    A.   Yes, I did.
9    Q.   And then on May 7, you talked to
10 Everett Bradley.
11        Do you remember Everett Bradley?
12    A.   I'm not familiar with the name,
13 but who --
14    Q.   Then you said -- you told him you
15 wanted to move to poly?
16    A.   Everett Bradley?  Yeah, I don't
17 know.
18    Q.   I might be saying --
19    A.   It might be.  I told a -- I told a
20 bunch of people I wanted to move to poly.
21    Q.   Well, let me put it this way, you
22 don't remember the name necessarily, but if
23 somebody says that you told them --
24    A.   Oh, yeah, I would.
25    Q.   -- that you wanted to move to

Page 86

1 poly?
2    A.   I definitely wanted to move to
3 poly.
4    Q.   And one reason you wanted to move
5 to poly was because it was your perception
6 at least, that the job at poly was easier
7 than the job at the wash rack?
8    A.   Yes.
9    Q.   Was the job at the wash rack more
10 physically demanding?
11    A.   No, not really.  I mean, you
12 just -- you're lifting up the hatches,
13 taking bonnets out.  It's more -- I guess
14 you could say it's more bending over.  It's
15 like more bending over and stuff.
16    Q.   So my understanding --
17    A.   And going up on the hooking --
18 hooking and walking along this rail, walked
19 along the top of the rail of the cars.  I
20 didn't -- that wasn't -- I didn't like that.
21    Q.   Yeah, on top of the rail --
22    A.   On top of the railcar, on the
23 rail.  I didn't care for that either, I was
24 walking.  I was walking like this here
25 (indicating).

Page 87

1    Q.   Like an old man?
2    A.   You can't see it, but I was
3 walking like an old man on top, yeah.  I was
4 scared to be up there.
5    Q.   I'm going to --
6    A.   They had some of the guys from
7 E-Chem, they wouldn't go up there, that was
8 helping.
9    Q.   I want to -- let me say this back
10 first so I know -- I can't see underneath,
11 but I got a mental picture.  I'm going to
12 tell you, kind of like a penguin walk, like
13 a shuffle?
14    A.   Yeah.
15    Q.   Being very careful with your step?
16    A.   Exactly.
17    Q.   Because you -- did you -- it
18 looked like you were making use of a lanyard
19 there?
20    A.   Yeah.  You had to hook yourself
21 up, you had to -- you put a harness on and
22 you hook yourself up and you open a gate and
23 then you walk along that all the way to the
24 end and come all the way back.
25    Q.   So I take it, and I -- I've got a

Page 88

1 picture here I'm going to show you in a
2 minute.  The washers, if you will, there are
3 some openings, some kind of manhole-looking
4 things at the top of these tank cars.  You
5 put the washers down inside there?
6    A.   Yes.
7    Q.   So when you're getting on top of
8 the railcar, you got to open up those --
9    A.   The manholes?
10    Q.   The manholes, put the washers down
11 inside.  That's why you were up there,
12 right?
13    A.   Yes.
14    Q.   And then on the ground side of
15 that operation, when you're actually doing
16 the washing, there's some valves or so forth
17 you got to open them up?
18    A.   Open them up.
19    Q.   To let the water and the debris
20 that you're washing come out?
21    A.   Yes.
22    Q.   And my understanding is, these are
23 railcars that are being returned from
24 customers and maybe not quite 100 percent of
25 the product is out of them?



Page 89

1     A.   Uh-huh (indicating affirmatively).
2     Q.   And before they load them with new
3 product, they want to wash all the old
4 product out?
5     A.   Right.
6     Q.   And so you're going to have a
7 little bit of debris, a little bit of old
8 product come out the bottom?
9     A.   Yes.
10    Q.   And then that one's done and you
11 keep washing?
12    A.   You got to go back up, lift them
13 up, and then they're call bonnets, you know,
14 like your cook have this thing around their
15 head?
16    Q.   Right.
17    A.   A bonnet, they got to put bonnets
18 on top of them and then close it.
19    Q.   Oh, I see.  That tells them that
20 they -- you've cleaned it?
21    A.   Yes.
22    Q.   That's how they know --
23    A.   Cause they got old bonnets.  We go
24 up there first, take the old bonnets off,
25 then we lower the sprouts down into it --

Page 90

1     THE REPORTER:
2        The sprouts?
3     THE WITNESS:
4        I call it the sprouts.
5 EXAMINATION BY MR. CRAWFORD:
6     Q.   Spouts?
7     A.   Spouts.  And we lower that in
8 there and they operate the machine.  Once we
9 lower it down in there, they operate and
10 turn it on and what have you, and they start
11 doing the washing.
12    Q.   Hold on.  Usually I attach your
13 driver's license as number 1.  I've got --
14 do you have your driver's license with you
15 today?
16    A.   Uh-huh (indicating affirmatively).
17    MR. CRAWFORD:
18       We'll get -- we'll get a copy at
19 the break?
20    MR. SHELTON:
21       Yeah.
22    MR. CRAWFORD:
23       We'll attach driver's license as
24 number 1 when we take the break.
25       (Exhibit No. 1 marked for

Page 91

1 identification.)
2     MR. CRAWFORD:
3        I'm going to start with number 2.
4 Your driver's license will be number 1.  You
5 make sure we don't leave without it.  And
6 then, I'm going to label this as number 2.
7        (Exhibit No. 2 marked for
8 identification.)
9 EXAMINATION BY MR. CRAWFORD:
10    Q.   Is that the spout you're talking
11 about?
12    A.   That's it.  That's it.  You got to
13 operate that little deal on the side that
14 makes it go up and down.
15    Q.   All right.  And so somehow or
16 another, this spout goes down inside the car
17 and starts doing the whirlybird thing and
18 washes the inside of the car?
19    A.   Yes.
20    Q.   This ain't what happened -- this
21 has nothing to do with what hit you,
22 correct?
23    A.   No, no.
24    Q.   All right.  You agree?
25    A.   Agree.

Page 92

1     Q.   See, I told you we'd have one of
2 those.
3     MR. CRAWFORD:
4        Well, I'll attach this -- well,
5 I'm going to attach this as number 3.
6        (Exhibit No. 3 marked for
7 identification.)
8 EXAMINATION BY MR. CRAWFORD:
9     Q.   Do you recognize -- well, I'm
10 going to let everybody see real quick.
11    A.   That's the one that exploded.
12    Q.   Let me get the question out.
13 Number 3, that is the tank involved that
14 exploded?
15    A.   (Nodding head affirmatively).
16    Q.   You're nodding your head.
17    A.   Yes.
18    Q.   All right.  Now, can you -- now,
19 when you say it exploded, did the metal fail
20 or was it just the seal that -- that broke?
21    A.   I have no idea.
22    Q.   You don't know?
23    A.   I have no idea what broke, but I
24 know after a while, because when it -- when
25 it exploded --




JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
93–96

Page 93

1   Q.   Uh-huh (indicating affirmatively).
2   A.   -- I was on -- it was on the right
3 side.  It was above, about -- I say
4 approximately 5 feet.  It pushed me over and
5 the next thing I knew, I remember that I was
6 sitting in the office with George Duhon and
7 with an E-Chem employee.  Between -- when
8 that -- between this exploding, and my
9 memory of -- I mean, just pretty much going
10 away from it and the next thing I knew I was
11 sitting inside the office.
12   Q.   Okay.  All right.  So are you --
13 are you telling me that there is a period of
14 time between the happening of the accident
15 and when you realized you were sitting in
16 the office, that you have no memory of?
17   A.   None.  I don't.
18   Q.   Do you have an estimate of how
19 much time that was?
20   A.   No, I don't.  I know when we got
21 in the office, if I'm not mistaken, George
22 called Terry.  Just -- Terry is the -- the
23 su -- the safety personnel, assistant
24 safety.
25   Q.   Okay.

Page 94

1   A.   And he came over and he looked at
2 it and so I went back over there and he
3 looked at it.  Terry wanted to assemble it
4 back and say, crank it back up.  But the
5 gasket around here -- the gasket around
6 there, had split.
7   Q.   I'm going to show you, I'm going
8 to give you this highlighter, and when you
9 say around here, let me just show you, hold
10 on, before you start.  She --
11   A.   She can't see it.
12   Q.   Well, and this, here can be here,
13 here or here, you see?  That's why I need
14 you to mark on this paper where you're
15 talking about.
16   A.   Okay.
17   Q.   So just if you would, highlight
18 the area that you're talking about where
19 the -- where the gasket was.
20   A.   The gasket is right around this
21 area right here.  This is the -- the gasket
22 go all the way around, the little black
23 gasket go all the way around.
24   Q.   On the inside.  We can't see it
25 if --

Page 95

1   A.   On the inside.  After I came out
2 of that office, after they called Terry
3 we came out of the office and went and
4 looked at it.  When I -- the seal -- the
5 rubber, the seal was sticking out, like this
6 here was broken in half.  One piece was over
7 here and one piece was like right here.
8   Q.   All right.  Let me get you to
9 stop --
10   A.   And it was split in half, right
11 there.
12   Q.   I just want to get you to stop
13 making too many marks with that.  You'll
14 have it marked until we get where we can't
15 follow anything.
16   A.   Okay.
17   Q.   Okay.  So I might give you a pen
18 in a minute with -- clean that up, but it's
19 okay.  Some people start -- they start
20 making a bunch of marks and now the -- now
21 our paper doesn't mean anything, you follow
22 me?
23   A.   Okay.
24   Q.   Okay, but basically, when we're
25 looking at this picture, there is a -- some

Page 96

1 kind of connection here.
2   A.   Uh-huh (indicating affirmatively).
3   Q.   And that -- and it connects the
4 top and the bottom part of this tank?
5   A.   Right.
6   Q.   And inside that, there is a gasket
7 that we can't see while it's closed?
8   A.   Uh-huh (indicating affirmatively).
9   Q.   And you're telling us that at some
10 point and, well, we're getting to the
11 details.  One way or how, you were able to
12 see that the gasket had broken?
13   A.   Right.
14   Q.   Okay.  Let's back up before we --
15 we can't eat the whole elephant in one bite,
16 right?
17   A.   Okay.
18   Q.   Okay.  So first of all, do you
19 know what this tank does?
20   A.   It's a filter.  It's a filter
21 tank.
22   Q.   And do you know what the capacity
23 of that tank is?
24   A.   No, I don't.
25   Q.   Well, let me ask it this way:  Is



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
97–100

Page 97

1 that -- is that tank small enough that you
2 could bear hug it if you wanted to?
3    A.   I think so.
4    Q.   It's not -- it's not huge?
5    A.   No, it's not.  It's not.
6    Q.   Okay.  Do you know approximately
7 how tall it is from the bottom -- let me get
8 it out -- from bottom to top and I will tell
9 you that I know that the tank is off the
10 ground.  So we're going -- I'm just talking
11 about the length of the tank and we'll talk
12 about how high it is in a minute, okay?
13 From bottom to the top of the tank is
14 approximately how far?
15    A.   Four feet.  You say the length of
16 this tank?
17    Q.   Yes, sir.
18    A.   It's approximately, I would say,
19 about 4 feet.
20    Q.   Okay.  And then approximately how
21 high up in the air would the tank be?
22    A.   I would say I was approximately,
23 with me, I don't know how high it's up in
24 the air, but I could touch it.
25    Q.   You could touch the bottom?

Page 98

1    A.   The bottom part of it, yes.
2    Q.   Okay.
3    A.   Because they had to get on a
4 rail -- he had to get on a rail to get that
5 top bolt -- to get this top deal off.
6    Q.   He being George?
7    A.   I'm sorry, George.
8    Q.   George?
9    A.   George.  George had to get on
10 the -- on the scaffold.  It was -- it was
11 already a made scaffold for the -- for the
12 area and --
13    Q.   We'll talk about that in just a
14 minute.  Let me back up because we kind of
15 skipped a few pieces?
16    A.   Okay.
17    Q.   All right.  The people that were
18 working with you, obviously, we have
19 identified George?
20    A.   Correct.
21    Q.   Was George the person that was
22 working with you at the wash rack?
23    A.   Yes.
24    Q.   And then you mentioned a couple of
25 times some people from E-Chem?

Page 99

1    A.   Yes.
2    Q.   Is it E-C-H-E-M or is it E-K-I --
3    A.   E dash K-I-M.
4    Q.   E-Chem, okay and the E-Chem
5 people, were you all training them?
6    A.   No.  No, sir.
7    Q.   What were they doing?
8    A.   They were helping.  They were
9 helping clean the cars.
10    Q.   Okay.  All right.  And how many of
11 those people were there?
12    A.   Sometime it would be four,
13 sometime it would be three because they work
14 different shifts.
15    Q.   I see.  All right.  Do you
16 remember any of the E-Chem people by name?
17    A.   I know one name, Mark.  And the
18 guy that was up there with George at the
19 time of the explosion, I don't know his
20 name, but I know his face.
21    Q.   Okay.
22    A.   George probably could tell you
23 that.
24    Q.   Okay.  All right.  And then you've
25 mentioned a guy named Terry that you thought

Page 100

1 was with safety?
2    A.   Yes.
3    Q.   Was he a Savage employee?
4    A.   Yes.
5    Q.   Do you know which Savage entity
6 you worked for?
7    A.   They have different ones.
8    Q.   Well, I'm asking you, do you know?
9    A.   No.  Not exactly, no.
10    Q.   Okay.  And this is what I believe,
11 triple underline, believe these came to us
12 from your attorney and they are pictures of
13 paystubs, so they -- I'm not going to tell
14 you they're the clearest.
15    MR. CRAWFORD:
16        I will attach them in globo as
17 number 4.
18        (Exhibit No. 4 marked for
19 identification.)
20 EXAMINATION BY MR. CRAWFORD:
21    Q.   And I'll tell you it's not the
22 easiest to make out, but it is possible to
23 make it out.  If I could get you, this is
24 also been Bates labeled as Johnnie Hardy 20,
25 21 and 22. I'll show you where that is.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
101–104

Page 101

1    MR. POOLE:
2        May I see that?
3    MR. CRAWFORD:
4        (Handing).
5    THE WITNESS:
6        Looks like it.
7 EXAMINATION BY MR. CRAWFORD:
8    Q.   Do you recognize that as your
9 paystubs?
10    A.   Uh-huh (indicating affirmatively).
11    Q.   Do you -- can you look up in the
12 upper left-hand corner, I see you put your
13 glasses on, right?
14    A.   Uh-huh (indicating affirmatively).
15    Q.   Can you -- can you make out the
16 entity that's identified on the pay stub as
17 the employer?
18    A.   Savage, is that transportation?
19    Q.   I believe it is.
20    A.   That's what it looks like right
21 there.
22    Q.   Does it say Savage Transportation
23 Management, Inc., I think it is?
24    A.   I can't read the bottom ones.
25    Q.   And then if you look below, it

Page 102

1 says it's like a division of or something to
2 that effect, Savage Enterprise, something,
3 something.  Do you see that?
4    A.   Do y'all -- do y'all have anything
5 clearer?
6    Q.   Well, this is what you gave us.
7    A.   Okay, well...
8    Q.   This is your copy.  This isn't
9 what I gave, this is what you gave.
10    A.   I can't --
11    Q.   Let me put it this way --
12    A.   It's kind of blurry. so I --
13    Q.   Okay.  So you can't make it out
14 from this -- from that page -- from that
15 Exhibit 4?
16    A.   If I had my check stubs, I could
17 make it out.
18    Q.   Do you know where you got these
19 pictures from?
20    A.   These pictures?
21    Q.   Yeah, these came to us from your
22 attorney.
23    A.   These are my -- these are from my
24 check stubs?
25    Q.   Yeah.  I'm asking you, do you know

Page 103

1 where the check stubs are?
2    A.   No, I don't, not at this moment.
3    Q.   Okay.
4    A.   I don't.
5    Q.   All right.
6    A.   Because after the hurricanes and
7 stuff --
8    Q.   You don't have anything?
9    A.   I ain't -- nothing much.
10    Q.   I got you.  What happened to the
11 house at 945 Beulah anyway?
12    A.   Hurricane.
13    Q.   Well, I got that part.  What
14 happened?
15    A.   It's all gutted out.  I mean, the
16 roof -- the roof come off of it.
17    Q.   Well, that's what I meant.
18    A.   Yes.
19    Q.   So the whole roof came off?
20    A.   Pretty much, the whole half of the
21 house, the roof come off.
22    Q.   Wow.  And then, obviously, it just
23 rained all up in it?
24    A.   Yes.
25    Q.   Okay.  Well, so let me -- let me

Page 104

1 say it this way, if Ed Lee says he was
2 employed by Savage Transportation
3 Management, Inc. and everybody else who
4 worked at the Sasol location is employed by
5 Savage Transportation Management, Inc., do
6 you have any reason to believe that he is
7 mistaken?
8    A.   No.
9    Q.   You just don't know?
10    A.   I simply don't.
11    Q.   Okay.  And if you still had a copy
12 of your paystubs, you'd look at the
13 original, not these pictures of the paystub,
14 and could make it out?
15    A.   So -- so what you're telling me,
16 those are fake paystubs?
17    Q.   No, sir.  These are from your --
18    A.   Do you have the original ones from
19 them?
20    Q.   I don't have them today.
21    A.   The other employees like George,
22 see if he has his like that, as well?
23    Q.   I -- we can -- I can -- I can deal
24 with George --
25    A.   I'm pretty sure they all have the



Page 105

1 same -- it's not a fake paystub.
2    Q.   No, I'm not arguing that.
3    A.   Okay.
4    Q.   And what -- and the reason I ask
5 you, in all fairness, is because the
6 entities that your lawyers sued are
7 different entities, okay?  They didn't sue
8 Savage Transportation Management, Inc. and
9 they didn't sue Savage Enterprise, LLC, they
10 sued Savage Services Corporation and Savage
11 Industrial Rail Services, Inc.  And I'm --
12 and I'm not arguing with you or fighting
13 with it, I'm just trying to say, do you know
14 who you worked for?
15    A.   Yes.
16    Q.   In --
17    A.   I mean, just like you guys
18 gathering information, he gathered
19 information as well.
20    Q.   I get it.  And, again, remember
21 I'm not fighting you, I'm just trying to
22 figure out --
23    A.   I understand.
24    Q.   -- what you know and what you --
25    A.   Well, you dig into a lot of stuff,

Page 106

1 you find out stuff.
2    Q.   I got it.  I'm just working on
3 my -- a little piece at a time.  Look, we've
4 been going for almost two hours.  It's about
5 10:00 till 12:00, let's take a five-minute
6 break and figure out what we want to do.  I
7 am -- I ate breakfast and I'm good to
8 continue.  If we want to take a break for
9 lunch, you know, we need to figure that out,
10 when we're going to do it and when we're
11 going to break and so forth.
12    MR. SHELTON:
13       Let's go five minutes because I'm
14 going to order our food.
15    MR. CRAWFORD:
16       Okay.  Take a break for
17 five minutes, let you order some food, go
18 back on the record, and whenever y'all are
19 ready.
20    MR. SHELTON:
21       1:00, y'all want to go to lunch at
22 1:00?
23    MR. CRAWFORD:
24       That's fine for me.
25       (Whereupon, a brief recess was

Page 107

1 taken.)
2 EXAMINATION BY MR. CRAWFORD:
3    Q.   Okay.  So we were -- we were
4 talking about -- we kind of stumbled upon
5 your accident there.  The -- and you said
6 when you were walking and you get hit from
7 the right side, is that correct?
8    A.   I wasn't walking, I was standing.
9    Q.   You were standing still?
10    A.   Yes.
11    Q.   Okay.  And which direction were
12 you facing relative to the tank, if you
13 will?
14    A.   The tank was right here.
15    Q.   To your right?
16    A.   Yeah, to my right and I was
17 standing along the rail right here looking
18 into the -- they have something like a --
19 and what I was doing was -- it supposed to
20 fill up -- it was at 35 psi and I think the
21 tank's supposed to be like, if I recall, 65
22 to 70 before it could -- before you could
23 start operating it.
24 EXAMINATION BY MR. CRAWFORD:
25    Q.   The washer you mean?

Page 108

1    A.   The washer.
2    Q.   Okay.
3    A.   And I was looking down the
4 grates -- you could see through the grates,
5 you could see the water coming and that's
6 what I was doing.  I was standing right over
7 by the gra -- by the rail, on the grates
8 looking to see when it would start filling
9 up.
10    Q.   So if I'm -- you know, I'm sta --
11 and I'm facing this way, is the --
12    A.   Tank right there, right above you.
13    Q.   I'm going to call it the filter
14 tank, so we don't --
15    A.   Filter tank, yeah.
16    Q.   That's the one that you say
17 exploded?
18    A.   Pressurized filter tank.  That's
19 what I called it.
20    Q.   So the filter tank, is it to your
21 immediate right or is it slightly behind you
22 or do you know?
23    A.   No, I'm not familiar exactly where
24 it was at, but I know it was on the right
25 side.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
109–112

Page 109

1    Q.   Okay.
2    A.   I can't determine if it was beyond
3 or -- I couldn't say actually.
4    Q.   Okay.  And then you say it kind of
5 pushed you over, is that right?
6    A.   Yes.
7    Q.   Okay.  Now, how long, if you know,
8 did the water actually make impact with your
9 body?
10    A.   I have no idea.
11    Q.   Okay.  Are you telling us that you
12 lost consciousness?
13    A.   Yes.  After it hit me, I lost
14 consciousness and I didn't even see -- all I
15 could remember is the next thing I knew I
16 was in the office between it hitting me and
17 I was in the office.  I have no idea of how
18 long that was between it hitting me and me
19 being in the office.  I have no idea between
20 that as well.  I don't know how long that's
21 been.
22    Q.   All right.  Do you remember George
23 calling Terry to the scene?
24    A.   Yes.  He called Terry to the
25 scene.  That's when we was in -- I believe

Page 110

1 we was in the office and he called Terry.
2    Q.   Let me -- let me say this, do you
3 remember George while at the wash rack
4 calling Terry to come to the wash rack?
5    A.   When we was in the office?  I
6 mean, no, I don't remember that.
7    Q.   Okay.  Do you remember having
8 interaction with George and the people from
9 E-Chem while at the wash rack?
10    A.   What timeframe are you talking
11 about, before the incident or after the
12 incident?
13    Q.   No.  After the incident, before
14 you were in the office?
15    A.   No.  I don't remember that.
16    Q.   Do you remember interacting with
17 Terry in the wash rack after the incident,
18 before you were in the office?
19    A.   No, because Terry wasn't there.
20 Terry wasn't -- I don't think Terry was
21 there before -- after the incident happened,
22 if I'm not mistaken, George called Terry.
23    Q.   Okay.  So let me -- tell me the --
24 everything that you can remember about the
25 incident.

Page 111

1    A.   Okay.  I was standing -- I was --
2 me and George was at the bottom level.  Me
3 and George was down at the bottom and the
4 E-Chem guy was on the top.
5    Q.   Okay.
6    A.   And he was saying, something's not
7 working.  So George went up and went and met
8 the guy from E-Chem and they were both up on
9 the second level.  And no more than
10 five minutes after they were up there,
11 that's when it exploded.
12    Q.   Okay.  And so -- all right.  And
13 during the time when George is up there,
14 what were you doing?
15    A.   I was looking down in the grate to
16 see if the -- if the water was filling up
17 down there.  Because it had to be a
18 certain -- a certain level before they could
19 activate it, and it was at thirty -- I
20 remember, it was at 35.
21    Q.   Thirty-five what?
22    A.   Water level, the water level for
23 the tank.
24    Q.   Okay.
25    A.   And the tank was at 35 and you

Page 112

1 can't operate it, from what I understood,
2 from me being back there, just looking at
3 them and observing of what they doing, I
4 don't think you could operate that -- you
5 couldn't operate the wash rack with just 35,
6 at 35.
7    Q.   Now, let me see if I can
8 understand.  My -- and, of course, I never
9 worked at the wash rack and didn't receive
10 any training, but my understanding is the
11 filter tank identified in Exhibit 3 is
12 essentially cleaning some water and that
13 water goes into a reservoir tank that's
14 beneath the filter tank.  Are you --
15    A.   I'm not familiar.
16    Q.   You're not familiar with that?
17    A.   No, I'm not.
18    Q.   Okay.  When you are saying that
19 they had to have 35, are you referring to a
20 tank that had to contain water or to
21 pressure or to what?
22    A.   Contain water.
23    Q.   To tank water?
24    A.   Yes, contain water, 35 is, I
25 guess, gallons.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
113–116

Page 113

1    Q.   Okay.  And which -- and do you
2 know what the name of that tank is?
3    A.   No, I don't.
4    Q.   Okay.  All right.  But there is
5 some tank that has to have a minimum amount
6 of water in it --
7    A.   Yes.
8    Q.   -- before --
9    A.   You can operate the system.
10    Q.   Before this spout that we see in
11 Exhibit 2 will actually operate?
12    A.   Yes.
13    Q.   Okay.  And somebody from E-Chem is
14 saying, well, the tank is not filling up?
15    A.   Uh-huh (indicating affirmatively).
16    Q.   Yes?
17    A.   If I'm not mistaken, yes.
18    Q.   Okay.  And so that's when
19 George -- George is going up there to see
20 why can't we get water in the tank?
21    A.   Correct.
22    Q.   Okay.  And did you ever find out
23 why they couldn't get water in the tank or
24 why they couldn't get enough water in the
25 tank?

Page 114

1    A.   No.
2    Q.   You have no idea?
3    A.   I have no idea.
4    Q.   Okay.  And so you're basically
5 just looking into the tank to see if water
6 is going in it?
7    A.   Yes.
8    Q.   All right.  So you're not --
9    A.   Well, it's not -- it's not a tank.
10 I'm not looking into a tank.  I'm looking
11 into a grate.  It's a grate and water goes
12 into a big old square.  I wouldn't -- cause
13 it's not a tank, it's not a -- it's just a
14 grate where you can see the water.  I can
15 see the water coming in there.
16    Q.   Okay.  But that, whatever this
17 thing is, it holds the water that's going to
18 be used to clean --
19    A.   Yes, cause all it does is
20 circulates.  You clean it, it goes back in
21 circulation.  Just -- they use the same
22 water over and over and over again.
23    Q.   And the -- and the tank that we
24 see in Exhibit 3 is part of the cleaning
25 system that cleans the water, is that right?

Page 115

1    A.   It's a filter, so I guess so.
2    Q.   All right.  So you're standing
3 down in the position that we talked about
4 with the tank off to your right?
5    A.   Uh-huh (indicating affirmatively).
6    Q.   For approximately five-minutes
7 while George is up on the second level with
8 the E-Chem guy.  Tell me, did you hear an
9 explosion?
10    A.   Oh, yes.
11    Q.   So what did that sound like?
12    A.   A boom.  I mean, a loud explosion.
13    Q.   Okay.  And then what happened?
14    A.   Then the next thing I know, I was
15 sitting in the office.
16    Q.   Okay.  Did you ever feel any water
17 on you?
18    A.   Oh, yes.
19    Q.   Okay.
20    A.   I felt it, yes.  I felt it and
21 when I -- when I got in the office, I said,
22 "Look like oil is all spotted."  I said,
23 "What's all this?"
24        They said, "That's not oil."
25        I said, "It look like oil,"

Page 116

1 because it's spots.  It was -- had just like
2 little, little spots all over me and all my
3 backside was wet.
4    Q.   Okay.
5    A.   So I guess that's from debris
6 hitting me, I guess, the spots was.  I have
7 no idea.  I don't know.
8    Q.   You don't know what exactly hit
9 you?
10    A.   No, I don't.
11    Q.   But what I'm -- but I want to make
12 sure I know what -- I want to make the
13 distinction, if we can, Mr. Hardy, between
14 what you know happened and what you assume
15 happened.  You understand?
16    A.   Okay.
17    Q.   Okay.  So I know that you heard
18 the boom noise that you described?
19    A.   Uh-huh (indicating affirmatively).
20    Q.   Right?  Did you feel water before
21 you woke up?  In other words, did you just
22 realize you'd been hit by water after you
23 woke up?
24    A.   No, I felt it -- I felt it when it
25 exploded.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
117–120

Page 117

1    Q.    And where did it hit on your body?
2    A.    It hit from my neck, my -- the
3 back of my head, the right side, my neck,
4 and my shoulders and my upper -- and my
5 upper back.
6    Q.    Okay.
7    A.    That's where it hit.
8    Q.    And how hard would you say that
9 was?  It was hard enough to push you over,
10 you said.
11    A.    It pushed me over.
12    Q.    Would you say it was harder
13 than a shower of water coming out of the
14 shower nozzle?
15    A.    I guess.
16    Q.    I mean, you take a shower more or
17 less every day?
18    A.    Yes.
19    Q.    And, unfortunately, we -- sometime
20 we have a nice hard shower and sometimes we
21 have kind of a little weak shower, but it
22 was harder than the hardest shower you've
23 ever taken in your life?
24    A.    Yeah.
25    Q.    How would you compare it to, say,

Page 118

1 the water coming out the end of the fire
2 hose when you worked as a fireman?
3    A.    I couldn't compare it.  I can't
4 compare it to -- one is an explosion and one
5 is controlled.
6    Q.    Okay.
7    A.    So one is -- I can't compare that.
8 I never -- I'm not -- I'm not the person to
9 compare something like that.
10    Q.    Okay.  All right.  Do you have any
11 estimate of the force that you were struck
12 by?
13    A.    I have none.
14    Q.    Okay.  So when you wake up and
15 you're back in the office, I take it you
16 don't have any memory of being taken from
17 the accident scene back to the office?
18    A.    No.
19    Q.    Do you have any memory of riding
20 in a truck --
21    A.    Oh, yes.
22    Q.    -- back to the office?  So you
23 remember --
24    A.    With Terry.
25    Q.    Okay.  So you remember riding --

Page 119

1 well, hold on now.  When did that happen?
2    A.    Terry -- when Terry came over, we
3 walked back.  I figure it was out of the --
4 well, after I left out of the office, Terry
5 came over and we walked back to where -- to
6 this tank.  That's when the gasket was out.
7 Terry wanted to say, "Well, let's fix it.
8 Let's crank it back up."
9    Q.    Terry said that?
10    A.    Yes, he did.
11    Q.    Okay.  And who said not to do
12 that?
13    A.    He determined, well, no, let's
14 just shut it down.  He determined he wanted
15 to fix it.  They got up, Terry got up on the
16 rail, George was up on the rail, on this
17 side.  On the -- George was up on the scaffold
18 and Terry got up on -- you could -- you
19 could walk -- they got like little --
20    Q.    Hold on just a minute.
21    A.    Okay.  She don't see it.
22    Q.    When you say "this," this can be
23 this, this, this.  You understand?
24    A.    Yes.
25    Q.    Okay.  If you were --

Page 120

1    A.    Okay.
2    Q.    Hold on.  Hold on.  Let me just
3 describe it and if I get it wrong, you tell
4 me.
5    A.    Okay.
6    Q.    You were looking at Exhibit 3?
7    A.    Uh-huh (indicating affirmatively).
8    Q.    And you were indicating George is
9 standing over here and you're pointing off
10 to the left-hand side of the photograph --
11 off of the -- something we can't see in the
12 picture, but on the left side of the
13 picture, correct?
14    A.    George was standing on the rail.
15 They got a -- they got a permanent rail --
16    Q.    Okay.
17    A.    -- that you can climb up and you
18 can -- it's like a -- I call it -- it's a
19 scaffold.
20    Q.    Where is it, in relation to
21 Exhibit 3?
22    A.    Right up in this area.
23    Q.    Off to the left side of the
24 picture?
25    A.    To the left, the tank -- the tank



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
121–124

Page 121

1 is like this here (indicating).  Terry was
2 on this side and George was on the scale --
3 on the scaffold, on this side and they -- he
4 walked up, they got some little pipes where
5 you can stand.  You got some pipes right
6 here where you can stand up and you can be
7 right even with it.  It'd be right there
8 with you.  And -- and I was standing
9 approximately right where I got hit by the
10 pressure and so Terry said, "Well, let's see
11 if we can fix it."
12      Q.   And so let me -- I'm trying to get
13 some basic order here.
14      A.   Okay.  I might be --
15      Q.   I'm really not fighting with you,
16 so don't misunderstand me.
17      A.   Okay.
18      Q.   I am -- I am --
19      A.   You're trying to understand.
20      Q.   Just trying to make sure what
21 you're saying comes out clearly so we can
22 all follow it.
23      A.   Okay.
24      Q.   I'm not -- so just let me try and
25 get it out of you a little piece at a time.

Page 122

1      A.   Okay.
2      Q.   Okay.  So earlier, you had told
3 me, you didn't have any memory between right
4 after the accident and then you -- until you
5 woke up in the office, correct?
6      A.   I didn't wake up, I don't know if
7 I woke up or --
8      Q.   Did you walk to the office?
9      A.   Yeah, nobody carried me.  I don't
10 think nobody carried me to the office.
11      Q.   Okay.  Did you --
12      A.   I just don't remember -- I just
13 don't remember getting to the office.
14      Q.   Okay.  So, well, let me ask it
15 this way:  Do you remember riding from the
16 wash rack to the office in Terry's truck?
17      A.   Yes.
18      Q.   Okay.  So are you saying that
19 after you got to the office, you went back
20 to the wash rack?
21      A.   We went back to this -- the tank,
22 we went back to the tank.
23      Q.   And that's where the wash rack is?
24      A.   Yes.
25      Q.   Okay.  This is just --

Page 123

1      A.   We never left the wash rack.
2      Q.   So when you say you went to the
3 office --
4      A.   They have an office in the -- at
5 the wash rack.
6      Q.   I see.  Okay.  So you're not
7 saying back at the main office?
8      A.   No, no.  I'm sorry.  No.  They
9 have an office at the wash rack.  The office
10 from where this here happened at, the office
11 no further than from here to that fence
12 right there.
13      Q.   So maybe 70 feet or so?  I don't
14 know --
15      A.   Approximately, I guess.  It's
16 about that far from the office.
17      Q.   So there's -- the wash rack in
18 general is just kind of an open -- it's a --
19 it looks like a giant carport?
20      A.   Exactly.
21      Q.   Okay.  And I don't know exactly
22 how long it is, but you can hold about four
23 cars underneath there, right?
24      A.   You can hold two.  The length --
25 the length of it is approximately, I would

Page 124

1 say, maybe two cars.
2      Q.   Okay.  And then it's a couple
3 of -- it's a couple wide, right?  There's
4 one on one side and one on the other side?
5      A.   Two on -- two on one side and two
6 on the other side.
7      Q.   Okay.  So however wide that is,
8 it's about 50 feet wide, I would guess.
9      A.   We would wash four cars at a time.
10      Q.   Okay.  So somewhere up underneath
11 this giant carport, right, is an office?
12      A.   Exactly.
13      Q.   Okay.  So I -- so I was confused
14 because you were saying, "I went to the
15 office."  And I was like -- cause that
16 was -- the main office, you actually have to
17 get in a truck and drive?
18      A.   Yes, yes.
19      Q.   I see.  So when you say you woke
20 up, quote, in the -- or you woke up maybe or
21 you became aware --
22      A.   Yes.
23      Q.   -- in the office.  You mean the
24 office that's underneath this giant carport
25 where the wash rack is?



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
125–128

Page 125

1    A.   Exactly.
2    Q.   Okay.  That's what was causing me
3 confusion.
4    A.   I'm sorry -- sorry about that.
5    Q.   And so -- so from where you were
6 when you lost memory --
7    A.   Uh-huh (indicating affirmatively).
8    Q.   -- to the location of the wash
9 rack office is approximately 50 to 75 feet?
10    A.   Could be, yeah.
11    Q.   And exactly how you managed to get
12 there, you don't know, but you would surmise
13 that you walked?
14    A.   Yeah.
15    Q.   How much do you weigh?
16    A.   I weigh 235.
17    Q.   And that -- is that about what you
18 weighed then?
19    A.   Uh-huh (indicating affirmatively).
20    Q.   And you would -- I mean,
21 obviously, you think you walked or at least
22 partially walked -- these people didn't
23 carry a 235-pound man.
24    A.   I think I walked there.
25    Q.   Okay.  And so while you were still

Page 126

1 at the wash rack, okay, whether in the
2 office or in the vicinity, does Terry come
3 to the location?
4    A.   Yes.  Terry comes to the location.
5    Q.   Okay.  And then there was some
6 discussion about trying to put the filter
7 tank, that we see in Exhibit 3, back
8 together?
9    A.   Yes.
10    Q.   And the ultimate conclusion was,
11 no, we're not going to do that right now?
12    A.   They shut it down.
13    Q.   Shut it down?
14    A.   Yes.
15    Q.   And at that point, did you get in
16 the truck with Terry?
17    A.   Yes.
18    Q.   Okay.
19    A.   Terry, Terry called his supervisor
20 and he said, "We're going to shut it down
21 for tonight.  Y'all go, y'all can go home."
22       When he told me he called his
23 supervisor -- his supervisor's named
24 Shannon, and Shannon said, "Take a picture
25 of the back of his neck to cover his ass."

Page 127

1 Excuse me.
2    Q.   Now, were you -- were you
3 requesting medical attention at that time?
4    A.   No, I didn't request anything at
5 that time.
6    Q.   Now, were you having pain at that
7 time?
8    A.   At the first -- I mean, right off
9 the bat, I mean, the back of my neck -- I
10 mean the head, and the neck area, at that
11 time, it was -- it was pain at that time,
12 yes.
13    Q.   And -- and why didn't you want to
14 seek medical attention?
15    A.   They didn't ask me, so he told me
16 go home.
17    Q.   Okay.
18    A.   I figured they would offer, but
19 they didn't offer me for medical attention.
20 He just sent us home, you can go home.
21    Q.   Okay.  Is it your sworn deposition
22 testimony that Terry did not ask you if you
23 were okay?
24    A.   He actual -- I -- I'm not sure if
25 he did or not, but to say that he wrote an

Page 128

1 incident report and then took a picture of
2 it, evidently he thought otherwise, that I
3 was hurt.
4    Q.   Okay.  So you think he concluded
5 that you were hurt because he wrote an
6 incident report?
7    A.   Yeah.  I mean --
8    Q.   When did he --
9    A.   And he took a picture -- and he
10 took a picture.
11    Q.   When did he take the -- when did
12 he write the incident report, to your
13 knowledge?
14    MR. SHELTON:
15       Objection.
16       Go ahead.
17    THE WITNESS:
18       I don't know.  I don't know when
19 he did that.
20 EXAMINATION BY MR. CRAWFORD:
21    Q.   When -- well, I've seen a
22 handwritten statement that you wrote?
23    A.   Yeah.
24    Q.   When did you write that?
25    A.   I wrote that that same night



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          129–132

Page 129

1 before I left.
2     Q.   Okay.  Okay.
3        MR. CRAWFORD:
4           Let me see, we're going to show --
5 we're on number 5, right?
6        THE REPORTER:
7           I don't know.
8        MR. CRAWFORD:
9           You don't know, I'm on number 5.
10 I'm going to go with number 5.
11           We're on number 5.
12           (Exhibit No. 5 marked for
13 identification.)
14 EXAMINATION BY MR. CRAWFORD:
15    Q.   Mr. Hardy, I'm showing you
16 number 5.  Is that your handwriting?
17    A.   Yes, it is.
18    Q.   Is that your statement?
19    A.   (Reading).
20    Q.   Listen to me.  Take your time.
21    A.   (Reading).
22    Q.   Okay.  Is that the statement that
23 you wrote that night?
24    A.   Yes.
25    Q.   Exhibit 5?

Page 130

1     A.   Yes.
2     Q.   That's all in your handwriting?
3     A.   This is.
4     Q.   And that's your signature?
5     A.   Uh-huh (indicating affirmatively).
6     Q.   Can you read it out loud for us so
7 that she can take it all down?  You were
8 kind of mumbling, reading it to yourself.
9     A.   Okay.  "I, Johnnie Hardy, was
10 standing approximately 5 feet away from the
11 filter tank when it blew up, and the water
12 from the tank hit the back of my head."
13    Q.   Now, is there anywhere on there
14 that you suggest that you were in pain?
15    A.   No.
16    Q.   Is there anywhere in there that
17 you suggest that you needed medical
18 attention?
19    A.   No.
20    Q.   Okay.
21        MR. CRAWFORD:
22           I'm going to attach this as
23 number 6.
24           (Exhibit No. 6 marked for
25 identification.)

Page 131

1 EXAMINATION BY MR. CRAWFORD:
2     Q.   And Exhibit 6 is two pages and the
3 first page has two photographs on it.  And
4 the second page looks to me maybe to be just
5 a bigger version of one of those same
6 pictures to be honest.  I really think it's
7 only two.
8           Would you take a look at that?
9     A.   (Reading).
10    Q.   Okay.  Now do you recognize
11 Exhibit 6 as being the back of your head?
12    A.   Uh-huh (indicating affirmatively).
13    Q.   Yes?
14    A.   Yes.
15    Q.   And I can't tell if that's three
16 pictures or two and we just reprinted one of
17 them.  I don't really know as to what
18 that -- my staff handed it to me.
19           I said, "I need those pictures."
20           And they gave them to me this way.
21           To the best of your knowledge, are
22 these the photographs that Terry took to,
23 quote, unquote, cover his ass?
24    A.   Yes.
25    Q.   Okay.  And these are photographs

Page 132

1 that were taken that night?
2     A.   That's what Shannon said.  Shannon
3 told him that to cover his ass.
4     Q.   Okay.  Did you hear that
5 conversation?
6     A.   Pretty much, yes.
7     Q.   Yes?
8     A.   For him to say it, he's on the
9 phone.  You could hear -- if you get on your
10 cell phone right now, you have it up there.
11 You talk and I can pretty much -- we can
12 pretty much all hear you in the room.
13    Q.   In a room that's quiet like this?
14 Okay, fair enough.
15           So to be clear, though, this is
16 the photograph that is taken while you were
17 still at the -- the main office, I'm going
18 to call it, at the Savage location at Sasol?
19    A.   Yes.
20    Q.   And these are photographs taken by
21 Terry?
22    A.   Yes.
23    Q.   And this is taken shortly after he
24 has his phone conversation with someone
25 named Shannon?



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
133–136

Page 133

1    A.   Yes.
2    Q.   Do you know Shannon's last name?
3    A.   I don't know Shannon's last name.
4 When we was in training, all I knew was
5 Shannon.
6    Q.   Okay.  All right.
7    A.   And then that ain't -- then they
8 say -- then they would tell us, that's not
9 his name.  His name is something else.
10        And I said, well, what is his
11 real -- I don't remember, they told me some
12 name.  But I called him Shannon.
13    Q.   Okay.  Is there any outward sign
14 of injury that you can see in the
15 photographs on Exhibit 6?
16    A.   I can't tell by these pictures and
17 what have you, I couldn't tell.
18    Q.   Okay.  Can you take this pen and
19 circle for us the area where you believe --
20 hold up, listen to me.  Let me get the
21 question out.  Where you believe the water
22 made contact with you in the accident and
23 just do it --
24    A.   He got me -- he got me all over,
25 but the majority of it (complying) --

Page 134

1    Q.   Okay.  Now, this clothing that
2 you're wearing in the photograph, is that
3 part of a uniform?
4    A.   Yes, that's a uniform.
5    Q.   And I don't know how it works at
6 Savage, do you change into the uniform when
7 you get there?
8    A.   Uh-uh (indicating negatively), you
9 wear them home.
10    Q.   Okay.  Now, is the photograph --
11 when I look at the photograph, I can't
12 necessarily tell if this is a wet uniform.
13 Is that a wet uniform?
14    A.   It should be wet.
15    Q.   Well, I'm asking you.
16    A.   I can't tell -- I can't tell.
17    Q.   Okay.
18    A.   I can't tell.
19    Q.   Well, tell me this, your
20 recollection of the volume of water that was
21 on your uniform after the incident, how wet
22 did you believe it was?  Was it drenched?
23 Was it just a little damp?  What?
24    A.   It was wet.  I mean, I can't -- I
25 can't determine how much water it was, I

Page 135

1 just can't determine that.
2    Q.   You agree with me from these
3 photographs, you can't necessarily tell that
4 the uniform was wet at all, correct?
5    A.   Because it's been a while.  It was
6 a while before I got to his office as well.
7    Q.   Okay.
8    A.   It could have -- a lot of it
9 probably dried up as well, cause we -- cause
10 when we went back to the tank and stuff, we
11 didn't go right back to his office right
12 after it happened.
13    Q.   All right.
14    A.   We were still out in the field for
15 a little while as well.
16    Q.   Did you ever ask Savage to provide
17 you with medical care?
18    A.   No.  I know one thing, he wanted
19 me to come back while I was still under the
20 doctor's orders.
21    Q.   Who is he?
22    A.   Ed Lee.
23    Q.   Ed Lee?
24    A.   Yes.
25    Q.   Did Ed ask you to come back or was

Page 136

1 it somebody else?
2    A.   Ed.
3    Q.   You spoke directly with Ed?
4    A.   Directly to Ed Lee.
5    Q.   Okay.  Did Ed ask you to come back
6 and do training on the computer?
7    A.   Did some training on the box for
8 the operation.
9    Q.   And that's a simulated operation
10 that you do in the office, correct?
11    A.   Yes.
12    Q.   So Ed wasn't asking you to come
13 back to full body work, he was asking you to
14 come back and do additional training,
15 correct?
16    A.   Yes.
17    Q.   Okay.  Let's back up for a moment.
18 When was the first time that you told
19 anybody at Savage that you had physical
20 injuries that were going to prevent you from
21 returning to work?
22    A.   I can't recollect.  I don't -- I
23 don't remember that.
24    Q.   Okay.  Well, so the incident
25 happens on a -- on a Friday, is that right?



Page 137

1    A.   Right.
2    Q.   And it happens at night?
3    A.   Night.
4    Q.   And you told me you could tell me
5 exactly what time?
6    A.   11:00.  11:00 p.m.
7    Q.   Okay.  I had been told 11:18.
8    A.   Okay.
9    Q.   That's close enough, right?
10   A.   Yeah.
11   Q.   All right.  But it was -- it was
12 late at night, not late, late, but, I mean,
13 almost midnight?
14   A.   Yes.
15   Q.   Okay.  And shortly after it
16 happened, they told you to go home?
17   A.   Yes.
18   Q.   Okay.  And did you seek medical
19 attention that night?
20   A.   No.
21   Q.   And then the first time you sought
22 medical attention was the following morning?
23   A.   Yes.
24   Q.   And I've got -- you went to a
25 place called Fast Pace Health, is that

Page 138

1 right?
2    A.   Yes.
3    Q.   You didn't call anybody on
4 Saturday night to tell them you'd gone to
5 see Fast Pace Health, nobody at Savage?
6    A.   Not that I can recall.
7    Q.   And you didn't call anybody at
8 Savage?
9    A.   I honestly don't remember when I
10 called them, but I called them to let them
11 know.
12   Q.   Okay.  So -- so to my knowledge,
13 what I have been told, is that you called
14 Matt Moyer at around 7:15 on May 10th -- at
15 night?  Does that sound right to you?
16   A.   I can't recall that.  If it is --
17   Q.   Let me --
18   A.   But, I mean --
19   Q.   You know --
20   A.   -- I don't remember if I did or
21 didn't.
22   Q.   Okay.  And you're not saying that
23 you called earlier than that?
24   A.   I'm not.  I don't remember when I
25 called them, but I did call them.

Page 139

1    Q.   Okay.  And do you remember you
2 told Matt Moyer you couldn't come to work
3 because you were under doctor's orders?
4    A.   I had a doctor excuse.
5    Q.   Okay.  And did Matt Moyer ask you
6 to come in and do training during that
7 conversation?
8    A.   I'm not familiar with that
9 conversation with him.  But I know with Ed
10 Lee, talking to Ed, he wanted me to come in
11 and do some computer stuff with the remote
12 box for the locomotives.  I do remember
13 having the conversation with him on that --
14 with Ed Lee.
15   Q.   Okay.  So did you -- I'm showing
16 that you talked to Ed Lee on that Monday,
17 May 11th, about 2:00 in the afternoon.
18       Does that sound right?
19   A.   That could be right.
20   Q.   And that's when he asked you --
21 that's when Ed Lee asked you to come in for
22 training?
23   A.   Yes.
24   Q.   Okay.  And this is after you sent
25 them a picture of your doctor's note,

Page 140

1 correct?
2    A.   Yes.
3    Q.   And after you -- after you had
4 that conversation and Ed asked you to come
5 in and do additional training, you went back
6 to a different doctor?  Is that right?
7    A.   No.  It was the same -- it was --
8 what the deal was, Ed wanted me to come back
9 while I was on sick leave.  Ed wanted me to
10 disobey doctor's orders.  I wasn't supposed
11 to come back until the 12th.  Ed told -- he
12 wanted me to come back right then and there.
13 Ed didn't care what the doctor said.
14       So I said, "I'm under doctor's
15 orders.  I can't go back and go sit in your
16 computer while I'm taking this medicine.
17 There is no way I can do that."
18   Q.   So on May 11, Ed Lee has a
19 conversation with you at 2:00 in the
20 afternoon and he says he wants you to come
21 do training.  You're saying he wants you to
22 do it on the 11th and not on the 12th?
23   A.   He wanted me to come in right then
24 when he talked to me that day.
25   Q.   Okay.  And did -- did you go back



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
141–144

Page 141

1 to the urgent care facility that evening?
2    A.   I went back the next day.  If I'm
3 not mistaken, it was one of those days.
4    Q.   And you got a different doctor's
5 orders through the 18th, is that right?
6    A.   Yes.
7    Q.   But the original one said you
8 could go back to work on the 12th?
9    A.   The original one said to go back
10 on the 12th.
11    Q.   I'm asking you.
12    A.   Yes, on the 12th.
13    Q.   There is a question mark at the
14 end of that?
15    A.   Yes.
16    Q.   So -- and then the new one said
17 you shouldn't operate any equipment, is that
18 right?
19    A.   Correct.
20    Q.   You shouldn't drive a car?
21    A.   Correct.
22    Q.   Were you on any kind of medication
23 that would interfere with you operating
24 equipment?
25    A.   Yes.  I'm not -- I'm not familiar

Page 142

1 with what I was on, but they did give me --
2 prescribe me medication.
3    Q.   How did you happen to go see
4 Dr. Do over in Houston?
5    A.   I drove there.
6    Q.   I see.  So you couldn't drive to
7 the office, but you could drive to Houston?
8    A.   I couldn't drive to the office,
9 but I could -- I was under doctor's care,
10 so...
11    Q.   Okay.  So you --
12    A.   He wanted me to work.  He wanted
13 me to go to work.
14    Q.   All right.  So you -- and the
15 work, of course, is training on a computer
16 with a box, correct?
17    A.   Right, that I know of.  That's
18 what he was -- that he was telling me that.
19 But with Ed, he might have had something up
20 his sleeve that I -- he wanted me to go back
21 and then fire me or something.  I don't -- I
22 don't know what he had up his sleeve.  But
23 for him to say that he wanted me to go back
24 and don't worry about what the doctors say,
25 who are you to say that you want me to go

Page 143

1 back and I'm still under doctor's care.
2    Q.   So is it your sworn testimony that
3 Ed Lee told you to ignore the doctor's
4 orders?
5    A.   No.  He didn't say that, no.  In
6 his -- but in his way he was saying come on
7 to work.
8    Q.   All right.  You agree with me that
9 the actual words that Ed said, regardless of
10 what he might have had in his head, his
11 actual words were, come in and do this
12 training on the box, correct?
13    A.   Uh-huh (indicating affirmatively).
14    Q.   Yes?
15    A.   Yes.
16    Q.   So how did you know to go to
17 Dr. Do in Houston?
18    A.   Well, I talked to my lawyer and he
19 gave me some names and I picked Dr. Do out
20 of those names.
21    Q.   So when you went to see Dr. Do in
22 Houston, did you spend the night in Houston
23 or did you drive and come back all in the
24 same day?
25    A.   I'm not -- no, I don't recall.  I

Page 144

1 don't recall what I did that -- when I went
2 to see Dr. Do.  I don't know if I stayed at
3 relatives, or -- I honestly don't remember
4 because I've seen so many doctors, so...
5    Q.   Uh-huh (indicating affirmatively).
6    A.   And sometime I would go to Dr. Do
7 and I would -- I would spend a night.  They
8 did have days where I would spend the night.
9    Q.   Okay.  When you stayed and spent
10 the night, where would you stay?
11    A.   Sometime I would stay at a
12 relative.  Sometime I'd stay at a hotel.
13    Q.   Have you paid for any medical
14 treatment?
15    MR. SHELTON:
16        Objection to form.
17 EXAMINATION BY MR. CRAWFORD:
18    Q.   You can answer.
19    A.   I have -- I have my own insurance
20 as well, too.
21    Q.   So I'm still asking, have you,
22 have you paid for any of your medical
23 treatment?
24    MR. SHELTON:
25        Same objection.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
145–148

Page 145

1    MR. CRAWFORD:
2        Are you instructing him not to
3 answer or --
4    MR. SHELTON:
5        No.
6    MR. CRAWFORD:
7        All right.
8 EXAMINATION BY MR. CRAWFORD:
9    Q.  Have you paid for any?
10    A.  My insurance, I gave them my
11 insurance and stuff, so I don't know what
12 they're doing with my insurance or what.
13    Q.  Okay.
14    A.  I do have insurance.
15    Q.  I know that you had Blue
16 Cross/Blue Shield at one point.  Do you
17 still have Blue Cross/Blue Shield?
18    A.  Yes, I do.
19    Q.  And is that provided to you from
20 your retirement with the fire department?
21    A.  Uh-huh (indicating affirmatively).
22 Yes.
23    Q.  Have you been required to pay any
24 co-pays, any out-of-pocket expenses?
25    A.  For medication.

Page 146

1    Q.  For medication?
2    A.  Uh-huh (indicating affirmatively).
3    Q.  Is there a location where you go
4 to get your medicine?
5    A.  Well, it's kind of -- kind of up
6 in the air with that and stuff.  Sometime I
7 would use LRx.
8    Q.  LRx?  Hold on, LRx?
9    A.  LRx.
10    Q.  Okay.
11    A.  And CVS.
12    Q.  So, LRx, is that a store?
13    A.  That's a pharmacy.
14    Q.  That's what I'm saying.  It's a
15 building?
16    A.  Yes.
17    Q.  I don't know where LRx is.  Is it
18 somewhere in Lake Charles?
19    A.  It's in Houston.
20    Q.  In Houston?  Okay, I see.  Okay.
21 And the CVS, is there a specific CVS you go
22 to?
23    A.  Not any more.
24    Q.  Any of them?
25    A.  Yeah, any of them.

Page 147

1    Q.  And is there -- the one that you
2 typically go to?
3    A.  They have one on Bryan, they have
4 one on Nelson.
5    Q.  But they all have your info?
6    A.  Yeah.
7    Q.  Okay.  Well, before I forget it,
8 is Exhibit 1 a copy of your photo -- of your
9 driver's license?
10    A.  Uh-huh (indicating affirmatively).
11 Yes.
12    Q.  I want to just make sure I do that
13 before I forget about it.  Which physicians,
14 or other healthcare providers, because some
15 of them I don't think are doctors, are
16 you -- have you seen since the accident?
17    A.  I've seen Dr. Victoria Do, I've
18 seen Dr. Hernandez, Dr. Pollock, Dr. Small,
19 and Dr. Henry.
20    Q.  Okay.  If you know, okay, do you
21 know the full name of Dr. Hernandez?
22    A.  No, I don't.  I don't know the
23 full name of none of them really, but the
24 last names.
25    Q.  Do you know what Dr. Hernandez's

Page 148

1 specialty is?
2    A.  In pain.
3    Q.  He's a pain doctor?
4    A.  Uh-huh (indicating affirmatively).
5    Q.  Do you know what Dr. Small's
6 specialty is?
7    A.  I know he's the one that looked at
8 my -- my shoulder and my -- and my neck --
9 and my -- and my back as well.
10    Q.  Okay, now, when did you hurt your
11 back?
12    A.  That was the same -- that was the
13 same night.  That was the same night.  I
14 didn't put that on here, but it was the same
15 night.
16    Q.  On -- on May 8th?
17    A.  Yes.
18    Q.  But not because the water hit you?
19    A.  Yes.
20    Q.  Okay.  How did you hurt your back?
21    A.  When that hit me, it hit the back
22 of my head, it hit my neck, it hit my upper
23 back and my shoulder area.  All this area
24 right up in here (indicating).
25    Q.  Okay.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
149–152

Page 149

1    A.   All up in there, right there.
2    Q.   How did you hurt your back?  What
3 part of your back are you referring to, I
4 guess?
5    A.   The upper -- upper center --
6 center right, upper center right.
7    Q.   You're still referring -- you're
8 still gesturing toward your shoulder area,
9 you just mean the backside of your shoulder?
10    A.   The upper, upper here, upper back.
11    Q.   You're not -- when you say back,
12 you don't mean your lower back?
13    A.   Upper.
14    Q.   You mean --
15    A.   Where the shoulder blades.
16    Q.   Shoulder blades and up?
17    A.   Right.
18    Q.   Okay, I understand.  I just want
19 to make sure we -- you know, what -- when
20 you say back, what that means, right?
21    A.   Okay.
22    Q.   Dr. Henry, do you know what kind
23 of doctor he was?
24    A.   I think he was maybe a
25 psychiatrist.  I'm not -- I'm speculating on

Page 150

1 that.  Put a question mark on the side of
2 that one.
3    Q.   All right.
4    A.   I know y'all are going to find
5 out.
6    Q.   We'll go through that in a minute.
7 And Dr. Pollock?
8    A.   Dr. Pollock is the brain.
9    Q.   I think he's a neuropsychologist,
10 but he's looking at your brain to see if
11 something is wrong with it?
12    A.   Right.
13    Q.   What is your understanding from
14 Dr. Pollock, what he says?
15    A.   He shows that -- that I have -- I
16 had a concussion and I have brain injury.
17    Q.   And what's he doing for it?
18    A.   Well, they can't -- they can't do
19 anything right now because of my -- my sugar
20 level.  They can't like -- I guess I'm going
21 to have to have surgery.  I'm going to have
22 surgery for it.
23    Q.   For your brain?
24    A.   You have to do what you have to.
25    Q.   Okay.  All right.

Page 151

1    A.   But right now, they can't do
2 anything because of my sugar level and my
3 high-blood pressure.  They can't do anything
4 till they get that under control.
5    Q.   Okay.  Now, I had seen somewhere
6 where you have a doctor in Houston who
7 treats your diabetes, is that right?
8    A.   Dr. Victoria Do.
9    Q.   She's the -- she's the one?
10    A.   Uh-huh (indicating affirmatively).
11    Q.   And you had never seen Dr. Do
12 before May 8th, 2020, is that right?
13    A.   Correct.
14    Q.   And she was somebody that was
15 identified for you by your attorneys,
16 correct?
17    A.   She was one of them.  I picked
18 her.
19    Q.   Okay.  And then do you remember
20 who the others were?
21    A.   The other was Dr. Little -- no,
22 no, not Little, Small.  I'm sorry, Small.
23    Q.   So Dr. Small was one that they
24 identified that you could pick and then you
25 eventually saw Dr. Small, though, right?

Page 152

1    A.   Yes.
2    Q.   Okay.  Anybody other than Dr. Do
3 and Dr. Small that was suggested to you
4 initially?  Did I ask you that?
5    MR. SHELTON:
6       I'm going to instruct him not to
7 answer.
8    MR. CRAWFORD:
9       What's the basis for that?
10    MR. SHELTON:
11       Attorney-client privilege.
12    MR. CRAWFORD:
13       Well, he's the one who said he
14 had -- he was given choices and he picked
15 somebody.
16    MR. SHELTON:
17       And now you're getting into
18 communications about what we talked to him
19 about.
20    MR. CRAWFORD:
21       All right.
22 EXAMINATION BY MR. CRAWFORD:
23    Q.   What have you done to bring your
24 sugar levels under control?
25    A.   I take insulin and pills, diabetes



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
153–156

Page 153

1 pills.
2    Q.   Where do you get that filled, that
3 prescription?
4    A.   I get it delivered to me.
5    Q.   And so who provides that?
6    A.   LRx.
7    Q.   Okay.  And is it true that you
8 never received anything from LRx before
9 May 8th, 2020?
10    A.   True.
11    Q.   Before May 8th, 2020, where did
12 you get your insulin or your diabetes
13 supplies?
14    A.   I didn't have insulin then.
15    Q.   Okay.  There was a name -- here it
16 is.  And I'm looking at your response to
17 Interrogatory Number 13.  It identifies --
18 I'm going to butcher this last name.  I'm
19 going to spell it for you so, Dr. Maria
20 Bajaz, Bajaj, B-A-J-A-J?
21    A.   We just lost communication, her
22 and I.
23    Q.   But how do you say her name?
24 Bahaj?
25    A.   Bahaj, something with the --

Page 154

1    Q.   Like an h?
2    A.   Something like that.
3    Q.   It's B-A-J-A-J.
4    THE COURT REPORTER:
5        Wait a minute, say that again.
6    MR. CRAWFORD:
7        B, as in boy, A, J like Jaguar, A,
8 J like Jaguar.
9 EXAMINATION BY MR. CRAWFORD:
10    Q.   Okay.  So you had been treated,
11 I'm going to call her Dr. Maria, so I can
12 say that.  You had been treated by her for
13 your diabetes in the past, but you lost
14 contact with her?
15    A.   Yeah.  We just failed to
16 communicate.
17    Q.   And is she somebody that you saw
18 for your diabetes before May 8th, 2020?
19    A.   Yes.
20    Q.   Okay.  Do you test your blood
21 sugar every day?
22    A.   Not every day.  Majority of the
23 days, yes.
24    Q.   Okay.  When was the last time you
25 tested your blood sugar?

Page 155

1    A.   Before I left here.
2    Q.   This morning?
3    A.   No.  Before I left to come to --
4 to Baton Rouge.
5    Q.   And when was that?
6    A.   That was -- today is Wednesday,
7 Sunday -- it was Sunday when I did -- I
8 tested.
9    Q.   Okay.  And what was your blood
10 sugar then?
11    A.   It was at around 218.
12    Q.   Have you been in Baton Rouge since
13 Sunday?
14    A.   No.  No.  That's when I tested
15 last.
16    Q.   That's when you tested last.
17 Okay, when did you come to Baton Rouge?
18    A.   I came to Baton Rouge yesterday.
19    Q.   Okay.
20    MR. CRAWFORD:
21        I'm up to number 7.  I'm going to
22 staple everything together.
23        (Exhibit No. 7 marked for
24 identification.)
25 EXAMINATION BY MR. CRAWFORD:

Page 156

1    Q.   Take a look at Exhibit 7.  Is that
2 another photograph of the filter tank that
3 we're talking about?
4    A.   That's the one.
5    Q.   Okay.
6    MR. CRAWFORD:
7        I'm going to show you Exhibit 8,
8 which I think is three different
9 photographs.
10        (Exhibit No. 8 marked for
11 identification.)
12 EXAMINATION BY MR. CRAWFORD:
13    Q.   Does Exhibit 8 depict -- so how --
14 how tall is it, actually?  How tall is it?
15    A.   We'll get to that in a minute.
16    Q.   Is exhibit -- does Exhibit 8 show
17 other parts of the wash rack area?
18    A.   Yes.
19    Q.   I know there's some writing on
20 there.  Obviously, you didn't write the
21 writing, correct?
22    A.   Uh-huh (indicating affirmatively).
23    Q.   But on the photograph to the left,
24 the furthest left, there's a set of stairs
25 and is this generally depicting the



Page 157

1 scaffolding that you were describing
2 earlier?
3    A.   No.  The scaffold I was describing
4 earlier is right there.
5    Q.   In the middle?
6    A.   Yes, where the -- where the tank
7 is.  See the scaffold right by the tank?
8 You see right, the scaffold is right there
9 (indicating), that's the walk.  That's
10 the -- stand on that right there and that's
11 a shaker machine right there in back of it.
12    Q.   So let me just say this, if I'm
13 looking this direction, is the tank not
14 right there in the middle?
15    A.   Yes.
16    Q.   It's behind there, correct?
17    A.   Behind there.
18    Q.   You're just saying it's easier to
19 see it in the middle photograph?
20    A.   Yes, the scaffold that George
21 stands on.
22    Q.   Okay.  So George is -- is George
23 on the upper level all the way?
24    A.   All the way, he's on the -- he's
25 all the way up on the top, up the stairs.

Page 158

1    Q.   Okay.  So now I'm going to show
2 you this, and I know you didn't write this
3 in, but there is a bubble here that says the
4 other three team members were upstairs when
5 the event occurred and it has an arrow.
6 It's generally depicting the location where
7 George was located?
8    A.   No, the machine is on the other
9 side.  Let's see, yeah, this -- this is a
10 totally different side.  This is not --
11 let's see.
12    Q.   I'm going to come around beside
13 you, and I'm going to ask you the question.
14    A.   Tell me -- tell me which way is
15 northwest.  So you got two stairs.
16    Q.   Okay.  And he's going to challenge
17 me.
18    A.   Yeah, cause you -- cause you got
19 stairways on each side.  This here is I --
20 and George, if that -- if that, wherever --
21 wherever that machine that they operate to
22 start it at, that's where George and them
23 was standing at.  And I don't believe
24 they -- that machine is on that side.  I
25 believe that machine is over here on this

Page 159

1 side.
2    Q.   On the left?
3    A.   On the left.
4    Q.   Okay.
5    A.   The arrow is wrong.
6    Q.   And I can't -- well, I don't know.
7 So you just -- you -- you think this might
8 be the opposite side?
9    A.   Yeah, cause if this on this
10 side -- if that tank is on this -- I'm
11 sorry.  I'm --
12    Q.   No, no, no, this and that.
13    A.   Oh, okay.  If the -- if the tank
14 is on the right side, the machine where they
15 operate is on the -- on the left side.
16    Q.   Okay.  Let me say that back --
17    A.   Cause this the rail.
18    Q.   Yeah.  Listen, in fairness, I'm --
19 I'm more used to trying to say it real
20 precise, so listen real careful, okay?
21    A.   Okay.
22    Q.   There's three pictures we got
23 here, correct?
24    A.   Uh-huh (indicating affirmatively).
25 Right.

Page 160

1    Q.   Okay.  The picture on the far
2 right just shows some people standing on
3 some grating.
4    A.   Right.
5    Q.   Is that grating, to your
6 understanding, at the upper level?
7    A.   Yeah, it was right up there.
8    Q.   Okay.  All right.  Then in the
9 middle picture, we have a clear photograph
10 of the tank, correct?
11    A.   Uh-huh (indicating affirmatively).
12    Q.   And you can actually see the tank?
13    A.   Right.
14    Q.   Correct?
15    A.   Right.
16    Q.   All right.  Now, on the far left
17 photograph, we can see a set of steps
18 leading up to the upper level where some
19 team members are standing, correct?
20    A.   Uh-huh (indicating affirmatively).
21    Q.   All right.  You're saying there's
22 two sets of steps?
23    A.   On the other side.
24    Q.   There is a set that we see here in
25 this photograph and a set that we don't see



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
161–164

Page 161

1 on the opposite end?
2    A.   Exactly.
3    Q.   And you're not sure which side
4 we're seeing from this photograph on the
5 left?
6    A.   Right, cause if the tank is on
7 this side, the machine where they start it,
8 is on this side.
9    Q.   So I --
10    A.   It's on the board -- it's on the
11 wall -- well, it's not on the wall, it's
12 just an open --
13    Q.   I don't know that they're trying
14 to say precisely where they're standing up
15 top.  They're just trying to say they're
16 standing somewhere up top.
17    A.   Well, that arrow is wrong, cause
18 they was no where -- they was standing
19 there.  I was standing approximately right
20 here (indicating).
21    Q.   You -- you agree they were
22 standing on the upper level?
23    A.   Yes.
24    Q.   Just not precisely where the arrow
25 is?

Page 162

1    A.   Exactly.
2    Q.   Okay.  Now, I'm just -- I'm asking
3 you this.  I'm not suggesting to you that
4 it's so, okay?
5    A.   Okay.
6    Q.   We can see on the far left
7 picture, on the right-hand side, we can see
8 somebody in kind of an orange-looking top,
9 can you see that?
10    A.   Yes.
11    Q.   I don't know this, I'm asking you,
12 if the tank on this middle level on the
13 right-hand side like just behind the
14 stairway, is that approximately where you
15 were standing at the time of the incident?
16    A.   I can tell you right here, I was
17 standing right here, approximately, right
18 there.  I can't tell you where this part at,
19 but this here shows better.  I was standing
20 right here (indicating).
21    Q.   Okay.  So you could --
22    A.   Because Terry asked me the same
23 thing.
24       He said, "Where were you
25 standing?"

Page 163

1       I said, "I was standing right
2 there."
3    Q.   So I'm -- and I'm asking this.  In
4 this middle photograph, I see the tank.
5    A.   Uh-huh (indicating affirmatively).
6    Q.   It's just kind of a bright silver
7 tank and then just beside it, there's kind
8 of an upright, I don't know what this is, is
9 that a pipe?
10    A.   I guess it is.
11    Q.   I don't know.  I see it coming
12 down to like some kind of a flexible hose or
13 something at the bottom.  But -- and I don't
14 know.  Is this right?  Is this little pipe
15 that we see right next to it, is it forward,
16 is it just kind of --
17    A.   I don't know, with that picture
18 and stuff, I can't, I can't -- if I was
19 there, I could tell you, but other than
20 that, no, I can't tell you where that pipe
21 at and stand.
22    Q.   Yeah, I can't tell if this is in
23 the foreground --
24    A.   It's the fore, yeah, I was --
25    Q.   -- behind, you know what I'm

Page 164

1 saying?
2    A.   Cause I was standing like right in
3 here next -- it doesn't look -- it might
4 look like it's all cluttered up right there
5 with that picture, but it's not.  It's not
6 cluttered.
7    Q.   It's just, it's just the picture
8 is small.
9    A.   It's just that this pipe is --
10 yeah, it look like it make it cluttered up
11 to where you can't -- I can't stand right
12 there.
13    Q.   Okay.  But there is -- well,
14 that's what I was going to ask you.  But
15 you're telling me it was easy to stand
16 there.
17    A.   Yeah, cause it should -- cause I'm
18 going to tell you something else.  They got
19 this, this rail right here -- they got some
20 deals where you can stand on them.  You can
21 climb right here.  It's pipes and other kind
22 of stuff.  You can stand on there and you
23 can change that valve.
24    Q.   Which valve?
25    A.   This -- I mean, change -- take



Page 165

1 that filter out and do all this releasing,
2 unscrew those nuts and bolts and what have
3 you on here.
4    Q.   Did you ever have to undo the nuts
5 and bolts in that filter?
6    A.   Yes, I did.
7    Q.   Okay.  Was that part of your job?
8    A.   No, it wasn't.
9    Q.   Okay.  But you had done that
10 before?
11   A.   Yes, I did.  Cause if it would
12 be -- cause he wouldn't have no help at all.
13 He needed help.
14   Q.   Who?
15   A.   George, I'm sorry.  George needed
16 help to do it.
17   Q.   So George would -- that was part
18 of George's job and you would assist him
19 occasionally?
20   A.   I don't know if it was part of his
21 job because -- I don't think he's certified
22 to do that.
23   Q.   Okay.  But he was doing it?
24   A.   He was doing it.
25   Q.   Okay.  Whether it was part of his

Page 166

1 job or not, he was doing it?
2    A.   He was doing it.
3    Q.   And you helped him at times?
4    A.   Right.  Ed Lee was -- Ed, Ed Lee
5 knew he was doing that cause he would call
6 Ed and tell him, "Well, it's leaking again.
7 We got to shut it down."
8         You know, he would call and verify
9 it with Ed Lee.
10   Q.   Did you ever see this tank
11 leaking?
12   A.   Yes, I did.
13   Q.   And did it leak right there at
14 that spot?
15   A.   Yes, it did.
16   Q.   Okay.
17   A.   It did like a -- it did like a --
18 it did like an umbrella.  It was -- it was
19 leaking and that's when -- that's when
20 George said, "I'm tired of doing this here.
21 I ain't doing this no more."
22   Q.   Okay.  You were telling me earlier
23 you were looking into --
24   A.   Like the grate.  Look, see right
25 here?

Page 167

1    Q.   Uh-uh (indicating negatively).
2 Let me get the question out.
3    A.   Okay.
4    Q.   Otherwise, it's going to be a --
5 sound stupid.  I mean really, when you
6 haven't read one back, but trust me, I have.
7    A.   Okay.
8    Q.   You kept telling me you were
9 trying to look into something.  Can we see
10 it in this photograph?
11   A.   Yeah, you see these grates down
12 here, it's just like there's these grates
13 down there.
14   Q.   Beneath this blue --
15   A.   Yeah.
16   Q.   -- piece of equipment?
17   A.   If I'm not mistaken, yeah.  And
18 you can see water.  Water goes in and out
19 right there.
20   Q.   Okay.
21   A.   And I was looking and see if they
22 would fill up or not.
23   Q.   Okay.  But --
24   A.   Why they don't take a picture of
25 that grate?  See, they take a picture of

Page 168

1 this grate on the second level, but they
2 ain't taking a picture of where the grate
3 that's underneath where that water comes in
4 and out right there.
5    Q.   But just for the record, you're
6 looking at the middle photograph on
7 Exhibit 8 and pointing to the bottom of the
8 photograph?
9    A.   Yes.
10   Q.   And it's beneath -- there's a
11 piece of equipment that's blue and orange
12 and you're pointing to something that's
13 underneath there?
14   A.   Yeah, they got a grating
15 underneath there where water comes in and
16 out.
17   Q.   And this picture is not the best
18 one to depict that?
19   A.   No.
20   Q.   But that's -- that's the general
21 location where it is?
22   A.   Yes.
23   Q.   Okay.  Look, it's 12:58 y'all.
24   MR. SHELTON:
25       I'm good for lunch.



Page 169

1    THE WITNESS:
2        I'm ready to keep rolling.
3    MR. CRAWFORD:
4        I know.  All right, let's keep
5 rolling.  You got diabetes.
6        All right.  So we'll start back
7 at -- I don't know how quickly you can, I
8 can.  Y'all can probably eat in 30 minutes,
9 maybe 45 minutes for us to get back.
10        Yeah, we're going to shoot for
11 1:45.
12        (Whereupon, a recess was taken for
13 lunch.)
14        (Exhibit No. 9 marked for
15 identification.)
16 EXAMINATION BY MR. CRAWFORD:
17    Q.  I am going to show you what I have
18 marked Exhibit 9.  This has some
19 measurements in it because it shows a tape.
20 I don't know if this is accurate or not,
21 okay?
22    A.  Uh-huh (indicating affirmatively).
23    Q.  But it is what it is.  So I'll
24 show it to you and, again, this one has some
25 little bubbles with some writing in it.

Page 170

1    A.  (reading).
2    Q.  I will let you look at that for a
3 second.
4    A.  What is this measurements of?
5    Q.  Hold on.  I'll ask you a question
6 here in a minute.  I'm just letting you look
7 before I ask you a question, all right?
8    A.  Okay.
9    Q.  And if you can't make out any of
10 the distances in that picture, I understand.
11 On the -- on the photograph on the left, can
12 you see the measuring tape?
13    A.  No.  I can see the measuring tape.
14    Q.  But you can't make out any of the
15 numbers?
16    A.  No.
17    Q.  Okay, fair enough.  Let me see it.
18    A.  (Handing).
19    Q.  It looks to me like it's about
20 117, 118 inches where the arrow is pointed,
21 which -- so 120 inches is going to be
22 10 feet, right?  So -- and if you look at
23 the -- there's a little red mark -- anyway,
24 basically, the approximate height of this
25 thing is somewhere around 10 or 11 feet at

Page 171

1 the top.  Does that sound about right to
2 you?  And I'm not asking you --
3    A.  I don't know --
4    Q.  -- based on the measurement, I'm
5 asking you based on your recollection.
6    A.  No, it was right next to me and
7 I'm 5'11", so --
8    Q.  Yeah.  No, I understand.  Well,
9 let me ask it this way.  The -- where the
10 gasket goes, the yellow part that you marked
11 on Exhibit 3, where would that be in
12 relationship to your, say, shoulders?  Would
13 that be up?
14    A.  Up, yeah.
15    Q.  Yeah.  Two, 3, 4 feet?
16    A.  I couldn't -- I don't remember.  I
17 mean --
18    Q.  Taller than your shoulders?
19    A.  Yes.
20    Q.  How much taller than your
21 shoulders?
22    A.  I don't know.
23    Q.  Don't know.  Okay.  Now, I know at
24 some point you had said you were -- you
25 thought about 5 feet from the tank, and my

Page 172

1 question is, is that horizontally 5 feet
2 away?
3    A.  Like probably upward.  I mean
4 5 feet upward?
5    Q.  So you mean like as the crow
6 flies, so diagonally?
7    A.  Approximately, I will say
8 approximately about that.  I'm just -- I'm
9 guessing.  That's why I said approximately
10 5 feet.
11    Q.  All right.  So when I'm -- when I
12 look at -- you see, they have a -- and I
13 don't know this.  This is Exhibit 9 on the
14 right.  You can see there's a person in the
15 background holding one end of this tape.
16        Do you see that?
17    A.  Yes.
18    Q.  Is that -- is that person standing
19 in the approximate location where you were
20 at, at the time of your accident?
21    A.  No.  I was closer than that.
22    Q.  You were closer than that?
23    A.  Yeah.
24    Q.  Okay.  Where would you say you
25 were in that photograph?



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          173–176

Page 173

1    A.   I would have to say I was closer
2 to the tank.
3    Q.   Well, I'm just trying to say
4 where?
5    A.   It should be somewhere up in this
6 area, either -- I think I was standing right
7 here.
8    Q.   So that -- when this looks like a
9 different picture of that same pipe we saw
10 earlier --
11    A.   Yeah, it looks like the pipe is
12 closer on the other picture.
13    Q.   No, just so we get it.  We're
14 looking at Exhibit 8 where we talked about
15 before lunch, right?  You can see that pipe?
16    A.   Uh-huh (indicating affirmatively).
17    Q.   And you see the hose at the bottom
18 of that pipe we talked about?
19    A.   Uh-huh (indicating affirmatively).
20    Q.   So you're saying you think you
21 were basically right next to that pipe?
22    A.   Yes, I was next to that pipe.
23 Probably standing like right here by the
24 pipe on the --
25    Q.   On the inside of the pipe?

Page 174

1    A.   Cause that's the grate -- that's
2 the grate I was talking about right there I
3 was looking in.
4    Q.   You're not looking at this --
5    A.   One of these here?  No, I was
6 looking at this (indicating).
7    Q.   In the bottom right-hand corner?
8    A.   That's where the -- that's where
9 the water goes.
10    Q.   Let me say it.
11    A.   Okay.
12    Q.   On the bottom right-hand corner of
13 the right side of Photograph 1, Exhibit 9,
14 that's the grating you're talking about?
15    A.   Yes.
16    Q.   Okay.  And what I'm -- I'm going
17 to make clear, this part right here looks --
18    A.   I'm not --
19    Q.   Let me get my question in.
20    A.   Okay.  Okay.
21    Q.   All right.  Where this stand is,
22 if you're standing inside of that, to me it
23 appears that you're standing on top of
24 equipment, is that wrong?
25    A.   I wasn't standing on top of no

Page 175

1 equipment.
2    Q.   Okay.  So are you standing outside
3 of this pipe?
4    A.   I was standing in this area right
5 here.
6    Q.   Okay.  I'm going to let you --
7    A.   Okay.  Now that pipe is right -- I
8 wasn't standing on the pipe.  I was standing
9 approximately like right up in this area,
10 right here.
11    Q.   Would you have been standing on
12 this hose?
13    A.   No.  That hose was -- I don't
14 remember no hose being right there like
15 that.  I don't remember all this junk being
16 like that piled up as well, either.  So this
17 something here, this something here that
18 hadn't been there when I was there.  They
19 ain't had all that piled up in that buildup
20 and all that stuff like that.
21    Q.   You're referring to the left
22 photograph on Exhibit 8?
23    A.   Yeah.  All that junk they got
24 piled up right there, I don't remember
25 seeing all that as well.  So I'm estimating

Page 176

1 on where I was standing at.
2    Q.   I'm just asking you to tell me
3 where you were standing?
4    A.   Approximately 5 feet from that
5 hose -- from that pipe.
6    Q.   Yes, sir.  Can you draw on
7 Exhibit 9 where you think you were standing?
8    A.   No, I can't.
9    Q.   Okay.  Now, who did you get your
10 daily instructions from?
11    A.   From George.
12    Q.   Okay.  George was your superior?
13    A.   Yeah, he was the crew chief.
14    Q.   Okay.  Did you get instructions
15 from anybody else?
16    A.   No.
17    Q.   Okay.
18    A.   I was working under him.
19    Q.   Now, I know you told me that you
20 talked to Ed Lee and Ed told you to come in?
21    A.   Yeah.
22    Q.   Right?
23    A.   Yeah.
24    Q.   And I know at some point Matt, I
25 think his last name is Moyer, but the guy



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          177—180

Page 177

1 doing the training, he was teaching you how
2 to do the job?
3    A.   Yeah.
4    Q.   Right?  Okay, and then you worked
5 every day.  Once you got to the wash rack
6 you were working with George?
7    A.   Uh-huh (indicating affirmatively).
8    Q.   Do you know of anybody who worked
9 for Sasol that you ever had direct contact
10 with?  What I mean is, they worked for
11 Sasol, not for Savage.
12    A.   For Sasol?
13    Q.   Yes, sir.
14    A.   And I had direct contact with?
15    Q.   Yes.  While you were working at
16 the wash bay or on the Sasol facility, under
17 the Savage umbrella.  I'm not talking about
18 your previous work for G4S.
19    A.   You mean have -- I know a lot of
20 people that's there, that works there.
21    Q.   Did you -- did your work at Savage
22 at the wash rack require you to have any
23 interaction with anyone from Sasol?
24    A.   No.  I mean, I see them around,
25 you got to, you got to deal with them

Page 178

1 operators.
2    Q.   The operators are people that are
3 loading the product?
4    A.   Exactly.  You got to talk to them,
5 you got to communicate with them.
6    Q.   But not when you're working at the
7 wash rack?
8    A.   No.  I mean, you can talk to --
9 you can pretty much talk to anybody.  So I
10 don't -- I don't understand your question.
11    Q.   Yeah, my question is, first of all
12 are there any Sasol operators at the wash
13 rack?
14    A.   Not that I know of.
15    Q.   Okay.  At the time of your
16 incident, you were at the wash rack?
17    A.   Right.
18    Q.   Was there anybody from Sasol
19 involved in any part of the operation at the
20 wash rack so far as you know?
21    A.   No.
22    Q.   And I think you already told me,
23 you don't know who owns that equipment, that
24 is all the equipment that is part of the
25 wash rack?

Page 179

1    A.   It's Sasol.
2    Q.   Okay.  Do you know that?
3    A.   That's the word, I mean, that's
4 what they told us.  I'm just going about
5 hearsay, so --
6    Q.   Okay, yeah.  So if it turns out
7 that Savage owned the wash rack and had
8 leased it to Sasol, do you know if that's
9 true or not?
10    A.   I don't know.
11    Q.   Okay.
12    A.   Because I know E-Chem was waiting
13 for a contract and Sasol had it, so they
14 were saying, Sasol owned it because E-Chem
15 was waiting for the contract so they could
16 own it, but it never went through and they
17 made -- and Savage worked it.  So E-Chem was
18 going to take over.
19    Q.   Eventually?
20    A.   Eventually.
21    Q.   But that never happened?
22    A.   That never happened.
23    Q.   Was that part of why the E-Chem
24 people were there, to make sure they knew
25 how to operate everything?

Page 180

1    A.   I would -- I would guess.
2    Q.   But that's not something you know?
3    A.   Right.
4    Q.   And in fairness, the details of
5 the contract between Savage and Sasol is not
6 something that you know?
7    A.   The details, as in what?
8    Q.   Like the actual -- you've never
9 seen a copy of the contract between Sasol
10 and Savage?
11    A.   No.
12    Q.   And exactly what it provides in
13 that contract, that's not something that you
14 know?
15    A.   No.
16    Q.   It wasn't -- respectfully, it was
17 above your pay grade?
18    A.   If you can say that, yeah.
19    Q.   Well, I'm asking you.
20    A.   I don't know if it was pay --
21 above my pay grade or somebody getting $5 an
22 hour.  I don't know what grade it's at.
23    Q.   Well, can you tell me anything
24 about the contents of the contract between
25 Sasol and Savage?



JOHNNIE ROY HARDY, JR.                                March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                      181–184

Page 181

1    A.   No.
2    Q.   Okay.  Can you tell me anything
3 about a proposed contract between Sasol and
4 E-Chem?
5    A.   No.
6    Q.   When you were working at the wash
7 rack, what kind of tools did you have to
8 use?
9    A.   Cutting pliers.
10   Q.   And who provided you with those?
11   A.   I guess Savage.
12   Q.   Do you know?
13   A.   No.  I don't, no.
14   Q.   Okay, but you had some?
15   A.   Yes.
16   Q.   Was that the only tool that you
17 had to use?
18   A.   Wrench.
19   Q.   A wrench?
20   A.   Yes.
21   Q.   And do you know who provided you
22 with the wrench?
23   A.   No, I don't.
24   Q.   Where did you get the wrench?
25   A.   George had it.

Page 182

1    Q.   In the truck?
2    A.   I have no idea where he had them
3 at.
4    Q.   Okay.  He just had them?
5    A.   Yeah.  He had, he had the
6 wrenches.  He'd know better than I, I don't.
7    Q.   Okay.  And I, again, I'm just
8 trying to get you off the edge of the tru --
9 of the table.
10   A.   Yeah.
11   Q.   Okay.  Make sure I know what you
12 know and what you don't know, what you can
13 say and what you can't say.
14   A.   Okay.
15   Q.   As far as you know, did you ever
16 get a paycheck from Sasol?
17   A.   No.  That's why they say, that's
18 why they say the check is coming from Sasol.
19   Q.   Who says what?
20   A.   It's hearsay, hearsay.
21   Q.   Who says what?
22   A.   People that work, in general.
23   Q.   I see, the check is coming it from
24 Sasol?
25   A.   Yeah.

Page 183

1    Q.   Okay.  So, in other words, Sasol
2 pays Savage and then Savage pays you?
3    A.   I guess.
4    Q.   Well, if you don't know, say
5 you --
6    A.   I don't know.  I don't know.
7    Q.   Listen, I'm not asking you to
8 guess, right?  I am absolutely -- if I -- if
9 I didn't make that clear ahead of time, you
10 know, and I tried to make clear, if you
11 don't know, you can say you don't know,
12 okay?  But I'm not asking you to guess, I'm
13 not asking you to speculate.
14   A.   Okay.
15   Q.   If the answer is I don't know, as
16 long as that's the truth, it's fine.
17   A.   All right.
18   Q.   Sometimes I may follow up to make
19 sure just how much you don't know, right?
20   A.   Okay.
21   Q.   It's pretty funny and I will just
22 tell you this by way of an aside.  You know,
23 a friend of mine is like, "Oh, I wish I had
24 kept the time, you know, tried -- like I
25 say, when everything just happened."

Page 184

1        And I was like, "Geez, I can't
2 remember any of that."
3        And I'm like, "Well, do you
4 remember this?"
5        "Oh, yeah, I remember that."
6        "You remember this other?"
7        "Oh yeah, I remember."
8        You know, the next thing you know,
9 of course, she knew a whole bunch of stuff.
10 It's just one of those deals.
11       (Exhibit No. 10 marked for
12 identification.)
13 EXAMINATION BY MR. CRAWFORD:
14   Q.   I'm going to show you Exhibit 10,
15 which is a letter to you dated May 14th,
16 2020, from Ed Lee.  And ask if you recognize
17 that?  It's actually a picture of the
18 letter, but that's the way it was produced
19 to us.
20   A.   Yeah, I kind of remember this.  Is
21 this the one that so-called called me
22 dishonest and all that other stuff because I
23 claimed to be hurt and all this stuff?  He
24 pretty much said I'm lying.  And this --
25 and I don't agree with this at all.



JOHNNIE ROY HARDY, JR.                                March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                      185–188

Page 185

1    Q.   And did you have any discussions
2 with Ed Lee after you received this letter?
3    A.   No, I did not, because my
4 lawyer -- gave that to the lawyer and that's
5 it.  I didn't have no discussion after I got
6 a -- seeked a lawyer.  He wrote that on his
7 own.
8    Q.   Did you engage counsel before or
9 after you received this letter?
10   A.   I have no clue.  I don't remember.
11 I honestly don't remember.
12   MR. POOLE:
13       Is this 10?
14   MR. CRAWFORD:
15       This is Exhibit 10.
16   THE WITNESS:
17       If anybody's dishonest, it's he
18 dishonest, Ed Lee.
19 EXAMINATION BY MR. CRAWFORD:
20   Q.   Mr. Lee?
21   A.   Yes.
22   Q.   And what is he lying about?
23   A.   Like -- I don't know what he's
24 lying about to be honest with you right off
25 the bat.

Page 186

1    Q.   And he -- he's a liar in general?
2    A.   Evidently.  That right there is a
3 lie.
4    Q.   It's a lie?
5    A.   Yes.  He's going to call me
6 dishonest.  He don't -- he been knowing me
7 for three months.  And I, evidently -- why
8 would you hire a dishonest person if I'm so
9 dishonest?
10   Q.   How much contact did you have with
11 Mr. Lee before you were hired?
12   A.   I would see Mr. Lee every --
13 almost every week, I was trying to get over
14 there, about at least a month I would see
15 Mr. Lee.
16   Q.   So you had been going to the -- to
17 the Savage office there on a regular basis
18 trying to get employment?
19   A.   Exactly.
20   Q.   And they were telling you what,
21 they didn't have a position?
22   A.   Yeah, they said they didn't have a
23 position open yet.
24   Q.   Okay.  And then finally you go in
25 one day and they say, okay, we have a

Page 187

1 position and you interviewed for the job?
2    A.   Uh-huh (indicating affirmatively).
3    Q.   And then you got the job?
4    A.   Exactly.
5    Q.   I moved my stuff around and got
6 lost.  Happens to me.
7        During your discussions with
8 George, Terry, anybody out there, did anyone
9 event happened or afterwards, did anyone
10 ever suggest anything like that had ever
11 happened before?
12   A.   No.
13   Q.   Did anyone suggest they had any
14 advanced notice that that was going to
15 happen that day?
16   A.   No.
17   Q.   Do you know today, why that
18 incident happened?  Why the -- why the
19 whatever -- like you said, the tank
20 exploded, as you say, do you know why that
21 happened?
22   A.   I have no idea.  I'm not certified
23 for that.
24   Q.   No, I understand.  I'm just trying
25 to make sure I -- if you told me, I know

Page 188

1 exactly, well, I'm going to ask you, right?
2        Did anyone ever suggest to you
3 that they knew why?
4    A.   No.
5    Q.   No.  Okay.  When was the last time
6 you saw a healthcare physician related to
7 your injuries?
8    A.   I seen Dr. Do, golly, last -- last
9 week?  I think last week.  Yeah.
10   Q.   Today's the 31st.
11   A.   I had an appointment with
12 Dr. Do -- I have the date, I got it written
13 on my calendar.  It was last week sometime I
14 went to Houston.  I think it was Tuesday of
15 last week I went to Dr. Do, if I'm not
16 mistaken.
17   Q.   What did she do for you at that
18 point?
19   A.   Try to -- try to help me control
20 my high-blood pressure and my diabetes.
21   Q.   Real quick, we had talked -- I'm
22 trying to get back to my notes, we had the
23 list of doctors.  When was the last time you
24 saw Dr. Hernandez?
25   A.   Dr. Hernandez, I must have seen



JOHNNIE ROY HARDY, JR.                                March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                      189—192

Page 189

1 him about maybe three months ago, about
2 three months ago I would say.
3     Q.   So this is March 31, like the end
4 of December, beginning of January?
5     A.   Somewhere up in there, somewhere
6 up in January, if I'm not mistaken.
7     Q.   Okay.  And what did he do for you
8 at that time?
9     A.   He just looked at my arm and --
10 and it was -- he was supposed to send out
11 some medicine for my pain and he sent it to
12 the pharmacy, but somehow or another it got
13 all scrambled up and I hadn't received the
14 medicine yet since then.  So I guess he's
15 going to resend it.
16     Q.   And this -- and that would have
17 been through LRx, to your knowledge?
18     A.   No, it's V -- VCS.
19     Q.   CVS?
20     A.   CVS, I'm sorry.  CVS, I get it.
21     Q.   We all do that occasionally.  All
22 right, so you think that would have been
23 through CVS?
24     A.   Yes.
25     Q.   Dr. Small, when was the last time

Page 190

1 you saw him?
2     A.   Almost about -- almost about the
3 same time cause when I go there, I try to
4 get two appointments, so I don't have to
5 keep going back and forth.  It's probably
6 similar to that time as well.
7     Q.   Okay.
8     A.   Somewhere up in that area.  I'm
9 not -- I'm not exactly sure.
10     Q.   And what did Dr. Small do for you
11 the last time you saw him?
12     A.   Dr. Small, that's when I went to
13 Dr. Small.  He looked at my neck and he said
14 I had two dislocated discs in my neck and
15 he's going to have to do some additional
16 image for that as well.
17     Q.   Okay.  Some kind of MRI or CT scan
18 or something?
19     A.   Uh-huh (indicating affirmatively).
20     Q.   And has that been done?
21     A.   Not yet.
22     Q.   Okay.  Dr. Henry, when's the last
23 time you saw him?
24     A.   Dr. Henry?  I don't know if I
25 remember the last time I seen Dr. Henry, but

Page 191

1 I seen someone prior to Dr. Henry, was
2 Dr. Hayes, that's from Lake Charles --
3     Q.   Okay.
4     A.   -- to get physical therapy -- not
5 physical therapy, he's a psychiatrist.
6     Q.   Psychiatrist?
7     A.   Psychiatrist, right.
8     Q.   He wasn't --
9     A.   I seen him last week.
10     Q.   Okay.  So Dr. Hayes was not in the
11 list that we went through before, right?  So
12 let me -- I would say we have Dr. Victoria
13 Do, Dr. Hernandez, Dr. Small, Dr. Henry, and
14 Dr. Pollock, and now we've added Dr. Hayes,
15 Patrick C. Hayes?
16     A.   I don't know.  He's in
17 Lake Charles.
18     Q.   Did -- did your attorneys refer
19 you to Dr. Hayes?
20     A.   No, my attorneys didn't refer me
21 to Dr. Hayes.  Dr. Hayes called me up on his
22 cell -- I have no idea if my attorneys did
23 or not, cause they didn't tell me, "Well,
24 you're going to go see Dr. Hayes."
25         Dr. Hayes called me and said

Page 192

1 hey --
2     Q.   How come you don't have an
3 appointment?
4     A.   Exactly.
5     Q.   You didn't seek Dr. Hayes out, he
6 found you, correct?
7     A.   Exactly.
8     Q.   All right.  And how that happened,
9 you don't know?
10     A.   No.
11     Q.   Okay.  And then when did you see
12 Dr. Hayes most recently?
13     A.   Got to be at least sometime last
14 week I seen Dr. Hayes.
15     Q.   And what did he do for you?
16     A.   He was pretty much telling me -- I
17 was telling him about what happened and he
18 said, an explosion can -- you can, after an
19 explosion, you can loose your memory like I
20 did for that instant.
21     Q.   Uh-huh (indicating affirmatively).
22     A.   And he was talking about that and
23 seek -- and seek counseling with him in the
24 future.
25     Q.   Was that the first time you've



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
193–196

Page 193

1 seen Dr. Hayes?
2    A.   Uh-huh (indicating affirmatively).
3    Q.   Last week?
4    A.   Yes.
5    Q.   Okay.  And then -- we were talking
6 about Dr. Henry and we got to Dr. Hayes.
7    A.   I know.  I don't remember the
8 date -- the last time I seen Dr. Henry.
9    Q.   But your understanding is
10 Dr. Henry was some kind of psychiatrist
11 also?
12    A.   Yes.
13    Q.   But more recently you've been
14 seeing Dr. Hayes?
15    A.   Yes.
16    Q.   Okay.  And then Dr. Pollock, I
17 know he normally -- he would have you do
18 a --
19    A.   Hey, you know what I said that
20 about Dr. Pollock about having brain
21 surgery?
22    Q.   Uh-huh (indicating affirmatively).
23    A.   Correct me on that.  I mean, it's
24 just -- he was going to do more imaging.
25 I -- you know.

Page 194

1    Q.   Okay.  All right.  Let me -- but
2 on Dr. Pollock, I know that he normally has
3 you do a bunch of tests, is that right?
4    A.   Yes.
5    Q.   And he may have a technician who
6 gives you a bunch of different tests?
7    A.   Correct.
8    Q.   Was that one day or two-days you
9 did that?
10    A.   Two-days.
11    Q.   Over two days time?
12    A.   Uh-huh (indicating affirmatively).
13    Q.   Was it all day both days, mostly?
14    A.   Yes, pretty much eight hours.
15    Q.   Long time?
16    A.   Uh-huh (indicating affirmatively).
17    Q.   Now, since those two days, when
18 you had all the tests done, have you seen
19 Dr. Pollock in person?
20    A.   After that day?
21    Q.   Right.
22    A.   No, I haven't seen him.
23    Q.   Okay, and have you been back to
24 his office since that day?
25    A.   No.

Page 195

1    Q.   Okay.  So you went there, had
2 those tests, and then he told you --
3    A.   But I am scheduled to see him next
4 month.
5    Q.   Okay.
6    A.   Dr. Pollock, yes.
7    Q.   That's what I was going --
8    A.   Okay.  Well, yeah.  I'm going to
9 see him next month.
10    Q.   But you haven't seen him since
11 then, but you are going to?
12    A.   Yes.
13    Q.   Okay.  All right.  Is there any
14 other doctor or healthcare provider because
15 I think Dr. Pollock is -- he's Dr. Pollock,
16 but he's not a medical doctor, right?
17    A.   Uh-huh (indicating affirmatively).
18    Q.   Is there any other medical
19 provider that you are currently scheduled to
20 see?
21    A.   No.
22    Q.   Okay.  And then Dr. Hayes, do you
23 have a return appointment with him?
24    A.   He wrote me a prescription.  I'm
25 not sure.  I don't -- I don't remember.

Page 196

1    Q.   Before I leave --
2    MR. CRAWFORD:
3       Off the record.
4       (Whereupon, an off-the-record
5 discussion was held.)
6 EXAMINATION BY MR. CRAWFORD:
7    Q.   We're back on the record.  Go
8 ahead.  You think you have an appointment?
9    A.   I'm not sure, but I -- I'm going
10 to see.  I may eventually end up seeing him
11 again.
12    Q.   Dr. Hayes?
13    A.   Dr. Hayes.
14    Q.   You just don't know when?
15    A.   No.
16    Q.   Okay.  Other than to see
17 Dr. Pollock in the next month or maybe
18 Dr. Hayes, do you have any other
19 appointments currently scheduled?
20    A.   I have one Tuesday -- Monday or
21 Tuesday, I go see Dr. Small.
22    Q.   Dr. Small?  Okay.
23    A.   Yes.  I see Dr. Small -- this
24 Monday and Tuesday, I have a doctor's
25 appointment for those two days.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
197—200

Page 197

1    Q.   Like you said before, you try to
2 set up a couple, so you can go and save a
3 trip?
4    A.   Yes.
5    Q.   So the apartment that you're
6 renting, how big is that?
7    A.   It's two bedrooms.
8    Q.   Two bedrooms?
9    A.   Uh-huh (indicating affirmatively).
10    Q.   Okay, and when you moved in to the
11 apartment, roughly a month ago, February 19
12 give or take, how did you move?
13    A.   What you mean?
14    Q.   Well, what did you move and who
15 moved it in?
16    A.   Oh, I had some friends move it in
17 for me.
18    Q.   Who are they?
19    A.   Squally and Wilford.
20    Q.   Squally?
21    A.   I see you don't know how to spell
22 Squally and Wilford.  You don't spell
23 Squally and Wilford.
24    Q.   Okay.  By the way, during the
25 lunch hour, did you happen to get your cell

Page 198

1 phone?
2    A.   Oh, no.
3    Q.   We'll get that in a minute,
4 because I want to get the contact
5 information for Squally and Wilford.  Okay.
6         Do you know what Squally's full
7 name is?
8    A.   We just call him Squally.
9    Q.   Do you have Squally in your cell
10 phone?
11    A.   No, I don't.
12    Q.   Wilford?
13    A.   I got Wilford.  I just call him
14 Soul Train.
15    Q.   And do you know Wilford's full
16 name?
17    A.   No.  They -- we got so many
18 nicknames and don't know his full name.
19    Q.   So somebody who's -- you don't
20 know their full name, got -- moved you in?
21    A.   We got a bunch of nicknames.  We
22 got a bunch of them.  A lot of them I grew
23 up with and don't know their full name.
24    Q.   How'd you find them?
25    A.   I grew -- pretty much just right

Page 199

1 there in the neighborhood.
2    Q.   So you know where they live?
3    A.   Yes.
4    Q.   What's their addresses?
5    A.   Shoot, you got me on that one,
6 too.
7    Q.   So Squally lives in the
8 neighborhood, but you don't know where and
9 you don't have his phone number?
10    A.   No.
11    Q.   And Wilford is known as Soul
12 Train, but he also lives in the neighborhood
13 and you don't have his phone number?
14    A.   No.
15    Q.   But somehow you were arranged --
16    A.   I get in touch with them --
17    Q.   Somehow you -- let me get my
18 question out -- somehow you arranged for
19 them to show up at a precise time and
20 precise place so that they can move you in?
21    A.   Yes.
22    Q.   How'd you do that?
23    A.   I go -- I ride in the
24 neighborhood.  I ride in the neighborhood
25 almost every morning.

Page 200

1    Q.   In your car?
2    A.   In my truck.
3    Q.   In your truck?
4    A.   (Nodding head affirmatively).  And
5 I see them.
6    Q.   When you see them, where are they?
7    A.   They walking.
8    Q.   Is Squally working --
9    A.   No, neither one of them work.
10    Q.   Are they disabled?
11    A.   I don't know what you want to call
12 them.  I don't know what you call them.
13 They don't work.
14    Q.   How old are they?
15    A.   They probably in their late 50s.
16    Q.   Did you pay them to help you move?
17    A.   I pay them about $20 apiece.
18    Q.   What all did they have to move?
19    A.   A bed and a dresser and some
20 chairs.
21    Q.   So what kind of chairs are we
22 talking about?
23    A.   That one is -- well, just
24 regular -- I don't know what, I don't know.
25 I can't tell you that.  It's just chairs.



Page 201

1 So it's not no big chairs, it's just some
2 small table chairs.
3     Q.    That's what I was trying to get
4 to.  Chairs that you might see around a
5 kitchen table?
6     A.    Yes.
7     Q.    Not chairs like a recliner?
8     A.    Oh, no.
9     Q.    Okay.
10    A.    I was upstairs, so they wasn't
11 moving nothing upstairs that's big.
12    Q.    And the bed is what size bed?
13    A.    Twin.
14    Q.    A twin bed?
15    A.    Yes.
16    Q.    And the dresser is how big?
17    A.    About from here to right there
18 (indicating), from this end of my chair to
19 the end of Trent's.
20    Q.    Maybe 6 feet?
21    A.    About 6 feet.
22    Q.    Okay.  And what about clothes?
23    A.    Clothes?  I had clothes, not much.
24    Q.    Pictures?
25    A.    I don't have --

Page 202

1     Q.    Pictures you put on the wall?
2     A.    No, none of that.
3     Q.    Nothing like that?
4     A.    No.
5     Q.    What about -- what's in the second
6 bedroom--
7     A.    Nothing.
8     Q.    Empty?
9     A.    Empty.
10    Q.    How much is the rent there?
11    A.    I'll say about 115.
12    Q.    A hundred and fifteen?
13    A.    Uh-huh (indicating affirmatively).
14    Q.    Is this --
15    A.    No, I'm talking about one -- 1500.
16    Q.    Okay, sorry.  So $1,500 a month?
17    A.    Uh-huh (indicating affirmatively).
18    Q.    In rent.  Well, help me
19 understand, because you told us earlier that
20 you had --
21    A.    Loss of use, insurance.
22    Q.    Oh, on the -- on which -- on
23 which?
24    A.    On the home, my apart -- my name
25 and Sondra name is on that policy of my

Page 203

1 house.
2     Q.    Of your -- of your -- of the house
3 that Sondra lives in?
4     A.    Right.  My name is on that policy,
5 both our names on that policy.  Insurance
6 paid the loss of use for that much.
7     Q.    I see.
8     A.    For each one.
9     Q.    I see.  And so how much are you
10 receiving in loss of use from the insurance
11 company?
12    A.    That is irrelevant.  I don't have
13 to tell you that.  That's -- that's private.
14    Q.    Well, I'm sorry --
15    A.    I'm not being -- I don't mean to
16 be rude or anything, but that's --
17    Q.    Well, let me ask you this:  Who's
18 the insurance -- I'll go issue a subpoena
19 and we go fight over it.  Who is the
20 insurance company?
21    A.    Allstate -- State Farm, I'm sorry.
22 State Farm.
23    Q.    And what is the location of the,
24 of the home?
25    A.    It's South Jace Matthew in Iowa,

Page 204

1 Louisiana, 4703.
2     Q.    4703?
3     A.    South Jace Matthew.
4     Q.    Can you just spell that for me?
5     A.    South?
6     Q.    South --
7     A.    Jace, J-A-C-E, Matthew Lane, L-N.
8     Q.    And that is in?
9     A.    Iowa, Louisiana.
10    Q.    And what's the zip there?
11    A.    70647.
12    Q.    And when is the last time you
13 lived there?
14    A.    Hmm, I don't know.
15    Q.    Before 2017?
16    A.    Way, yeah.  I mean, we split up
17 and she live there.  So I couldn't honestly
18 tell you how long it's been.
19    Q.    Just kind of skipped past this
20 earlier.  This is -- I think this is during
21 the time that you and your wife were
22 separated.  All right, we started talking --
23 we were talking about this.  I think this is
24 what you were talking about with Mr. Buller
25 earlier.



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
205–208

Page 205

1    A.  Uh-huh (indicating affirmatively).
2    Q.   This has previously been Bates
3 labeled as 305 and 306, but this is
4 basically dated Halloween of 2017 and
5 there's a -- I'm not going to go through
6 this whole letter, but it's a letter --
7 Craig White, it says he's the District Chief
8 at Sulphur Fire Department.
9        Does that sound right to you?
10    A.  Uh-huh (indicating affirmatively).
11    Q.   And he describes an incident where
12 your wife got really upset and was yelling
13 for him never to go back to her house again.
14        Is that the instance you were
15 talking about earlier?
16    A.  No.
17    Q.   Let me show it to you.  I don't
18 try to hide it.  I'm not -- this was
19 something that was produced as part of the
20 personnel file and one of them is a little
21 bit out of order, 305, 306 and 307.  So 305
22 is the statement from Raymond Gaudet, he was
23 the captain at Sulphur Fire Department?
24    A.  Uh-huh (indicating affirmatively).
25    Q.   And 306 is the statement from

Page 206

1 Trigg White, and then there's a related
2 police department statement where they're
3 making a related complaint, but they're all
4 three related.  I was, just for
5 completeness, I want to go through that real
6 quick.
7    A.  (Reading).  I don't recall them
8 writing this.
9    Q.   No, I'm not asking you if you
10 recall them writing it.  Do you remember
11 those events that are written about?  And
12 I'm not saying they're writing them
13 precisely as they occurred.
14    A.  I don't remember these events.
15    Q.   Earlier, we were talking about
16 somebody going to the wrong house, they went
17 to your wife's house?
18    A.  That was the Assistant Chief
19 Buller before Mark McClelland.
20    Q.   So did -- let me see --
21    A.  Before Mark McClelland.  Randy
22 Buller, he's gone.  Mark McClelland is the
23 AC now.  Randy Buller was gone and Mark
24 McClelland was the AC then.  That was --
25 that was after all that happened.

Page 207

1    Q.   So the first of this says they
2 went to two addresses to serve some papers
3 on you and the first time they went to
4 Beulah Street and saw your mother.
5    A.  And what she said?
6    Q.   She said she's going to give them
7 to him.
8    A.  And I wasn't there.
9    Q.   Right.  That's right, that's true.
10    A.  Uh-huh (indicating affirmatively).
11    Q.   And then it says they went and
12 they saw you at the Kroger parking lot.  Do
13 you remember seeing AC McClelland and Trigg
14 White in the parking lot?
15    A.  I'm trying to think if I did.  I
16 honestly don't remember.
17    Q.   Okay.  It looks like you were in
18 your truck and your wife was in her vehicle.
19        Do you remember anything about
20 that?
21    A.  I honestly don't.
22    Q.   Do you -- and this is October of
23 2017.  The general question is, were you and
24 your wife separated at that point?
25    A.  Yes, we were separated.

Page 208

1    Q.   Okay.  And then --
2    A.   Cause that was before she was
3 staying in the house before, that's when all
4 the activity happened with Assistant Chief
5 Randy Buller.  That was before that and we
6 were separated then, before then as well.
7    Q.   So this says -- he's describing
8 something happened on October 31, when
9 your -- Mrs. Hardy came in and started
10 yelling at him about going to her house.  I
11 was just trying to make sure.
12    A.  I don't remember.
13    Q.   Is this a separate person?
14    A.  Yes, I don't -- yeah, this is --
15    Q.   Let me get the question out.
16    A.  Okay.
17    Q.   All right?  You might understand
18 what the -- but do you remember your wife
19 yelling at more than one person from the
20 fire department, not to go to her house?
21    A.  If I wasn't there and she did, I
22 don't remember that.
23    Q.   Okay.
24    A.  If she did, I don't remember that.
25    Q.   Your recollection is she did that



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
209–212

Page 209

1 with Mr. Buller?
2    A.   Yeah.  Whoever she did it with, I
3 don't know.
4    Q.   But this is the first time you
5 know about this?
6    A.   Yes.  I mean, they -- they write
7 their report just -- they don't tell me
8 nothing about it.  I mean, that was my first
9 time seeing that.
10    Q.   Okay.  Do you have any
11 recollection of what kind of paperwork they
12 were serving you with in October of 2017?
13    A.   For that mayor.
14    Q.   For the administrative leave stuff
15 we talked about?
16    A.   Uh-huh (indicating affirmatively).
17 What we talked about with the mayor.
18    Q.   Okay.  All right.
19    A.   And I did receive those letters.
20    Q.   Okay.
21    MR. CRAWFORD:
22        And I'm going to attach those in
23 globo as 11 just because we talked about it.
24        (Exhibit No. 11 marked for
25 identification.)

Page 210

1 EXAMINATION BY MR. CRAWFORD:
2    Q.   The only reason I asked this,
3 because it was different names and similar
4 sounding stories.
5    A.   Yeah, cause that's -- that
6 happened -- that's after, because Randy
7 Buller was the AC, now -- now it's
8 McClelland.  So that's, that's after what,
9 what happened with the house with Randy
10 going to it.
11    Q.   AC means assistant chief?
12    A.   Assistant chief, right.
13    Q.   And we're saying Mark McClelland
14 M, little C, capital C-L-E-L-L-A-N D.
15        While you worked with Sasol --
16 excuse me, while you worked at Savage, did
17 you have any interaction with anyone from
18 KCS?
19    A.   With KCS?  No, I would see them, I
20 would see KCS.
21    Q.   But insofar as personal
22 involvement, that's not something?  You
23 could just see the --
24    A.   I could see the train.  Well,
25 locomotive.

Page 211

1    Q.   And do you know where the Sasol
2 tracks ended and the KCS tracks picked up?
3    A.   No.
4    Q.   Do you know the specific switch,
5 like this is the Sasol switch and that's a
6 KCS switch?
7    A.   No.
8    Q.   Okay.  And that's not something
9 you ever had to deal with?
10    A.   No.
11    Q.   You agree with me?
12    A.   Agree.
13    Q.   Okay.  Now, while you worked for
14 Savage, was there any kind of people work
15 that you generated?  By way of example, did
16 you had to prepare any reports?  Did you
17 have to submit a time card?  Was there any
18 type of work summary you had to say, like,
19 today I did these three things?
20    A.   No.
21    Q.   Is there any --
22    A.   Well, what we did was, we, like
23 each crew member, like different crews, we
24 would go over safety in the mornings.
25    Q.   Okay.

Page 212

1    A.   And we would have to sign off on
2 the safety paper.
3    Q.   Some kind of a pre-job safety
4 meeting?
5    A.   Yeah.  And what -- what -- how the
6 weather's going to be today and stuff, you
7 know how to protect, be safe.
8    Q.   Okay.  That was something that was
9 every day?
10    A.   Every day.
11    Q.   First thing in the morning?
12    A.   First thing in the morning.
13    Q.   What was your normal work
14 schedule?
15    A.   You know, like whenever we'd come
16 on shifts you'd have to.
17    Q.   Well, that's the question, what's
18 your shift?
19    A.   Sometime it was from 7:00 until we
20 would finish the car.  Sometime we would
21 leave early and still get paid for it.  And
22 it was eight hours, eight-hour shifts.
23    Q.   And would they normally start at
24 7:00?
25    A.   And we would end at around -- it



JOHNNIE ROY HARDY, JR.                          March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                213—216

Page 213

1 took us 8 hours, so 3:00.
2    Q.   Yeah, and I understand, I'm not --
3 I'm just trying to get the starting time.
4    A.   Uh-huh (indicating affirmatively).
5 3:00.
6    Q.   Normal starting time was 7:00?
7    A.   Agree.
8    Q.   Did you ever work at night?  Now,
9 obviously you were working at night at the
10 time of the accident?
11   A.   Right.
12   Q.   What time did you start that
13 night?
14   A.   I think we came in at 3:00,
15 3:00 to 11:00 or 3:00 to 12:00.  Sometime
16 have to work over just to move cars around.
17   Q.   So I guess that's my question.  If
18 this accident happened right around 11:00,
19 were y'all on the verge of finishing up?
20   A.   I think we were on the verge of
21 finishing up --
22   Q.   Okay.
23   A.   -- at that time, if I'm not
24 mistaken yeah.
25   Q.   Is there another shift that comes

Page 214

1 in at 11:00 to 7:00?
2    A.   No, just two shifts.
3    Q.   Okay.  So -- and that's important,
4 because we have an accident happen about
5 11:00, and then they were going to put it
6 back together, then said, no just go on
7 home.  The reality is, maybe you had another
8 30 minutes or so, but you really weren't
9 going to work much longer that evening?
10   A.   Uh-uh (indicating negatively).
11   Q.   Correct?
12   A.   Correct.
13   Q.   Okay.  It was very near quitting
14 time anyway?
15   A.   But a lot of times if we short --
16 I mean, like working two people out there,
17 we'd be shorthanded.  I would say
18 shorthanded because we -- because when I
19 first got on out there, at the wash rack, it
20 was three of us, then the other guy moved.
21 He went to the plant and it was just two of
22 us, me and George.  And then when we have
23 help every now and then from E-Chem.
24   Q.   And then, do you know how many
25 people for E-Chem were there that night?

Page 215

1    A.   That night, I would say
2 approximately maybe four, three to four
3 people.
4    Q.   Okay.  So you and George and three
5 or four people from E-Chem?
6    A.   (Nodding head affirmatively).
7    Q.   You think that was shorthanded?
8    A.   No.
9    Q.   Okay.
10   A.   Oh, no.
11   Q.   That was plenty of people?
12   A.   Oh, yes.
13   Q.   Okay.  What exactly do you think
14 that Savage did wrong?
15   A.   What I think that Savage did
16 wrong?
17   Q.   Uh-huh (indicating affirmatively).
18   A.   Not -- not having the right crew
19 people, or should I say, certified people to
20 fix stuff like this here, instead of
21 having --
22   Q.   Pointing to Exhibit 3.
23   A.   Yeah, they should have certified
24 people fixing on this kind of equipment and
25 then when they do have equipment, because he

Page 216

1 didn't -- nobody taped it off there when we
2 left.  When me and Terry left, they could
3 have taped it off or anything, because I --
4 with me being with the fire department, you
5 don't want to have a house burn when they
6 won't -- nobody around that equipment
7 because it's got a defect, tape it off.  And
8 then another thing, instead of using just a
9 wrench to tighten this back up, these big
10 old bolts, the bolts about that big around,
11 they should have some kind of power wrenches
12 or something to tighten that back up,
13 instead of using your hand wrench.  You
14 know, if you got different people doing
15 this, they might just -- just barely tighten
16 it.  So it could have been, could have been
17 done better.
18   Q.   Okay.  So I have they needed
19 certified people to fix the filter --
20   A.   Yes.
21   Q.   -- the tank, they should have
22 taped it off afterwards?
23   A.   And have the right power tools.
24   Q.   Should have had some kind of power
25 tool instead of a hand wrench?



Page 217

1     A.   Yes.
2     Q.   Anything else?
3     A.   Not that I know of.
4     Q.   Now, while you worked for Savage,
5 did you ever see anyone from Sasol dealing
6 with anything at the wash rack?
7     A.   No.
8     Q.   Did you ever see anyone from Sasol
9 actually make a change to the filter tank we
10 see in Exhibit 3?
11    A.   No.
12    Q.   As between Savage and Sasol, who
13 to your understanding had direct contact
14 with the -- it's two questions.  Number 1,
15 the wash rack, was that Savage or Sasol?
16    A.   From what my understanding is, all
17 the equipment and everything was for Sasol.
18    Q.   To your understanding?
19    A.   Right.
20    Q.   In terms of the operations of that
21 equipment, who did that?
22    A.   Sasol -- I mean, operation of the
23 equipment is Savage.
24    Q.   Okay.  In terms -- in terms of the
25 maintenance of the equipment at the wash

Page 218

1 rack, to your knowledge, who did that?
2     A.   Savage.
3     Q.   Savage.  How much were you making?
4     A.   $20 an hour.
5     Q.   And did you receive any benefits?
6     A.   It hadn't kicked in yet.
7     Q.   Because you hadn't been there long
8 enough?
9     A.   Right.
10    Q.   I see.  Much earlier in the
11 deposition we were going through in some
12 detail about what you did to actually
13 operate the wash rack, get in the lane, you
14 were making the connection, there was a
15 penguin walk on top, doing all that stuff.
16         Did we cover all of your job
17 duties or responsibilities at the wash
18 rack -- wash rack or were there some others
19 that we didn't talk about?
20    A.   They -- once the other guy left,
21 they had me operating the Trackmobile.
22    Q.   Okay.
23    A.   And I wasn't certified or I wasn't
24 written off or anything like that.
25    Q.   Okay.

Page 219

1     A.   Because it was just two of us back
2 there, me and George.
3     Q.   So at times you had to operate the
4 work -- the Trackmobile?
5     A.   Yeah, we would -- sometime we
6 would switch out.
7     Q.   Okay.  Was that something that you
8 thought you knew how to do from your days at
9 Baroid?
10    A.   Uh-huh (indicating affirmatively).
11 Yes.
12    Q.   Okay.  Did you feel comfortable
13 doing that?
14    A.   Yes.
15    Q.   And it sounds like that you never
16 hurt yourself while you were operating the
17 Trackmobile?
18    A.   No.
19    Q.   You agree with that?
20    A.   No, I'm not -- very safe, yes.
21    Q.   No, I'm saying none of that caused
22 you an injury is what I'm saying?
23    A.   No.
24    Q.   Have you filed income tax returns?
25    A.   From?

Page 220

1     Q.   From the last five years?
2     A.   Yes.
3     Q.   Okay.  And I know this sounds like
4 a crazy question, do your income tax returns
5 accurately reflect your income?
6     A.   Yes.
7     Q.   Believe it or not, I've had people
8 say no, I made more money.
9     A.   No, I wished I did.
10    Q.   I know, but I understand.  Okay.
11 Dr. Hayes, did he tell you what he diagnosed
12 you with?
13    A.   No.  I have to go back.  That's
14 what I say, I have to go back to him as
15 well.  I did a lot of paperwork filling out
16 for Dr. Hayes.
17    Q.   Other than the retirement money
18 that you receive from the fire Sulphur --
19 the Sulphur Fire Department, and whatever
20 ALE that you're receiving and won't tell me
21 about, do you have any other source of
22 household income?
23    A.   No.
24    Q.   Other than to go back and forth to
25 Houston to seek medical attention, have you



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
221–224

Page 221

1 made any other out-of-town trips anywhere
2 since May 8th, 2020?
3    A.   No, due to the Covid.
4    Q.   Oh, Covid doesn't let you go
5 anywhere?
6    A.   No.
7    Q.   Have you had your shot, by the
8 way?
9    A.   No.
10    Q.   I would think that somebody with
11 diabetes would be able to get one.
12    A.   We should be top priority.
13    Q.   You'd think.
14    MR. CRAWFORD:
15       I, in the interest of time, I'm
16 going to let Doug go.  I'm going to look
17 through my notes real quick, but I'm
18 99 percent done.  Okay?
19    THE WITNESS:
20       Thank you.
21 EXAMINATION BY MR. POOLE:
22    Q.   Mr. Hardy, we shook hands and met
23 before we started.  You understand I'm here
24 representing Sasol?
25    A.   Okay.  Yes, sir.

Page 222

1    Q.   And as I understand, your theory
2 against Sasol, is that you think they might
3 own the equipment that was involved in your
4 accident?
5    A.   From what I understand.
6    Q.   And that's not based on any
7 paperwork?
8    A.   No, none of that, just --
9    Q.   But what you also understand and
10 witnessed from the time you worked out
11 there, was that Sasol was not involved in
12 the use of this wash rack equipment?
13    A.   Right.
14    Q.   And, likewise, Sasol was not
15 involved in the maintenance of this
16 equipment?
17    A.   Correct, that I know of.
18    Q.   You saw Savage people doing the
19 maintenance of this equipment?
20    A.   Yes.
21    Q.   Such as changing the filter?
22    A.   Yes.
23    Q.   Such as changing the gasket?
24    A.   Yes.
25    Q.   And you never saw Sasol doing

Page 223

1 anything at all with the equipment?
2    A.   No, sir.
3    Q.   I'm going to jump around because I
4 was keeping notes and a few questions popped
5 up.  So the house you own in Iowa was
6 destroyed in Hurricane Laura?
7    A.   Yeah, in Laura and Delta.
8    Q.   All right.  They were right close
9 together?
10    A.   Yeah.  They was about -- they was
11 about five weeks apart, the hurricanes.
12    Q.   And that was this fall of 2020?
13    A.   Yes, sir.
14    Q.   And then your mom's house in
15 Sulphur, it was destroyed in Laura?
16    A.   Yes.
17    Q.   And you still are the owner of the
18 house in Iowa along with your wife Sondra?
19    A.   Correct.
20    Q.   And what did you do for cleanups
21 for those two houses?  Did you help your mom
22 with her house in cleanup after the
23 hurricane?
24    A.   No.  They had insurance.  They did
25 their own mitigation.

Page 224

1    Q.   So that was all contracted out?
2    A.   Yes.
3    Q.   Same question about your house?
4    A.   Exactly.  Same thing.  As a matter
5 of fact, I can't go to my mom house because
6 I got, like I was saying earlier, my sister
7 kicked me out of my mom house.
8    Q.   So you got evicted?
9    A.   Evicted, yes.
10    Q.   Well, was there also some sort of
11 a restraining order to prevent you from
12 going within, you know, some distance?
13    A.   No.
14    Q.   So your wife Sondra lived in your
15 house in Iowa right after the hurricane?
16    A.   Yes, sir.
17    Q.   And then she's moved somewhere in
18 Houston, Texas?
19    A.   Yes.
20    Q.   And you have two children, what
21 are their ages?
22    A.   Megan is 25 and Johnnie, JT is 17.
23    Q.   Is he -- is JT still in school?
24    A.   Yes.
25    Q.   High school?



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
225–228

Page 225

1    A.   Yes.
2    Q.   Do you know where he's going to
3 high school?
4    A.   He said Klein, Klein High School.
5    Q.   Is there a child support order for
6 JT?
7    A.   No.
8    Q.   Now, I'm bouncing around over
9 to -- back when you walk -- worked for the
10 Sulphur Fire Department.
11    A.   Okay.
12    Q.   And you had some issues there
13 before you retired, with some problems with
14 the --
15    A.   The mayor.
16    Q.   -- superiors and the mayor?
17    A.   Yes.
18    Q.   Were you -- did you have any
19 specific discipline that was assessed
20 against you when you worked for Sulphur Fire
21 Department, that is, under the collective
22 bargaining agreement, under the union
23 contract, were you assessed a discipline?
24    A.   No.
25    Q.   You were -- you're not found

Page 226

1 guilty of any of those things?
2    A.   No.
3    Q.   You mentioned that you hurt your
4 shoulder lifting weights at Planet Fitness?
5    A.   Uh-huh (indicating affirmatively).
6    Q.   Yes or no, remember?
7    A.   Yes, yes, yes.
8    Q.   Same rule over here.
9    A.   Okay, yes.
10    Q.   And which -- is the Planet Fitness
11 there in Lake Charles?
12    A.   Lake Charles.
13    Q.   Do you still belong?
14    A.   They don't take money.  I haven't
15 been there in a long time.
16    Q.   Are you still a member?
17    A.   No.
18    Q.   When did you end your membership?
19    A.   It's been a while now, so I don't
20 even -- I have no recollection.  I don't --
21 I don't remember.
22    Q.   Do you lift weights anymore?
23    A.   No.
24    Q.   When was the last time you lifted
25 weights?

Page 227

1    A.   Right after therapy.  When I had
2 my rotator cuff, I did lightweights.
3    Q.   Was that 2017?
4    A.   Yeah.
5    Q.   So you had stopped doing that well
6 before this accident?
7    A.   Yes.
8    Q.   And you understand in the case
9 involving the accident we're here about, you
10 made a workmen's compensation claim?
11    A.   Yes, but I couldn't do any.
12    Q.   And it was denied because --
13    A.   It was denied, right.
14    Q.   Aside from that one, have you ever
15 made another workman's compensation claim?
16    A.   Not that I know of, no.
17    Q.   You've talked a lot about your
18 training after you hired on with Savage.
19 Did Savage have written materials that they
20 gave to new hires?  Had some policy book,
21 rule book, conduct book?
22    A.   Oh, yeah, we had that.  We had
23 that -- we had those rule books and policy
24 procedures when we were going to class for
25 about a month -- about maybe two weeks.  I'm

Page 228

1 sorry.  It was a training they had at the
2 hotel.
3    Q.   From the beginning, before you
4 ever went out to the plant?
5    A.   Yeah.  We had a class, yeah.
6    Q.   Let's remember not to talk at the
7 same time.  It makes her job harder.
8    A.   Yeah.
9    Q.   So you did have written materials?
10 And what -- what were the written materials
11 that Savage gave you?
12    A.   I guess policy and procedures.
13    Q.   And aside from giving you those
14 and telling you to read them, they trained
15 you on --
16    A.   They trained me as well out in the
17 field.
18    Q.   No, I mean they didn't just give
19 you the policy and procedures book and say
20 go read this when you went to the training
21 classes?  You talked about it.
22    A.   Well, we did -- yeah.  We talked
23 about it, yes.  We didn't do any physical
24 trainings, yeah.
25    Q.   What do these rules say about



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
229–232

Page 229

1 reporting an accident if you have one at
2 work on duty?
3    A.   You report it.
4    Q.   Immediately, right?
5    A.   Yes.
6    Q.   And aren't you supposed to report
7 it before the end of your shift?
8    A.   He called the supervisor to come.
9 The supervisor came where we were at to the
10 incident.  So George reported it.
11    Q.   And don't procedures talk about
12 you're supposed the fill out appropriate
13 forms and injury report form?
14    A.   Well, I didn't have them at hand.
15 I think it was the supervisor position to
16 hand me those forms to fill out before I
17 left.  He made me write a statement.  Why
18 wouldn't he give me the forms to fill out as
19 well.  I would have filled the forms out if
20 he would have gave them to me.
21    Q.   Did you ever say, I need an injury
22 form to fill out?
23    A.   No, I have not.
24    Q.   Did you ever say I got an injury?
25    A.   He took a picture of the injury.

Page 230

1    Q.   I'm not talking about somebody
2 else did.  I'm talking about what you did.
3 Did you say, "I was injured"?
4    A.   I don't recall.
5    Q.   When you filled out that little
6 short statement about what happened, it's
7 one of the exhibits, was there anything to
8 prevent you from saying, I'm injured, my
9 head, my neck, my shoulder all these other
10 parts you're saying now?
11    A.   No, not at the time.
12    Q.   And was -- how long did you work
13 with George?
14    A.   About maybe a month, four or five
15 weeks.
16    Q.   Did you get assigned to the same
17 co-workers at all the times?
18    A.   Uh-huh (indicating affirmatively).
19 Yes.
20    Q.   So it would be just you and George
21 out there together for a month?
22    A.   No.  They had another guy name
23 Leland, Leland?  Leland, his name was
24 Leland.  It was three of us for about a
25 month.

Page 231

1    Q.   Did you consider George a friend?
2    A.   Yes.
3    Q.   Did you ever tell George, hey, I
4 got hurt?
5    A.   No.
6    Q.   George, your friend, didn't he ask
7 you after this, are you hurt?
8    A.   He said --
9    Q.   You okay?
10    A.   I showed him, said, look where all
11 this here, when we was in the office, I
12 showed him, said he was soaking -- I was
13 soaking wet in the office and I was --
14 looked like I had like some oil stains on
15 me.  So I was right there by the glass.
16 So...
17    Q.   I'm just trying to understand.
18    A.   I mean, no, I -- no, the answer
19 is, no.
20    Q.   So I'm trying to understand how
21 your friend George, who you'd been working
22 with for a month and --
23    A.   You really don't know a person for
24 a whole month.  I could -- we could sit here
25 for a whole month and I wouldn't know a

Page 232

1 thing about you.
2    Q.   I'm just saying someone you work
3 with for a month and asks you if you're
4 okay, if you got hurt.  I believe I'd tell
5 them, I got hurt.
6    A.   I don't recall him saying if I was
7 okay.
8    Q.   When the water sprayed you, did
9 you fall in?
10    A.   No.  They pushed me over.  I
11 didn't fall in.
12    Q.   What do you mean pushed you over?
13    A.   I got pushed (indicating).
14    Q.   You move it to the side?
15    A.   No, I got pushed.  I didn't -- it
16 pushed me.
17    Q.   It moved you?
18    A.   It moved me to the side.
19    Q.   From right to left, because that's
20 what you just demonstrated?
21    A.   Right.  From right to left just
22 like that.
23    Q.   Did your feet move?
24    A.   My feet moved, yes.
25    Q.   What do you mean, stumbled or



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
233–236

Page 233

1 almost fell or what?
2    A.   No, pushed over.  I was -- if I
3 was standing up and push you over, you --
4 wherever your feet take you, that's where
5 you going to go.  I don't know if you want
6 to call it stumbled or whatever, something
7 like that.  I don't know.
8    Q.   How many steps did you take?
9    A.   I have no idea.
10    Q.   But you didn't go to the ground?
11    A.   No, I didn't go to the ground.
12    Q.   And was there any water on your --
13 below the waist?
14    A.   Yes.
15    Q.   So was it all in your back?
16    A.   It was pretty much everywhere.  I
17 was soaked from the back.
18    Q.   I know you mentioned some oil
19 spots or some kind of stains or something on
20 your uniform.  There was no debris anywhere
21 you saw, no solid material, just water?
22    A.   I couldn't tell.  I couldn't tell.
23    Q.   You didn't see any?
24    A.   I didn't -- I couldn't tell.
25    Q.   Well, I mean, you're standing

Page 234

1 there, was there anything besides wet stuff
2 on the ground?
3    A.   I couldn't tell, because from that
4 period, I was -- the next thing I realized I
5 was in the office.
6    Q.   Okay.  And then you said you came
7 back and spent a lot of time sitting in
8 there in the same spot, didn't you?
9    A.   Right there with Terry.  Terry was
10 about to crank it back up.
11    Q.   But you went back to the scene?
12    A.   I went back over there to the
13 scene, yes, I did.
14    Q.   You spent a lot of time there?
15    A.   I don't know how long it was
16 there.
17    Q.   You were there?
18    A.   I don't know how long I was there.
19    Q.   But you didn't see anything?
20    A.   I didn't what?
21    Q.   See anything besides water?
22    A.   I seen -- I seen the gasket on
23 this, on this filter right here broken.
24    Q.   I'm just --
25    A.   It split it up.  Yeah, I seen

Page 235

1 that, so that's debris as well.  So --
2    Q.   I'm asking did you see any solid
3 material that you could call debris,
4 something other than wet that would have
5 come out of there?
6    A.   All I seen when I went back over
7 there, that gasket was split in half.
8    Q.   Did you see any pieces of gasket
9 on the floor?
10    A.   I did not.  I wasn't looking for
11 evidence to be honest with you.
12    Q.   Even though you said you were
13 hurt?
14    A.   Yes.
15    Q.   And I -- and I know we looked at a
16 photograph of you taken afterwards.  Do you
17 have any estimate as to what time that
18 photograph was taken?
19    A.   No, I do not.
20    Q.   And the uniform that you had, did
21 you wear it home?
22    A.   Yes.
23    Q.   And you drove home in your truck?
24    A.   Yes.
25    Q.   Leave any marks on the -- oil or

Page 236

1 water or anything on your truck?
2    A.   Not that I know of.  I wear towels
3 in my truck.
4    Q.   What did you do with the uniform?
5    A.   I still have the uniform.
6    Q.   You still got it?
7    A.   Yeah.
8    Q.   Have you washed it since the
9 accident?
10    A.   Yes, it's been washed.
11    Q.   You put it in the washing machine?
12    A.   Yes.
13    Q.   And is there anything that you can
14 see on it now?
15    A.   Probably nothing you see on it
16 now.  I would -- I couldn't tell you which
17 one it was, so...
18    Q.   Well, you have more than one?
19    A.   I have four.
20    Q.   And you got to keep those?
21    A.   No, I really got -- I really need
22 to turn them back in.  They didn't ask me
23 for them.  I just -- they just sitting
24 there.  I ain't worn them since.
25    Q.   And so describe every part of the



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
237–240

Page 237

1 uniform that was wet.
2      A.   My whole back was wet.
3      Q.   The whole back?
4      A.   They would even say that, said,
5 you're soaking wet.  Even Terry said, "The
6 safety officer said you're all wet."
7      Q.   And after this -- the water came
8 out, did it just come out all at once or did
9 it continue to lose water?
10     A.   I have no idea.
11     Q.   You didn't look at it?
12     A.   No, I was -- like I said earlier,
13 when that hit me, I was -- I couldn't -- I
14 don't remember nothing until I was in the
15 office.
16     Q.   And then after you went to the
17 office and came back out there, was it still
18 leaking?
19     A.   Not that I know of.
20     Q.   Did you see the water coming out
21 when it first happened?
22     A.   When it first happened?  No, I did
23 not.
24     Q.   Did you ever see the water coming
25 out, did you look up at it at the time of

Page 238

1 the accident?
2      A.   No.  The water was not coming out.
3      Q.   Did it -- did you see water all
4 around the area?
5      A.   I didn't see -- they got water --
6 they have water all over that place.  They
7 have water all over, all over the area
8 because you deal with water the whole time
9 you work back there.
10     Q.   So the concrete slab --
11     A.   Is always, always wet when you're
12 working back there.
13     Q.   How do you believe the water come
14 out -- came out?  Did it come out like water
15 out of the hose, just in one place or was it
16 spraying all around the perimeter of the
17 tank?
18     A.   I have no idea; however, that
19 exploded and wherever that gasket was broken
20 at, that's where the majority of the
21 pressure was at, I would imagine.
22     Q.   And you never saw it to know?
23     A.   No.  I was looking down.
24     Q.   The tank has some kind of filter
25 in it, I think you said, right?

Page 239

1      A.   Uh-huh (indicating affirmatively).
2      Q.   Can you describe what that filter
3 looks like?
4      A.   It look like a -- look like a
5 round -- a round piece on the top and a stem
6 at the bottom.
7      Q.   Is it one big cylinder or is it
8 straight --
9      A.   It's one, one cyl -- it's one, I
10 guess it's tied in together.  I'm not -- I'm
11 not really sure, but I know it's a round
12 piece in there and it's one long cylinder.
13     Q.   What's it made out of?
14     A.   I don't -- y'all could tell me
15 that.  It's y'all's stuff.
16     Q.   I was just saying, you said you
17 saw George change the filter and you even
18 helped change it one time?
19     A.   Yes.
20     Q.   What did you see?  What the --
21     A.   It got debris, look like all kind
22 of debris in it.  All -- I don't know what,
23 I don't know what kind of debris that is,
24 because I don't know.  I know they have
25 those little pellets and stuff inside the

Page 240

1 car, but once it hit the ground, you're
2 talking about stuff that's hitting the
3 ground, you got -- you got -- you got all
4 kind of stuff.  They got them little
5 clamps -- those little clamps that you take
6 off of the -- off that head on the top, they
7 got clamps -- we got to cut the clamps off
8 and they just throw them on the ground.
9      Q.   Let me, let me cut you off.  My
10 question is, I want to get a description of
11 what the gasket -- the filter looked like.
12     A.   Okay.
13     Q.   When you replace it, do you take
14 it out and put a new one in or do you just
15 clean it?
16     A.   Cause I thought you was asking me
17 what kind of debris that was in there.
18     Q.   All right.  No, I believe I was
19 asking what this filter looked like?  You
20 said you watched George change it and you
21 helped George change it.
22     A.   Okay.
23     Q.   Is it something like a pool
24 filter, you take out and replace with a new
25 one?



Page 241

1    A.   No, you got to wash it.
2    Q.   You take it out and wash it?
3 Okay, and when you want to -- did you help
4 wash it with George?
5    A.   Yeah, once.
6    Q.   Okay.  So what's it look like?
7 What's the shape of it?
8    A.   That's what I'm saying, it's a
9 round piece and there's a cylinder that's
10 like it was a candy, like it's -- like this.
11 It's a round piece.  This --
12    Q.   Which cause the --
13    A.   Like that.
14    Q.   And is it some solid material,
15 it's not paper?
16    A.   It's not paper.
17    Q.   Okay.  And how often would y'all
18 change that filter?
19    A.   It was leaking.  They knew about
20 it.  It was leaking once a week.  We wasn't
21 changing it.  It was the only reason they
22 would change it.  They would do that,
23 because it was leaking around it.  Every
24 week that thing was leaking.
25    Q.   And what did you do when you saw

Page 242

1 it leaking?
2    A.   The supervisor George seen it the
3 same time I seen it.  He had just -- he
4 would go and change it.  Sometime he said,
5 "No, I ain't going to change this."  One
6 time he said, "I ain't changing that no
7 more, I'm tired."
8    Q.   Do you tighten up the connections
9 or do you -- what do you mean by change it,
10 just clean it out and put it back?
11    A.   Yes.  That's what you do, yeah.
12    Q.   And when it was leaking before,
13 what did that look like?  Did it come all
14 the way around the spring?
15    A.   It was different -- it was
16 different times.  One time we seen that it
17 was leaking.  It looked like an umbrella was
18 coming out of it all the way around.  It
19 looked just like an umbrella.  It was coming
20 out.  And then sometime  it would just --
21 you could see it just pouring out, oozing
22 out on the side sometimes.  And then when it
23 was looking like an umbrella coming out of
24 there, George said, "I'm not changing that.
25 I'm tired of changing it."

Page 243

1    Q.   When was that?
2    A.   I have no idea, but that was his
3 words and I would swear to it in a court of
4 law.
5    Q.   When was that in relation to this
6 accident, was it the day before or a long
7 time before?
8    A.   I know I worked there between four
9 to five weeks and every week we were
10 changing that cylinder because it was
11 leaking.
12    Q.   Changing the cylinder --
13    A.   Well, changing the whatever, the
14 filter, it was leaking every week.  We was
15 doing that once a week.
16    Q.   And "we" was you and George and
17 who else?
18    A.   And sometime the other guy,
19 because he would admit, he would say,
20 "That's not my job," and he wouldn't do it.
21 Needlet, Needlet.  Needlet said, "That's not
22 my job.  I'm not doing that."
23        And he wouldn't, he wouldn't help
24 George.  So I'm figuring, I'm doing the
25 right thing, I helped him.

Page 244

1    Q.   Now, I need to get from you sort
2 of a chart of who your chain of command was
3 at Savage.  Who would be your immediate
4 supervisor?  Would George be considered your
5 supervisor or was he just the same as you?
6    A.   No, he was the crew chief.  He
7 was -- George the one that, that gave the
8 orders back there.
9    Q.   Okay.  So would he have been your
10 immediate supervisor, George?
11    A.   Back there, yes.  I mean, just me
12 and him and that other guy that I was
13 working with for the longest.  It was just
14 us three and George was --
15    Q.   George was the crew chief?
16    A.   Yeah.
17    Q.   Who was just above him?
18    A.   I guess Matt and Lee.  I'm not
19 sure who was above him.  I don't -- I don't
20 know.
21    Q.   Do you know what Matt and Lee's
22 job titles would be?
23    A.   Matt is over everything -- I mean,
24 Lee is over everything.  And then Matt is
25 the second in command, that I know of.



JOHNNIE ROY HARDY, JR.                                    March 31, 2021
JOHNNIE HARDY vs SAVAGE SERVICES                          245–248

Page 245

1    Q.   So the totem pole was George, then
2 Matt, then Lee, right?
3    A.   Yeah.
4    Q.   And then who above Lee?
5    A.   I don't know.
6    Q.   You never saw them?
7    A.   No.
8    Q.   So how -- do you know how at the
9 time of the accident, the spring was
10 stopped?  Did it stop by itself or would
11 there be something you would have to turn
12 off, some kind of switch?
13   A.   I don't know.
14   Q.   If you saw it leaking, how would
15 you stop it?
16   A.   I couldn't.  It would just have to
17 leak.  I didn't -- I was clueless on how to
18 stop that.
19   Q.   How did you turn the pump on?
20   A.   I didn't turn it on.
21   Q.   Did it stay on?
22   A.   I didn't op -- I didn't operate
23 any of that over there because I didn't know
24 how.
25   Q.   Are you claiming that all the

Page 246

1 injuries you have came from the pressure of
2 the water hitting you?
3    A.   All the injuries that I have that
4 I said today?  Yes.
5    Q.   You're not claiming you hit your
6 head or --
7    A.   No.
8    Q.   -- on a pipe or anything else?
9    A.   No.
10   Q.   Just the water?
11   A.   Yes.
12   Q.   And as far as how much pressure in
13 the water, you have no idea?
14   A.   No.
15   Q.   As far as what you could see, and
16 I know you can't -- I know you don't have
17 eyes in the back of your head.  As far as
18 what you could see, did you see any marks,
19 any discoloration, any bruising, any other
20 mark on any part of your body?
21   A.   I don't remember seeing that.
22   Q.   Well, let's say I got a bruise,
23 you know, it leaves a mark or a welt or
24 something like that.  Did you ever see any
25 such thing on your body?

Page 247

1    A.   Just red, I mean redness.
2    Q.   When did you see that?
3    A.   I seen that the next day.
4    Q.   Did you do anything to it?
5    A.   I just went to the -- went to the
6 doctor, and she said I had whiplash.
7    Q.   But did you look in the mirror, is
8 that how you saw the red?
9    A.   That's when I looked in the mirror
10 and just seeing some redness.
11   Q.   A mirror in the front of you or a
12 mirror so you could see --
13   A.   Mirror in the front and mirror in
14 back.
15   Q.   You looked in the mirror and you
16 say you were red?
17   A.   Yes.
18   Q.   Were you red -- you'd think you
19 would be redder right there at first, when
20 you're still at the wash rack, when they
21 took that photograph.  Is that not what
22 happened?  Did it not get red then, but --
23   A.   I have no idea when it got red.  I
24 just looked in the mirror and that time the
25 next day, I seen it's red, so...

Page 248

1    Q.   And that was the first time you
2 saw anything like that?
3    A.   Anything.
4    Q.   You didn't see anything on the day
5 of the accident?
6    A.   I didn't even check it.  He took a
7 picture.  Whatever this is, if you've seen
8 this picture right here.
9    Q.   Right.
10   A.   Can you tell if it's red or not?
11   Q.   I can't tell.  It doesn't look
12 like it.  Does it look like it to you, you
13 were red?
14   A.   Yes.
15   MR. POOLE:
16       All right, sir, I'm going to pass
17 the witness back, even though he has a few
18 more for you.
19 EXAMINATION BY MR. CRAWFORD:
20   Q.   I have a couple of follow-ups, I
21 meant to ask you earlier, do you have any
22 kind of hobbies or social activities,
23 recreational activities that you used to do
24 before this accident that you feel like you
25 can't do right now?



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
249–252

Page 249

1    A.   I do.  I like basketball.  I
2 play -- I like softball, bowling.  I like to
3 play with my son.  He plays -- he plays
4 football.
5    Q.   Play with your son?
6    A.   Yes.  My son plays football.  I
7 try to show him some tactics of contact.  I
8 can't do that anymore.  I can't -- I can't
9 play with my grandson.  I throw him up in
10 the air or pick him up and I miss that.
11    Q.   When was the last time before
12 May 8th, 2020, that you played basketball?
13    A.   Before May 8th?  I been playing.
14 We got a gym.  I mean he's got -- at the
15 high school, and like Barbe, we played over
16 there.
17    Q.   Like Barbe?  Barbe, B-A-R-B-Y --
18    A.   B-A-R-B-E.  Like Barbe where my
19 son went, and I was the coach for a church
20 league.  Trinity Baptist Church, I was a
21 coach over there for basketball.  We went
22 undefeated.
23    Q.   Which -- which age group are you
24 teach -- are you coaching?
25    A.   That was, gee, they was younger.

Page 250

1 They was younger then.
2    Q.   Finish high school or --
3    A.   Uh-uh (indicating negatively).
4    Q.   7th graders or younger than that?
5    A.   About 8th graders.  I think it was
6 some 8th graders.
7    Q.   Are you saying you can't coach
8 right now?
9    A.   No, I ain't -- I wasn't -- I mean,
10 I can't -- I can't coach.  If it was
11 basketball, I couldn't coach because I have
12 to shoot the ball to show them how to shoot.
13    Q.   I take it you haven't tried to
14 coach?
15    A.   Huh?
16    Q.   I take it you have not tried to
17 coach?
18    A.   No.
19    Q.   Before May 8th, 2020, when was the
20 last time you played softball?
21    A.   It's been -- it's been a while.  I
22 mean, we just played softball like family
23 reunion, stuff like that, but I did play in
24 a league, in Lake Charles league.
25    Q.   When was that?

Page 251

1    A.   A while back.
2    Q.   Five years, ten years?
3    A.   Maybe five years.  We had a -- we
4 had a softball league at the fire
5 department.
6    Q.   Yeah.
7    A.   We had a team, we had a team from
8 the fire department.
9    Q.   When was the last time that you
10 played on the fire department softball team?
11    A.   Oh, it's been a while.
12    Q.   More than five years?
13    A.   Yeah, it's been a while.
14    Q.   Before May 8th, 2020, when was the
15 last time you went bowling?
16    A.   Oh, shoot, that's been a while,
17 too.
18    Q.   Just -- I don't expect you to have
19 an exact number, but do you have an idea
20 about how much your three-year old grandson
21 weighs?
22    A.   He's about that tall.  Maybe 20 --
23 26, 25 pounds maybe.
24    Q.   Do you feel like --
25    A.   Something like that.

Page 252

1    Q.   -- you can't lift 25, 26 pounds?
2    A.   I don't want to test it, because I
3 don't want to test it with him.
4    Q.   Is it -- is it your sworn
5 deposition testimony that since May 8th,
6 2020, you have not lifted your grandson?
7    A.   I picked him up in my left hand,
8 but as far as like doing it, throwing him up
9 in the air?  No, I can't do that.
10    Q.   I think this is pretty clear, but
11 the -- at the time of the accident, you --
12 you hear the noise and you feel the water,
13 but you don't ever see the water coming,
14 correct?
15    A.   Right.
16    Q.   And then you've never been back
17 there at a time when that filter tank was
18 reassembled and operating, correct?
19    A.   No, I haven't been back there,
20 correct.
21    Q.   I still need those signed, can we
22 get that done today?
23    MR. SHELTON:
24       Ben said he want to look at them.
25    MR. CRAWFORD:



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
253–256

Page 253

1      Can you send -- I mean, I sent
2 them to Ben before to get them signed.  Can
3 you send them -- can you see him today so we
4 can get him to sign while he's here?
5      MR. SHELTON:
6          I'll talk to Ben after the depo,
7 but the last time I talked to him he said he
8 wanted to see them.
9      MR. CRAWFORD:
10         Well, I sent them to him with the
11 discovery and he did say something about
12 executing, so I don't know what else to do.
13     MR. SHELTON:
14         I'll get them signed if he wants
15 to sign them.
16     MR. CRAWFORD:
17         Let's -- let's do this, let's get
18 him to sign them and you hold them.  That
19 way --
20     MR. SHELTON:
21         Yeah, we can do that.
22     MR. CRAWFORD:
23         That way they're signed.  If Ben
24 agrees, then you send them to me, okay?  But
25 let's not let him --

Page 254

1      MR. SHELTON:
2          Get away.
3      MR. CRAWFORD:
4          -- leave and then I'm -- you know,
5 at least let me just chase the signed one
6 from Ben.
7          I think I'm done.  Give me just a
8 second.
9 EXAMINATION BY MR. CRAWFORD:
10     Q.   Mr. Hardy, have you ever been
11 fired from any position?
12     A.   No, sir, not that I know of.
13     Q.   Okay.  And the Baroid job that you
14 mentioned earlier, what happened to cause
15 you to stop working there?
16     A.   I got tired of eating mud and
17 dust.  It was a mud drilling plant and it
18 wasn't good for my health, that's for sure.
19 Out the dust, into the fire.
20     Q.   Is that place still in business?
21     A.   Uh-huh (indicating affirmatively).
22 I have a friend works there.
23     Q.   How old were you when you left
24 there?
25     A.   I was -- in 1999, I got to the

Page 255

1 fire department.  But I worked from there
2 from 1983 to 1999 and I was 17, somewhere up
3 in there.
4      MR. CRAWFORD:
5          All right, that's it.
6      MR. POOLE:
7          One more.  One more series.
8 EXAMINATION BY MR. POOLE:
9      Q.   What is your understanding of any
10 diagnosis you have for your shoulder?
11     A.   What do I understand?  Could
12 you --
13     Q.   Well, you talked to your doctors
14 when you went to see them, right?
15     A.   Uh-huh (indicating affirmatively).
16     Q.   What do you understand is the
17 diagnosis for your shoulder?
18     A.   I have a tear in my shoulder.
19     Q.   Tear of what?
20     A.   I don't know.  It's just -- they
21 said a tear.  That's what's going to more
22 than likely happen, surgery.
23     Q.   Who told you that?
24     A.   Dr. Small.
25     Q.   And when is the first time you saw

Page 256

1 him after the accident?
2      A.   I don't remember.
3      Q.   You don't remember it?
4      A.   I don't remember that.
5      Q.   And what is your understanding of
6 the diagnosis of your neck?
7      A.   For my neck, I got two bulging
8 discs.
9      Q.   And who told you that?
10     A.   It was Dr. Small.
11     Q.   And you mentioned upper back?  Is
12 that --
13     A.   Between the shoulder blades and
14 the -- and the spinal -- my shoulder blades,
15 right up here.
16     Q.   Okay.  And you're pointing to an
17 area, it looks like about 6 or 8 inches
18 below your collar?
19     A.   Somewhere up in there, if I could
20 reach further, that's the further I can
21 reach.  So in that area, approximately that
22 area.
23     Q.   That's your --
24     A.   My upper back.
25     Q.   What is the diagnosis for that?



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
257–260

Page 257

1    A.   They going to -- they're going --
2 they got additional image for that as well.
3    Q.   What do you mean, they're going to
4 take --
5    A.   MRI.
6    Q.   They haven't done any yet?
7    A.   Yes, they have.  They done it.
8 But they didn't -- I guess -- it's just I
9 don't know how to -- I don't know how to put
10 it.  It's just that it was done -- I don't
11 know how to put that.  The tube that they
12 want me on to go in, I just, I don't -- I
13 feel claustrophobic between that tube and I
14 don't want to go and have to arrange some
15 kind of way for me to go in there because
16 they put something over to clamp, clamp in
17 my head and then they sticking me in a tube
18 where my shoulders touch.  I can't -- I
19 refuse to go in there because I am
20 claustrophobic, even though I was a fireman,
21 it seems funny, but...
22    Q.   So they've never done the tests
23 because you don't want to get in the
24 machine?
25    A.   Yeah.

Page 258

1    Q.   What exactly are the symptoms you
2 have today with respect to your right
3 shoulder?
4    A.   Pain.
5    Q.   That's all, is it just painful?
6    A.   Painful.
7    Q.   At all times or when you do
8 certain activity?
9    A.   Sometimes I have good days,
10 sometimes I have bad days.  Sometimes like
11 right now, I would say a five right now.
12    Q.   Do you have full ranges of motion?
13    A.   I can reach up in the air, but it
14 hurt.
15    Q.   What are your symptoms as far as
16 your neck?
17    A.   My neck is two bulging discs.
18    Q.   What is your symptoms?
19    A.   Pain.  It's like I have a motion
20 like right now, turning this way just that
21 much, it hurts going to my right and if I go
22 all the way to my left, I can still feel the
23 pain in my right neck.
24    Q.   You're saying that your neck hurt
25 to move?

Page 259

1    A.   Yes.  It kind of varies on the --
2 how much I can move it each way.
3    Q.   What are the symptoms you're
4 claiming for your upper back?
5    A.   My upper back, they said it's
6 still -- they got to do MRI on it.
7    Q.   So you don't know if you're going
8 to therapy yet?
9    A.   I'm hurt there.  But they have to
10 do some additional imaging.
11    Q.   As far as any claim of brain
12 injury, what are the symptoms?  What do you
13 claim?
14    A.   I have headaches.  Sometimes it
15 will be like migraine headaches and they
16 also -- that's another thing, they also have
17 to do as well, additional images on the head
18 as well.
19    Q.   You've never had a CAT scan or MRI
20 of your head?
21    A.   They had an X-ray.
22    MR. POOLE:
23        That's all I have.
24    MR. SHELTON:
25        We will reserve for trial.

Page 260

1        (Whereupon the deposition was
2 concluded at 3:16 p.m.)
3            * * *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



JOHNNIE ROY HARDY, JR.
JOHNNIE HARDY vs SAVAGE SERVICES

March 31, 2021
261

Page 261

```
 1           REPORTER'S CERTIFICATE
 2     This certification is valid only for a
    transcript accompanied by my original
 3  signature and original required seal on this
    page.
 4
       I, Diane Clark, Certified Court
 5  Reporter in and for the State of Louisiana,
    as the officer before whom this testimony
 6  was taken, do hereby certify that JOHNNIE
    ROY HARDY, JR., after having been duly sworn
 7  by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the
 8  foregoing 260 pages; that this testimony was
    reported by me in the stenotype reporting
 9  method, was prepared and transcribed by me
    or under my personal direction and
10  supervision, and is a true and correct
    transcript to the best of my ability and
11  understanding; that the transcript has been
    prepared in compliance with transcript
12  format guidelines required by statute or by
    rules of the board, and that I am informed
13  about the complete arrangement, financial or
    otherwise, with the person or entity making
14  arrangements for deposition services; that I
    have acted in compliance with the
15  prohibition on contractual relationships, as
    defined by Louisiana Code of Civil Procedure
16  Article 1434 and in rules and advisory
    opinions of the board; that I have no actual
17  knowledge of any prohibited employment or
    contractual relationship, direct or
18  indirect, between a court reporting firm and
    any party litigant in this matter nor is
19  there any such relationship between myself
    and a party litigant in this matter.  I am
20  not related to counsel or to the parties
    herein, nor am I otherwise interested in the
21  outcome of this matter.
22
23  _____
24         DIANE CLARK, RPR, RMR, CRR
           CERTIFIED COURT REPORTER
25
```

