UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**JOHNNIE HARDY, JR.**

**VERSUS**

**SAVAGE SERVICES CORPORATION, ET AL.**

CIVIL ACTION

NO. 20-565-JWD-RLB

CONSOLIDATED WITH

**JOHNNIE HARDY, JR.**

**VERSUS**

**SAVAGE TRANSPORTATION**

CIVIL ACTION

NO. 21-749-JWD-RLB

## RULING AND ORDER

Before the Court is *Sasol Chemical (USA) LLC's Motion and Notice Motion for Summary Judgment* ("Motion") brought by defendant Sasol Chemical (USA) LLC ("Sasol" or "Defendant"). (Doc. 87.) It is opposed by plaintiff Johnnie Hardy, Jr. ("Plaintiff" or "Hardy"). (Doc. 89.)[1] Sasol filed a reply brief. (Doc. 97.)[2] The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, the Motion is granted.

---

[1] Plaintiff's exhibits in support of his opposition were refiled in Doc. 91 to comply with local rules. However, for ease of reference, the Court will use the original document numbers of the exhibits attached to the Plaintiff's memorandum.
[2] As explained in detail later, this is Sasol's third motion for summary judgment. Its first motion for summary judgment (Doc. 33) was denied without prejudice so that Sasol could address corporate depositions taken by Plaintiff after the filing of its first motion for summary judgment. (Doc. 50.) Sasol's second motion for summary was fully briefed and denied by a ruling issued on July 21, 2022. (Doc. 60.) After the Magistrate Judge set another dispositive motion deadline (Doc. 86), Sasol filed the present Motion. While this Motion is similar to its previous motions for summary judgment, there are meaningful differences.

1

I.    **FACTUAL AND PROCEDURAL BACKGROUND**[3]

Sasol operates a chemical plant in Westlake, Louisiana. (Doc. 87-4 at 1, ¶ 2 (Declaration of Richard Lee);[4] Doc. 87-3 at 1–2, ¶¶ 2, 12 (Affidavit of Edward Lee).) As a part of its operations, Sasol utilizes railroad cars; "Sasol owns/leases 100% of the rail cars at the Sasol facility." (Doc. 87-3 at 3, ¶ 13.)

In December of 2017, Sasol contracted with Kansas City Southern Railway Company ("KCS") to lease undeveloped land and railroad tracks near the Sasol facility. (Doc. 87-4 at 1–2, ¶ 4.) The lease envisioned that a third party would construct a "wash-bay" where Sasol's railcars would be washed. (*Id*. at 6, ¶ 3.2(f).)

Sasol in turn contracted with Savage Transportation Management, Inc. ("Savage") to provide rail switching and wash-bay services and to construct and provide the wash-bay in exchange for which Sasol would pay Savage a monthly wash-bay fee. (*Id*. at 2, ¶ 5; Doc. 87-6 at 38 (30(b)(6) Deposition of Sasol).)[5] This area where rail cars were moved, washed, and cleaned was called generally the "Sasol SIT (storage in transit) yard." (Doc. 87-3 at 3, ¶ 16.) The contract also provided that Savage would be exclusively responsible for the inspection, calibration, and maintenance of the wash-bay equipment, including the filter tank and gaskets which were allegedly involved in the accident. (Doc. 87-4 at 2–3, ¶¶ 8–9.)

According to the terms of the services contract between Sasol and Savage, "Savage retained exclusive ownership of the Wash-Bay from the 'Commencement Date' until Sasol had completed making Wash-Bay payments in full on the 'fifth (5th) anniversary of the

---

[3] Sasol provides considerably more detail in connection with the present Motion than it did in its previous one regarding the place where the subject accident occurred, the SIT yard and wash bay area, its ownership, its lease, its operation, and the equipment located thereon. (*Cf., e.g.*, Doc. 51-4 at 1–2 with Doc. 87-4 at 1–16.)

[4] Richard Lee is the Logistics Manager for Sasol at Sasol's Westlake plant (Doc. 87-4 at 1, ¶ 2) and also acted as the corporate representative at Sasol's Rule 30(b)(6) deposition (Doc. 87-6).

[5] "Wash-bay" is defined in the contract between Sasol and Savage as "the facility to be built by [Savage] for the purpose of washing rail cars as is further described in Schedule B [of the contract]." (Doc. 87-4 at 9.)

2

Commencement Date – which is the date that [Savage] shall transfer title to the Wash-Bay to Sasol . . . .' " (*Id.* at 2, ¶ 6 (alterations in original) (citing *id.* at 15).) The "Commencement Date" in the contract is defined as December 1, 2017. (*Id.* at 7–8.)

Plaintiff Johnnie Hardy, Jr. was employed by Savage and, according to Edward Lee, "was assigned to work exclusively at the Sasol facility in Westlake, Louisiana. His job duties did not require him to work anywhere other than the Sasol facility." (Doc. 87-3 at 4–5, ¶ 29 (Affidavit of Edward Lee).)[6]

Hardy claims he suffered an on-the-job injury on or around May 8, 2020, while working in the SIT yard, specifically in the wash-bay area used to wash Sasol's rail cars. Plaintiff alleges he was injured "when a highly pressurized water tank exploded, causing highly pressurized water to be shot at his head, neck[,] and shoulder." (Doc. 89 at 3; *see also id.* at 3–4 (quoting Doc. 89-5 at 108–09, 116–17 (Hardy Deposition)).) The explosion is alleged to have occurred because of a failed rubber gasket on the pressurized water tank, also referred to as a filter tank. (*Id.* at 4–5 (citing Doc. 89-6 at 20–21, 25 (30(b)(6) Deposition of Sasol)).)

Plaintiff alleges that Sasol is liable to him under Louisiana Civil Code articles 2317 and 2317.1. Specifically, Plaintiff alleges that

- Sasol had custody of the defective filter tank because it either owned it or leased it, oversaw and directed its use, and had the power to change or control how it was used.

- Sasol was aware of the defect in the tank because it had received reports that the tank leaked, and therefore Sasol at the very least should have known that a dangerous condition existed in the tank.

---

[6] Edward Lee was the General Manager for Savage, and his duties included "oversight of the Savage operations at the Sasol plant in Westlake, Louisiana." (Doc. 87-3 at 1, ¶ 2.) Edward Lee's Affidavit was submitted by Sasol in support of its Motion.

3

- Sasol failed to ensure the tank functioned properly or to cure the known defect and is therefore liable for the damages incurred by Plaintiff.

(*Id.* at 1.)

Plaintiff filed suit in state court in East Baton Rouge Parish (Docs. 1-2, 1-3), which was removed to this Court (Doc. 1). Plaintiff's Motion to Remand was denied. (Doc. 28.)

## II. ARGUMENTS OF THE PARTIES

### A. Sasol's Memorandum

Sasol argues that it did not employ Plaintiff and had no responsibility for his work, workplace, or tools. (Doc. 87-2 at 8–9.) Sasol points the Court to Plaintiff's testimony where he admitted that all maintenance of the filter tank (including gaskets) was performed by Savage and not Sasol. (*Id.* at 10.) The filter tank that allegedly caused Plaintiff's injuries was owned, maintained, and used exclusively by Savage. (*Id.*)

Sasol maintains that the wash-bay area where the accident happened is "outside the physical boundaries of the plant[,]" and Sasol personnel have no responsibilities for the equipment there. (*Id.*) While Sasol admits that it does have an SIT Yard supervisor, that person's "interactions were not related to the details of [Savages's] operations but was instead focused on the results to be obtained." (*Id.* (citing Doc. 87-4 at 3, ¶ 10).) He had no responsibility for Savage's method of operation, inspecting, or even observing Savage's operations. (*Id.* at 10–11.)

Sasol next argues that it cannot be liable under Louisiana Civil Code articles 2317 and 2317.1 because it had no notice of any defect in the filter tank and, even if it had received notice, had "no right to do anything about it." (*Id.* at 12–15.) Furthermore, Sasol neither owned nor controlled the wash-bay equipment (and specifically the filter tank) and therefore did not have

4

"garde" over the equipment rendering it free from liability under these provisions. (*Id*. at 13–16 (citing and quoting *Curole v. Choice Hotels Int'l, Inc.*, No. 08-226, 2009 WL 10700609, at *1 (M.D. La. June 17, 2009); *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427 (5th Cir. 2021); *Pickett v. RTS Helicopter*, 128 F.3d 925, 932–33 (5th Cir. 1997)).)

### B. Hardy's Opposition

Hardy notes at the outset that "Sasol does not dispute that the tank had a defect, or that the defect caused Plaintiff's damages." (Doc. 89 at 12 (citing Doc. 51).) Hardy argues that "Plaintiff can show that Sasol had custody of the filter tan . . . [or] [a]t the very least, a genuine issue of material fact exists as to Sasol's custody of the filter tank." (*Id.* at 13.) This is true, argues Plaintiff, because "he was told [ ] that Sasol owned the wash rack and all equipment in it, including the filter tank . . . ." (*Id.*) Plaintiff points to his own testimony in support of this contention.

> Q. And I think you already told me, you don't know who owns the equipment, that is all the equipment that is part of the wash rack?
>
> A. It's Sasol.
>
> Q. Okay. Do you know that?
>
> A. That's the word, I mean, that's what they told us. I'm just going about hearsay, so –
>
> Q. As between Savage and Sasol, who to your understanding had direct contact with the - - it's two questions. Number 1, the wash rack, was that Savage or Sasol?
>
> A. From what my understanding is, all the equipment and everything was for Sasol.
>
> Q. To your understanding?
>
> A. Right.
>
> Q. In terms of the operations of that equipment, who did that?
>
> A. Sasol - - I mean, operation of the equipment is Savage.

(*Id.* at 7 (quoting Doc. 89-5 at 178–79).)

5

"[B]ut whether they own[ed] or lease[d] it, these factors alone are enough to show that Sasol had custody of the tank." (*Id.* at 13 (footnote omitted).) As pertains to custody, Plaintiff maintains that "custody of the filter tank hinges on the right of direction and control." (*Id.* at 12 (citing *Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 774 (E.D. La. 2017)).)

Sasol's supervisor would visit the SIT area where he would talk to Savage personnel and the other contractors to "mak[e] sure that everything is operating as needs to be as far as operation. Not telling them how to do their job, just making sure that we have coordination of what we need is being carried out per our contracts." (*Id.* at 9 (quoting Doc. 89-6 at 39–40).) Sasol set performance standards for Savage and its wash rack requiring Savage to wash 36 rail cars per day. (*Id.* at 8–9 (citing Doc. 89-6 at 34–35); *see also* Doc. 53 at 13.)

Insofar as Sasol's alleged prior notice of the defective filter tank, Plaintiff argues that "Savage employees reported to Sasol directly any time there was a problem with the wash rack . . . ." (Doc. 89 at 14 (citing Doc. 89-5 at 168, 243; Doc. 89-6 at 10–11, 31).) "Savage had reported problems with this filter tank to Sasol previously." (*Id.* (citing Doc. 89-5 at 168, 243).) Thus, Sasol "knew or should have known that the filter tank was defective but failed to do anything to mitigate [the] potential harm or prevent Plaintiff's injury." (*Id.*)

### C. Sasol's Reply Brief

In reply, Sasol argues that the only evidence of its alleged ownership of the wash rack and filter tank comes from the hearsay testimony of Plaintiff, admittedly not made on personal knowledge. (Doc. 97 at 3 (quoting Plaintiff's testimony that "they told us" Sasol owned the equipment but not identifying "they").) Furthermore, Sasol argues that it is now providing evidence not previously provided to the Court that shows conclusively that it did not own the wash-bay equipment including the filter tank. (*Id.* at 1–2 (citing and quoting from the new

6

Declaration of Richard Lee (Doc. 87-4) and parts of the attached contract between KCS and Sasol and the attached contract between Sasol and Savage).)

Sasol contends that the newly supplied evidence establishes firmly that Sasol had no right to direct or control the wash-bay equipment in question and did not do so. (Doc. 97 at 3–8.) Although Sasol did have an SIT yard site supervisor, Richard Lee's new declaration and the attached contract demonstrate conclusively that the supervisor's oversight was "limited . . . to the results to be obtained." (Doc. 87-4 at 3.) Rather, Savage was tasked with "complete control, supervision and direction of the method and manner of obtaining such results, and is responsible to Sasol therefor." (Doc. 97 at 4 (quoting the contract between Sasol and Savage, Doc. 87-4 at 10, § 3.1).) The other evidence highlighted by Plaintiff, says Sasol, does not demonstrate the right to direct or control the wash-bay equipment including Sasol's right to set performance standards and expectations for Savage and its wash rack. (*Id.*)

Regarding its alleged notice of the defective tank, Sasol argues that the testimony relied upon by Plaintiff in this regard is that Edward Lee, a Savage supervisor, knew "at some point" that the filter tank was leaking. (*Id.* at 8 (citing Plaintiff's testimony, Doc. 89-5 at 168).) While Hardy testified that "they" knew about the leak, this is inadmissible hearsay which cannot be considered in connection with the Motion, and, furthermore, he fails to specify who "they" are. (*Id.*)

In sum, insists Sasol, Plaintiff has failed to raise an issue of fact as to either its custody of the filter tank or its negligence. (*Id.* at 9.)

### III.   STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material

7

facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations and emphasis omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (internal citation omitted).

## IV.    DISCUSSION

Plaintiff's claims rest on Louisiana Civil Code articles 2317 and 2317.1, which state:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.

La. Civ. Code art. 2317.

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

*Id.* art. 2317.1.

The issues raised by Sasol's Motion are whether Plaintiff has raised genuine issues of material fact regarding first, whether Sasol had custody or garde of the defective tank and second,

8

whether Sasol knew or should have known of the defective tank and whether it negligently failed to correct same. The Court will consider these in turn.

### A. Custody or Garde

The Fifth Circuit has recently reminded us of the definition and test to be applied in determining whether one has custody or "garde" of an item under Article 2317.

> The first requirement for strict (custodial) liability is that "[t]he *thing* which caused injury must be in the care, custody and control of the defendant." *Palermo v. Port of New Orleans*, 951 So. 2d 425, 438 (La. App. 2007) (emphasis added); *accord Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 565 (5th Cir. 2003). "Louisiana courts have generally held that (1) ownership of a thing establishes a rebuttable presumption of custody or 'garde,' and (2) in a case of non-ownership, a defendant may be found to have custody over property when he exercises direction and control of the thing and derives some benefit from it." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 913 (5th Cir. 1997); *accord Davis v. Riverside Court Condo. Ass'n Phase II, Inc.*, 154 So. 3d 643, 648 (La. App. 2014) ("[I]n determining whether a thing is in one's custody or *garde*, courts should consider (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing." (alteration in original) (quoting *Dupree v. City of New Orleans*, 765 So. 2d 1002, 1009 (La. 2000))).

*Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 441–42 (5th Cir. 2021); *see also Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 617, n.10 (5th Cir. 2018); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 838 F. Supp. 2d 497, 511 (E.D. La. 2012).

The Fifth Circuit emphasized that "[g]enerally, '[d]etermining who has the custody or garde of the thing is a fact driven determination.' " *Butler*, 16 F.4th at 442 (quoting *Dupree*, 765 So. 2d at 1009.)

In its ruling on Sasol's earlier motion for summary judgment, this Court ruled that "a genuine issue of material fact exists regarding whether Sasol had custody or garde over the filter tank." (Doc. 60 at 8.) For context, the Court quotes the basis for its earlier ruling:

9

It is unclear whether Sasol owned the filter tank.[7] While Hardy testified that Sasol owned the equipment that was part of the wash rack (which presumably included the filter tank), he does not give the basis for that knowledge, saying only that "they told us" (never identifying who "they" were). (Doc. 53-3 at 178-79, 241.) However, there is other evidence in the record which indicates that Sasol had the right to direct and control the equipment.

According to the Affidavit of Edward Lee, submitted by Sasol, the contract between Savage and Sasol was to "provide[ ] men and equipment to move *Sasol's rail cars* as requested by Sasol. However, all such movements [were] on *Sasol's tracks*, i.e. Savage only move[d] rail cars at the *Sasol facility* . . ." (Doc. 51-3 at 3, ¶ 14, emphasis added.) "With respect to operations at the *Sasol plant*, Savage operate[d] exclusively on *track owned by Sasol*." (*Id.*, ¶ 18, emphasis added.) "The *tracks owned by Sasol* are used solely to facilitate the transportation of Sasol's products *inside the Sasol plant*." (*Id.*, ¶ 15, emphasis added.)

The accident happened in an area of the facility called the "Sasol SIT (storage in transit) yard" where Sasol rail cars are moved and washed. (*Id.*, ¶ 16.) While Sasol contracted with "Savage to operate the SIT yard and wash bay," which was outside of Sasol's facility, Sasol had a "long-term lease agreement for" the SIT yard and wash bay with Kansas City Southern Railroad. (Doc. 51-6 at 38, 30(b)(6) Deposition of Sasol.) A reasonable inference to be drawn from these facts is that the lease of the "SIT yard and wash bay" included the equipment in the wash bay, including in turn, the filter tank in question.

The evidence also indicates that Sasol exercised some level of supervision over the area. Sasol admitted it had a SIT yard supervisor who would visit the SIT area where he would talk to Savage personnel and the other contractors to "mak[e] sure that everything is operating as needs to be as far as operation. Not telling them how to do their job, just making sure that we have coordination of what we need is being carried out per our contracts." (Doc. 53-4 at 39-40.) Sasol expected Savage would wash 36 rail cars per day. (Doc. 53-4 at 34-35.)

This evidence raises a genuine issue of material fact as to Sasol's right to direct and control the SIT yard and the equipment within it. "Determining who has the custody or garde of the thing is a fact-driven determination." *Rando v. Anco Insulations Inc.*, 2008-1163 (La. 5/22/09), 16 So. 3d 1065, 1084 (citing *Doughty v. Insured Lloyds Ins. Co.*, 576 So. 2d 461, 464 (La. 1991)); *see also DeRouen v. Audirsch*, 25,847 (La. App. 2 Cir. 6/28/94), 639 So. 2d 476, 483 (same); *Baudoin v. McDermott, Inc.*, 93-2084 (La. App. 1 Cir. 10/7/94), 644 So. 2d 799, 801 (same); *Sewell v. Sewerage & Water Bd. of New Orleans*, 2018-0996 (La. App. 4 Cir.

---

[7] In its original *Statement of Material Facts Supporting Motion for Summary Judgment by Defendant Sasol Chemical (USA), LLC*, Sasol did not represent that it did not own or lease the filter tank. Rather, it represented that the equipment was "under the exclusive control of Plaintiff's employer" (Doc. 51-2 at 2, ¶12) and that "[t]he wash rack [was] outside the plant" (*id.*).

10

5/29/19), [379 So. 3d 636,] *writ denied*, 2019-01166 (La. 10/15/19), 280 So. 3d 612 (same).

The fact that Sasol may not have been the owner of the equipment does not necessarily gainsay its status as custodian under Art. 2317 nor does the fact that Savage may have had simultaneous garde of the tank.

> [T]he one who has possession or control may be the owner, but it may also extend to a broader category to include others. [citing *Loescher v. Parr*, 324 So. 2d 441, 447 (La. 1975), n.6, quoting David E. Verlander III, We Are Responsible, 2 Tul. Civ. L. Forum, No. 2 at 64 (1974).] Likewise, courts have recognized possession or control may be held by more than one person who may bear liability simultaneously. *See e.g.*, *King v. Louviere*, 543 So.2d 1327 (La. 1989); *Ehrman v. Holiday Inns, Inc.*, 04–0312 (La. App. 4 Cir. 3/29/95), 653 So.2d 732, 738, *writ denied*, 95–1051, 1058 (La. 6/16/95), 655 So.2d 343; *Thumfart v. Lombard*, 613 So.2d 286, 289–90 (La. App. 4 Cir.), *writ denied sub nom.*, *Montalbano v. Lombard*, 617 So.2d 1182 (La. 1993).

*Rando*, 16 So. 3d at 1084; *see also Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So. 2d 1002, 1009 (citation omitted) ("Moreover, because Article 2317 imposes liability upon persons for things in their custody or garde, a principle much broader than ownership, it is clear that more than one party may have custody or garde of a thing under LA. CIV. CODE art. 2317, determined by an examination of the parties' actions and relationships to the thing causing the injury."); *Sewell v. Sewerage & Water Bd. of New Orleans*, 2018-0996 (La. App. 4 Cir. 5/29/19) --- So. 3d ---, 2019 WL 2305763, *writ denied*, 2019-01166 (La. 10/15/19) 280 So. 3d 612 (citation omitted) ("[M]ore than one party may have custody or garde of a thing under Article 2317."); Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law, §14.05 ("A non-owner could have garde if he derived substantial benefit from the thing and exercised some control over it. Those listed in the *Loescher* footnote – bailee, lessee, usufructuary, borrower for use and repairman – met the test and perhaps others also would meet it.").

Sasol clearly derived benefit from the equipment and its operation. It was Sasol's rail cars which were washed there and, indeed, Sasol expected that some 36 of its cars would be washed there as a part of Savage's daily operation. (Doc. 53 at 13, citing Doc. 53-4 at 34-35.) In addition, Sasol described Savage's rail switching service as "an integral part of Sasol's operations." (Doc. 53 at 7, quoting Doc. 53-4 at 28-29, 30.)

It is true that the record evidence shows Sasol's supervisor in charge of monitoring Savage's operation exercised only limited control over the SIT Yard, "making sure that everything is operating as needs to be as far as operation. Not telling them how to do their job, just making sure that we have coordination of what we need is being

11

>  carried out per our contracts." (Doc. 53-4 at 39-40.) "Making sure everything is operating as needs to be" certainly implies a right to direct or control, and it is the "*right* of direction and control" the thing in one's garde that gives rise to responsibility under Arts. 2317. *Renwick*, 901 F.3d at 617, n.10 (emphasis added) (quoting *Dupree v. City of New Orleans*, 1999-3651 (La. 8/31/00), 765 So. 2d 1002, 1009).
>
>  In conclusion, the Court finds there is a genuine issue of material fact as to whether Sasol had custody or garde of the filter tank.

(Doc. 60 at 8–11.)

In its latest Motion, Sasol provides additional information which mandates a different result. First, it is now clear that Sasol did not own the wash-bay equipment including the filter tank which allegedly caused Plaintiff's injuries. While Sasol leased from KCS the property on which the wash-bay equipment rested (*see* Doc. 87-1 at 1, ¶ 4; *id.* at 6, § 3.2(f)), the contract between Sasol and Savage called on Savage to

1) provide for the "design[ ], procure[ment], construct[ion], commission[ing] and [making] fully functional [the Wash-Bay]." (Doc 87-4 at 9);

2) own the Wash-Bay until five years following the Commencement Date [December 1, 2017] at which time "[Savage] shall transfer title to the Wash-Bay to Sasol . . . ." (*Id.* at 2, 15);

3) operate the Wash-Bay (*Id.* at 2–3, ¶¶ 5, 9–10);

4) "operate[ ], inspect[ ], calibrate[ ] and main[tain] . . . the wash-bay equipment – including the filter tank . . . ." (*Id.* at 2–3, ¶ 9); and

5) "[be] responsible for spare parts, including gaskets." (*Id.* at 3, ¶ 9.)

Plaintiff disputes none of this but points the Court to his testimony that it was his "understanding" that the wash-bay equipment was owned by Sasol. (Doc. 89 at 7 (citing Doc. 89-5 at 180–81).) In that same testimony, Plaintiff said that "they" told him that it belonged to Sasol. (*Id.*) Plaintiff had an opportunity to supplement the record in connection with his opposition to the present Motion and explain to the Court who "they" were and the basis for Plaintiff's

12

"understanding" that Sasol owned the equipment. He did not do so. This hearsay evidence cannot be considered by the Court.[8]

In addition, the Court earlier found that Sasol's long-term lease of the SIT yard and wash bay from KCS gave rise to a reasonable inference that the lease "included the *equipment* in the wash bay, including, in turn, the filter tank in question." (Doc. 60 at 9 (emphasis added).) But the evidence now shows that Savage owned the equipment and Sasol contracted only for the services to be rendered by Savage.

Nonetheless, Plaintiff asks the Court to conclude that there is still sufficient evidence in the record for the Court to find a question of fact as to whether that Sasol had custody or garde. The Court concludes that Sasol's additional evidence forecloses that possibility. In its earlier opinion, the Court concluded that " '[m]aking sure everything is operating as needs to be' certainly implies a right to direct or control, and it is the '*right* of direction and control' the thing in one's garde that gives rise to responsibility under [Article] 2317." (Doc. 60 at 11 (citations omitted).)

But Richard Lee's second Declaration combined with the attached contracts shows that Sasol's SIT Yard supervisor did not have the right to direct and control the method and manner work being done at the wash-bay. According to the Declaration, the supervisor's

> oversight [was] limited . . . to the results being obtained. . . . This operational focus was on Savage's of completion of rail car cleaning at the contractually agreed upon rate, and not on Savage's method and manner of obtaining those results. . . . Sasol's SIT yard supervisor was not tasked with inspecting or even observing the Savage wash bay following Savage's commencement of the work.

(Doc. 87-4 at 3, ¶ 10.)

---

[8] This Court has held that hearsay evidence may be considered in connection with a motion for summary judgment if it is "capable of being presented in a form that would be admissible in evidence [at trial]." *Barnett v. La. Dep't of Health*, No. 17-1793, 2023 WL 2467876, at *2 (M.D. La. Mar. 10, 2023) (deGravelles, J.) (internal quotations omitted) (quoting *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016); Fed. R. Civ. P. 56(c)(2)). However, this rule is inapplicable here because Plaintiff cannot or will not identify a witness who will testify as to these matters at trial.

13

As Sasol correctly notes, the mere presence of a Sasol supervisor in the SIT yard there for the limited purpose of ensuring the contractor's compliance with its broad contractual obligations does not give rise to Sasol's custody of the equipment being used by the contractor for purposes of Article 2317. *Coulter v. Texaco, Inc.*, 117 F.3d 909, 914 (5th Cir. 1997) ("the mere presence of Texaco company men who monitored Dual's performance of its contractual obligations" did not amount to custody or garde.) The case cited by Plaintiff is distinguishable. *Dobbs v. Gulf Oil Co.*, 759 F.2d 1213, 1218 (5th Cir. 1985) affirmed a jury finding that Gulf Oil Co. had Article 2317 custody of its contractor's equipment where the evidence showed that Gulf "had some responsibility for overseeing the safety of the operations and did consider itself responsible for correcting any unsafe conditions on the rig." That is not the case here.

In conclusion, summary judgment must be granted on this issue.

### B.  Prior Actual or Constructive Notice of Defective Filter Tank

To prove liability under Article 2317.1, Plaintiff must also show that Sasol "knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage . . . ." La. Civ. Code art. 2317.1. Sasol Plant Manager Richard Lee stated in his original declaration that Savage "made no reports to Sasol regarding any malfunctions or defects in the operation, inspections, or maintenance of the filter tank at the wash rack." (Doc. 51-4 at 2, ¶ 6.)

In his opposition to Sasol's earlier motion for summary judgment, Plaintiff attempted to counter this declaration by insisting that "Savage employees reported *to Sasol directly* any time there was a problem with the wash rack . . . ." (Doc. 53 at 15 (emphasis added) (citing Doc. 53-3 at 178–81, 246; Doc. 53-4 at 9–10, 31–32).) Plaintiff represented that "Savage had reported problems with this filter tank *to Sasol* previously." (*Id.* (emphasis added) (citing Doc. 53-3 at 178, 246).)

14

In its earlier ruling, the Court found that a close examination of Plaintiff's cited sources showed that these representations were incorrect. The Court noted that at page 166 of his deposition, Hardy testified that he had seen the tank leaking before the accident in question and Ed Lee, *Savage*'s General Manager, was told about it. (Docs. 53-3 and 89-5 at 168.) There was no indication that Lee or anyone else told anyone at Sasol about it. At page 241, Hardy testified that "*they* knew" the filter was leaking once a week and "they would change it." (Docs. 53-3 and 89-5 at 243 (emphasis added).) But Hardy explained who "*they*" were.

At pages nine through ten of Sasol's 30(b)(6) deposition, Richard Lee testified that Sasol's warehouse manager was told about Hardy's accident *after* it occurred. (Doc. 53-4 at 10–11.) The final bit of testimony to which Plaintiff directed the Court on this point was Sasol's 30(b)(6) deposition at page 31. (*Id*. at 32.) But nothing on that page addressed the subject of who at Sasol was told about the leaking filter tank gasket. Thus, the Court found that the record at that time was "devoid of any evidence that Sasol had prior *actual* knowledge of the leaking filter tank." (Doc. 60 at 12)

Nonetheless and undeterred, Plaintiff makes the same arguments and cites to the same sources in his current brief. (Doc. 89 at 14.)[9] But the result is the same. In addition, although Sasol's latest Motion gave Plaintiff an opportunity to submit an affidavit from Plaintiff explaining who "they" were, (i.e., who knew the filters was leaking and vowed to change them), Plaintiff did not do so.

The remaining question is whether record evidence at least raises a reasonable inference that Sasol had *constructive* knowledge, i.e., "in the exercise of reasonable care, *should* [Sasol] have known of the ruin, vice or defect . . . ." La. Civ. Code art. 2317.1 (emphasis added). Plaintiff argues

---

[9] It troubles the Court that counsel for Plaintiff repeats the same misrepresentations of the record made earlier without any effort to explain or justify doing so.

15

that "[i]n a plant with heavy equipment *in its custody*, Defendant should have been inspecting these tanks for defects." (Doc. 89 at 15 (emphasis added).) "[S]afety on Defendant's plant is Defendant's responsibility[,] and Defendant should be monitoring this type of equipment to ensure that regular maintenance has occurred." (*Id*.)

In reply, Sasol reiterates its earlier argument that it exercised no direction or control over operations or had knowledge of any issues with the instrumentalities involved in the incident and that "the wash bay area [was] under Savage's operation." (Doc. 89-6 at 39.)

Plaintiff's argument begs the question before the Court: did Sasol have custody of the filter tank? In its earlier ruling the Court wrote:

> Here, unlike in *Latimer*, there is evidence that Sasol had a representative who visited the SIT yard for the express purpose of "making sure that everything is operating as needs to be as far as operation." (Doc. 53-4 at 39-40.) Hardy testified that the filter tank not only leaked but leaked frequently. (Doc. 53-3 at 166 ("Well, it's leaking again. We got to shut it down. *** "[I]t was – it was leaking and that's when- that's when George said, 'I'm tired of doing this here. I ain't doing this no more.' ").) A reasonable inference to be drawn from this testimony is that Sasol's representative should have discovered that everything was not "operating as needs to be" and corrected the situation.

(Doc. 60 at 13.)

The Court's earlier ruling, based on the record as it then existed, was premised on evidence giving rise to the inference that the Sasol SIT yard supervisor had the authority and duty to be aware of defective equipment in the wash-bay. As explained above, Sasol's newly presented affidavit and attachments expand and clarify that the Sasol SIT yard supervisor's job focused on "Savage's completion of rail car cleaning at the contractually agreed upon rate, and not on Savage's method and manner of obtaining those results. . . . Sasol's SIT yard supervisor was not tasked with inspecting or even observing the Savage wash bay following Savage's commencement

16

of the work." (Doc. 87-4 at 3, ¶ 10 (Declaration of Richard Lee).) Nothing that Plaintiff has presented raises a question of fact in this regard.

## V. CONCLUSION

For the foregoing reasons, Sasol Chemical (USA) LLC's Motion and Notice Motion for Summary Judgment (Doc. 87) is **GRANTED**.

Signed in Baton Rouge, Louisiana, on May 31, 2024.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**